# EXHIBIT
# 2

**SECTION 1**
**PARTIES**

**101.** ___ THIS LEASE (this "Lease"), made and effective as of the 15th day of September, 2008 (but executed on September ___, 2009), by and between Kansas City Live Block 124 Retail, LLC, a Maryland limited liability company ("Landlord") and Kobe Kansas , LLC, a Missouri limited liability company ("Tenant").

**SECTION 2**
**TERMS, CONDITIONS AND DEFINITIONS**

**Explanatory Statement, effective as of the date of execution of this Lease as well as the effective date of this Lease and the dates of the Lease and Amendment referred to below:** Landlord and Kansas Kobe, Inc. entered into a Lease dated October 17, 2006, which was amended by Amendment dated September 15, 2008. The owners and promoters of Kansas Kobe, Inc. failed to incorporate the entity. Landlord and Tenant have agreed to enter into this Lease which incorporates the terms of the Lease and Amendment referred to above that were entered into by Landlord and Kansas Kobe, Inc., as well as agreeing to other matters pertaining to the Premises and the lease transactions. Landlord and Tenant (and the Guarantors join herein to agree to be bound by this Explanatory Statement) agree that the date of Notice of Possession for the Premises is September 9, 2008, and that Tenant's Fixturing Period began on September 9, 2008. Tenant specifically agrees and acknowledges that no representations as to parking were ever made by Landlord and that Tenant waives any potential claims as to parking. Tenant specifically agrees and acknowledges that Landlord has fully complied with all of its obligations of this Lease as well as the Lease as amended as set forth above, and that the delays in Tenant's opening are completely Tenant's responsibility. In addition to the mutual covenants set forth herein, additional consideration for the foregoing Explanatory Statement and agreements and representations therein as well as the agreement of the guarantors to join therein is that Landlord hereby agrees to waive its right to Rent and other sums due under this Lease as to fifteen (15) days of delay by Tenant in opening for business in a timely fashion as required under this Lease and the Lease as amended and referred to above.

**201(a). Premises:** Landlord leases to Tenant and Tenant leases from Landlord, for the Term (as defined) and upon the terms and conditions set forth in this Lease, the Premises as shown on Exhibit A, which for the purposes of this Lease shall be deemed to contain seven thousand five hundred fifty-two (7,552) square feet of gross leasable area in the project to be located in Block 124 in Kansas City, Missouri, which is the land and proposed buildings shown on the site plan attached as Exhibit A (collectively, the "Project "). The Project is located within a mixed use office/residential/retail/entertainment development to be known as Kansas City Power & Light District (or such other name as shall be used) ("Development"). Tenant acknowledges that the Project and the Development are in the planning process, and that in the course of planning, constructing, developing, redeveloping and leasing the Project and the Development, the Project and/or the Development may be changed and altered in whole or in part. As a consequence, the Project and the Development may be subject to such changes as Landlord shall determine in its sole and absolute discretion. Prior to the Rent Commencement Date, the Premises shall be subject to such changes as Landlord or Landlord's architect or engineer may determine, so long as no such change substantially alters the general appearance or relative location of the Premises in the Project and the amount of floor space in the Premises does not vary by more than fifteen percent (15%) from that set forth above.

**201(b). Term:** The Term of this Lease shall be for ten (10) Lease Years commencing on the Rent Commencement Date (as defined), unless sooner terminated pursuant to the provisions of this Lease. The last day of the Term may be extended by an Extended Term(s) in accordance with Section 602 of this Lease.

**201(c). Permitted Use:** The operation in a first-class manner of a KOBE Japanese Steakhouse restaurant (based on the latest KOBE Japanese Steakhouse prototype) serving high-end Japanese cuisine specializing in and featuring Kobe beef, all in accordance with the menu attached as Exhibit H and the operation of the KOBE Japanese Steakhouse restaurants at White Marsh, Maryland and Sterling, Virginia , and, incidental thereto, serving beverages including liquor, beer and wine as permitted and in accordance with law for on-premises consumption only, subject to Exhibit E, and for no other purpose.

**201(d). Minimum Rent:** For the first five Lease Years, $177,472 Annually and $14,789.33 Monthly, which Minimum Rent shall increase by twelve and one-half percent (12 1/2%), cumulatively, on the fifth anniversary of the Rent Commencement Date and every five years thereafter.

**201(e). Percentage Rent:** A sum equal to (i) six percent (6%) of Gross Sales (as defined) for each Lease Year less (ii) the Minimum Rent actually paid pursuant to this Lease for such period.

**201(f). Minimum Sales:** $2,291,250. *(See Section 712)*

**201(g). Security Deposit:** One month's Rent payable upon execution of this Lease (See Section 1201).

**201(h). Rental Deposit:** One month's Rent payable upon execution of this Lease, to be applied to the first installment(s) of Rent (See Section 1201).

**201 (i). Gross Sales City Payment.** A sum equal to one percent (1%) of Gross Sales (as defined) to the extent that such sales exceed Four Hundred Dollars ($400) per square foot of the gross leasable area of the Premises (as adjusted upwardly annually at a rate equal to increases in the Consumer Price Index ) and an additional one percent (1%) of Gross Sales to the extent that such sales exceed Four Hundred Eighty Dollars ($480) per square foot of gross leasable area of the Premises (as adjusted upwardly annually at a rate equal to increases in the Consumer Price Index), which amount shall be paid directly to the City of Kansas City, Missouri.

**201(j). Intentionally Deleted**

**201(k). Intentionally Deleted**

**201(l). Estimated Delivery Date:** March 15, 2007 (See Section 403)

**201(m). Fixturing Period:** One hundred fifty (150) calendar days after Notice of Possession (as defined in Section 316) (See Section 307).

**201(n).   Landlord's Agent**: Landlord will provide Tenant with the name and address in the Notice of Possession.

**201(o).   Tenant's Trade Name:** KOBE Japanese Steakhouse

**201(p).   Tenant's   Agent   For   Service   of   Process:** _____ _____ whose   address   is
_____

**201(q).   Minimum Store Hours:**
   Sunday through Thursday 11:00 a.m. to 10:00 p.m.
   Friday and Saturday 11:00 a.m. to 11 p.m.;
   or such other hours as may be required by Landlord from time to time.

**201(r).   Landlord's Address:**
   Kansas City Live Block 124 Retail, LLC
   c/o The Cordish Company
   601 E. Pratt Street, 6th Floor
   Baltimore, Maryland 20202
   410-752-5444

**201(s).   Tenant's Address:**

   c/o Ms. Jenny Shin
   5105-H Backlick Road
   Annandale, VA 22003

**201(t).   Intentionally Deleted.**

**201(u)   Tenant's Grand Opening Promotional Charge:** $1.00 per square foot of the Premises. (See Section 11)

**201(v).   Certificate of Occupancy**: Within ten (10) days after the date that Tenant opens for business in the Premises, Tenant shall provide Landlord with a copy of a Certificate of Occupancy and/or such other document as may be required by the applicable governmental agency in order for Tenant to operate in the Premises.

## EXHIBITS

Attached to this Lease and made a part hereof are the following exhibits:

| | |
|---|---|
| **EXHIBIT A:** | Site Plan and Premises |
| **EXHIBIT B:** | Agreement Specifying Term of Lease |
| **EXHIBIT C:** | Landlord's Work and Tenant's Work |
| **EXHIBIT D:** | Sign Criteria |
| **EXHIBIT E:** | Prohibited Uses |
| **EXHIBIT F:** | Rules and Regulations |
| **EXHIBIT G:** | Guaranty |
| **EXHIBIT H:** | Menu |

## SECTION 3
### IMPORTANT DATES AND ADDITIONAL DEFINITIONS

**301.   Additional Rent.** All payments of money from Tenant to Landlord or to the City of Kansas City, Missouri, and required to be paid under this Lease other than Minimum Rent and Percentage Rent. Unless otherwise provided for in this Lease, any Additional Rent shall be due with the next installment of Minimum Rent due.

**302.   Common Areas.** Means those areas, improvements and facilities within the Project which may from time to time be furnished, operated, or managed by Landlord, or by any designee of Landlord, for the nonexclusive general common use of tenants and other occupants of the Project, their officers, agents, employees and customers. Landlord may temporarily close portions of the Common Areas and may erect and operate stages and other facilities for special events and charge patrons for access to such events. Tenant hereby consents to such temporary closings and related activities.

**303.   Consumer Price Index.** The Consumer Price Index, which is presently announced monthly (or, if not announced monthly, as last announced or published) by the Bureau of Labor Statistics, U.S. Department of Labor, and which index is computed on a base period index of Nov. 1996 = 100. This index is the overall summary Consumer Price Index for all Urban Consumers (CPI-U) for the Kansas City, Missouri area (or closest area thereto which defines a CPI-U). In the event that the Bureau of Labor Statistics changes the base period index for its summary Consumer Price Index (now Nov. 1996 = 100), the parties agree to continue to use the Nov. 1996 = 100 base period index if the Bureau of Labor Statistics continues to announce a consumer price index based on the present base period index as well as a later base period index. In any event, the base used by any new index, or as revised on the existing index, shall be reconciled to the Nov. 1996 base period index. If the Bureau of Labor Statistics shall no longer publish the Consumer Price Index, Landlord shall then substitute another index generally recognized as authoritative. If and to the extent this Lease expressly provides that Rent, or any item constituting part of Rent, is to be adjusted for changes in the Consumer Price Index (any item subject to such adjustment being herein referred to as an "Adjustment Item") such adjustment shall be made as follows. The amount of the Adjustment Item shall be adjusted, as of the beginning of each year for which the adjustment is to be made ("Adjustment Year"), to equal the amount which is the greater of (a) the amount of such Adjustment Item for the year immediately preceding the Adjustment Year, or (b) the product obtained by multiplying (i) the amount of such Adjustment Item for the year immediately preceding the Adjustment Year by (ii) a fraction, the numerator of which is the Current Consumer Price Index and the denominator of which is the Prior Year Consumer Price Index. As used herein, (A) the term "Current Consumer Price Index" means the Consumer Price Index published for the calendar month immediately preceding the calendar month in which the subject Adjustment Year commences, and (B) the term "Prior Year Consumer Price Index" means the

Consumer Price Index published for the calendar month immediately preceding the calendar month in which the year immediately preceding the subject Adjustment Year commenced. In each case, if the Consumer Price Index is not published for any calendar month referred to above, then the Consumer Price Index published for the calendar month closest thereto shall apply.

**304.     Date of Lease.** The date set forth in Section 101 above. On such date, all rights and obligations of the parties under this Lease shall commence.

**305.     Day or day.** A calendar day, unless otherwise expressly set forth to the contrary in a particular provision of this Lease.

**306.     Expiration Date.** The last day of the Term.

**307.     Fixturing Period.** The number of days specified in Section 201(m) above, commencing with Notice of Possession, within which Tenant is obligated to build, fixture and equip the Premises in accordance with Tenant's Plans (See Section 1401) as approved in advance by Landlord.

**308.     Intentionally Deleted.**

**309.     Landlord Parties.** Landlord Parties mean Landlord, its agents, contractors and employees.

**310.     Laws.** All present and future federal, state and local common law, statutes, rules, codes, ordinances and regulations, and all directions, requirements, rulings and orders of all federal, state and local courts and other governmental (and quasi-governmental) agencies and authorities including, without limitation, those of any health officer, fire marshal, building inspector or other officials, of the governmental agencies having jurisdiction.

**311.     Lease Interest Rate.** An annual rate of interest equal to the lesser of (i) the maximum rate of interest permitted in the State of Missouri, or (ii) eighteen percent (18%). Interest shall be calculated on the basis of a 365-day year, actual days elapsed, from the date any cost or expense is incurred until the amount owing (including all interest owing thereon) is fully paid.

**312.     Lease Year.** The first Lease Year shall begin on the Rent Commencement Date and shall end twelve (12) full calendar months thereafter. Thereafter, each Lease Year shall commence on the day following the expiration of the preceding Lease Year and shall end at the expiration of twelve (12) calendar months thereafter or, if earlier, the Expiration Date.

**313.     Major Tenant.** A tenant or occupant with space within the Project which contains a gross leasable area of ten thousand (10,000) square feet or more.

**314.     Mortgage.** Any mortgage, deed of trust, security interest or title retention interest affecting the Project or any portion thereof.

**315.     Mortgagee.** The holder of any note or obligation secured by a Mortgage, including, without limitation, lessors under ground leases, sale-leaseback arrangements and lease-leaseback arrangements.

**316.     Notice of Possession.** The earlier of the date (a) of Landlord's notice to Tenant that Landlord has substantially completed the work expressly listed on Exhibit C as being performed by Landlord (if any) (the "Landlord's Work"), or (b) on which Landlord would have tendered possession of the Premises to Tenant with Landlord's Work substantially completed but for delays caused in whole or in part by Tenant, as such date is set forth in a notice from Landlord to Tenant, or (c) the date Tenant begins work in the Premises. On such date, the utilities shall become Tenant's sole responsibility, Tenant shall maintain the insurance described in Section 902(a) and Section 903, and the Fixturing Period (as defined in Section 201(m)) begins.

**317.     "Operating Year"** means each twelve (12) consecutive month period or portion thereof occurring during the Term, from time to time designated by Landlord with respect to which Landlord estimates bills to tenants and determines annual Common Area Maintenance Costs.

**318.     Person.** An individual, firm, partnership, limited partnership, association, corporation, limited liability company or any other entity.

**319.     Pro Rata Share.** Tenant's Pro Rata Share shall be a fraction, the numerator of which shall be the gross leasable area of the Premises as set forth in Section 201(a) and the denominator of which shall be the gross leasable area of retail, bar, club, restaurant or entertainment space in the Project that is occupied or producing rent for the entire Operating Year; provided, however, if any tenant of the Project (a) pays Taxes pursuant to a separate tax assessment of its premises, (b) maintains its own premises or parcel or (c) insures its own premises or building, the amount of such taxes, maintenance charges or insurance paid by such tenant shall be excluded from the calculation of Tenant's Pro Rata Share of Taxes, or Common Area Maintenance Costs or Insurance and such tenant's premises shall be deducted in computing the square feet of gross leasable area in the Project for purposes of computing Tenant's Pro Rata Share of such item. In addition to the foregoing, in the event that any Major Tenant does not pay its full Pro Rata Share of Taxes (as defined in Section 8), Insurance (as defined in Section 901) and/or the Project's Common Area Maintenance Costs (as defined in Section 10), the denominator (gross leasable area of the retail, bar, club, restaurant or entertainment space in the Project that is occupied or producing rent) for determining Tenant's Pro Rata Share of any such item for which such Major Tenant does not pay its full Pro Rata Share shall be reduced by the aggregate square footage of the premises of any such Major Tenant; provided that the actual payments by such Major Tenant toward Taxes, Insurance and Common Area Maintenance Costs shall reduce the aggregate Taxes, Insurance and Common Area Maintenance Costs for which Tenant is obligated to pay Tenant's Pro Rata Share. Space contained in any basement area or mezzanine area of the Project shall be included or not included in computing gross leasable area of the Project in Landlord's discretion from time to time.

**320.     Rent.** All amounts that Tenant is obligated to pay under this Lease, including, without limitation, Minimum Rent, Percentage Rent, Additional Rent, Monthly Tax Charges, Monthly Common Area Maintenance Charges, Grand Opening Promotional Charges, and Monthly Promotional Fund Charges.

**321.     Rent Commencement Date.** The next calendar day after the last day of the Fixturing Period or the date Tenant opens for business, whichever is earlier, shall be the commencement date of Tenant's obligations to pay Rent and submit statements of Gross Sales pursuant to Section 7 below. Notwithstanding any provision to the contrary contained in this Lease, Tenant agrees if requested by Landlord to delay the opening of the Premises for business in order to coincide with a Grand Opening Date of the Project ("Grand Opening"). In that event, Tenant's obligation to pay Rent shall begin on the Grand Opening Date.

322.   **Tax Year.** A twelve (12) month period established by Landlord as the year for purposes of computing Tenant's Pro Rata Share of Taxes. The Tax Year may or may not coincide with the period designated as the tax year by the taxing authorities having jurisdiction over the Project.

323.   **Tenant Parties.** Tenant Parties mean Tenant, its agents, contractors and employees.

324.   **"Grand Opening Date"** means the date and time designated from time to time by Landlord for the initial opening for business of the Project, if any.

**SECTION 4**
**POSSESSION**

401.   Subject to Landlord obtaining all building and other permits required under all Laws to perform Landlord's Work, Landlord shall complete Landlord's Work as set forth in Exhibit C ("Landlord's Work"). Except for completion of such Landlord Work, Tenant accepts the Premises in "as is" condition. Tenant expressly acknowledges that Landlord makes no representations or warranties regarding the suitability of the Premises for Tenant's business.

Within five (5) days after Notice of Possession, Landlord and Tenant shall jointly prepare and agree upon a punchlist (the "Punchlist") of incomplete elements of Landlord's Work, if any, and Landlord shall cause the incomplete work set forth on said Punchlist to be performed with due diligence. Any dispute as to whether an element of Landlord's Work is incomplete shall be resolved by Landlord's architect. Tenant's taking possession of the Premises shall be conclusive evidence against Tenant that the Premises were in satisfactory condition when Tenant took possession, subject only to completion of such Punchlist items. Landlord has no obligation to improve or repair the Premises or the Project except as expressly provided in this Lease.

402.   Upon the date of Notice of Possession from Landlord, Tenant shall with due diligence proceed to install such fixtures and equipment and to perform all other work as shall be required pursuant to Tenant's Plans (as defined in Section 1401 hereof), as approved in writing by Landlord, or otherwise necessary or appropriate in order to prepare and complete the Premises for the opening and continued operation of Tenant's business ("Tenant's Work"). If Tenant does not open the Premises for the conduct of its business by the expiration of the Fixturing Period then in order to compensate Landlord for its loss, Landlord, in addition to all other remedies it may have hereunder, shall have the option of (a) terminating this Lease by giving Tenant notice of such termination, whereupon this Lease shall terminate for all purposes and in all respects, or (b) collecting from Tenant an amount equal to all Minimum Rent plus Additional Rent due under this Lease, <u>plus</u> an additional amount (which shall constitute Additional Rent under this Lease) equal to $1,833 per day for each and every day from the Rent Commencement Date until the date Tenant opens for business from the Premises in accordance with the terms of this Lease. Such additional amount shall be deemed to be in lieu of any Percentage Rent that might have been earned during the period of Tenant's failure to open.

403.   If Tenant is unable to obtain possession of the Premises on or before the Estimated Delivery Date, Landlord shall not be liable for any loss, damage or cost resulting therefrom, and this Lease shall not be affected thereby in any way; provided, however, that if the Premises are not available for Tenant's possession by December 31, 2009, Landlord may terminate this Lease by giving Tenant written notice thereof at any time thereafter.

404.   Landlord covenants and agrees that so long as Tenant is in compliance with its obligations under this Lease, Tenant's peaceful and quiet possession of the Premises during the Term shall not be disturbed by Landlord or by anyone claiming by, through or under Landlord, subject, however, to the terms of this Lease.

**SECTION 5**
**USE**

501.   Tenant shall continually use and occupy the entire Premises at all times during the Term solely for the Permitted Use, only under the Tenant's Trade Name and only in accordance with the uses permitted under applicable zoning and other applicable governmental regulations and requirements and for no other purpose or under any other name, unless otherwise approved in advance in writing by Landlord, which consent may be withheld in Landlord's sole and absolute discretion. It is agreed that the Permitted Use specified in Section 201(c) has been, and is, a material inducement to Landlord entering into this Lease with Tenant, and that Landlord would not enter into this Lease without this inducement. Furthermore, and without limiting the generality of the preceding sentence, Tenant shall not use the Premises for any of the purposes prohibited in Exhibit E or any future use restriction that may exist in the Project of which Tenant has notice.

502.   Upon the Rent Commencement Date and at all times thereafter during the Term, Tenant shall continuously and uninterruptedly operate its business from the entire Premises for the Permitted Use, in good faith, fully staffed and merchandised so as to maximize its sales volume during all hours of operation, as may be set from time to time by Landlord, and shall remain open for business at least during the Minimum Store Hours set forth in Section 201(q). Tenant shall conduct no distress sales, such as "going-out-of-business", "lost-our-lease", fire or bankruptcy sales on the Premises or elsewhere in the Project. Tenant expressly acknowledges that the failure of Tenant to operate the Premises in accordance with this Section 502 shall constitute an Event of Default under this Lease giving rise to all remedies provided in this Lease and/or available at law or in equity to Landlord, and Landlord shall be entitled, among its other remedies, to enjoin the removal from, or discontinuance of Tenant's business at the Premises by seeking injunctive relief or other appropriate remedy. Landlord recognizes that the Premises may be closed during certain business hours on a very infrequent and incidental basis for necessary repairs due to casualty or condemnation, and, provided such closings are reasonable in nature and duration, then the same shall not be considered a default under the Lease. Tenant may close New Year's day, Christmas Eve and day, and Thanksgiving day.  Tenant may close for up to thirty (30) consecutive days every five (5) years for Landlord approved remodeling.

503.   Without in any way limiting the foregoing, Tenant agrees to operate the Premises in a manner consistent with a first - class urban retail/entertainment project, and to obtain all applicable licenses and permits for the operation of its business. Tenant covenants and agrees that it will: (a) not place or maintain any merchandise, hostess or maitre'de stands in any vestibule or entry of the Premises or outside the Premises; (b) replace promptly any cracked or broken glass with glass of like kind and quality; (c) not permit any sound or sound system audible, or objectionable advertising medium visible, outside the Premises and, without limiting the generality of the foregoing, not permit any loudspeakers, phonographs, public address systems, sound amplifiers, radio or broadcast to operate in a manner that any sounds reproduced, transmitted, or produced shall be directed beyond the Premises in a manner that may disturb others as determined by Landlord in its sole discretion nor permit vibration and/or noise from mechanical apparatus to be transmitted beyond the interior of the Premises in a manner that may disturb others as determined by

Landlord in its sole discretion; (d) keep all hoods and equipment in good working order and condition; (e) not commit or permit waste or a nuisance upon the Premises; (f) not permit or cause objectionable odors to emanate or be dispelled from the Premises; (g) not solicit business in the Common Areas nor distribute advertising matter to, in or upon any Common Area; (h) cause its vendors and suppliers making deliveries to the Premises not to load or unload or park delivery vehicles making deliveries to Tenant outside any area designated by Landlord therefor; (i) not permit any use of vehicles which will interfere with the use of any Common Area; (j) comply with all Laws, ordinances, rules and regulations of governmental, public, private and other authorities and agencies, as well as comply, at Tenant's expense, with the reasonable recommendations of Landlord's insurance company and insurance agent regarding the Premises; (k) light the show windows of the Premises each day from dusk to dawn; (l) have the storefront sign remain lit from dusk to dawn every day; (m) not permit any noxious, toxic or corrosive fuel or gas, dust, dirt or fly ash on the Premises; (n) not place a load on any floor in the Project which exceeds the floor load per square foot which such floor was designed to carry; (o) receive all deliveries only through entrances designated by Landlord therefor; (p) not permit undue accumulations of garbage, trash, rubbish, or any other refuse, fail to remove the same at regular intervals, fail to keep such refuse in proper containers as designated by Landlord; (q) keep the Premises free of rodents, roaches, or other pests; (r) not use or permit any use to be made of the Premises that constitutes a nuisance; and (vi) not commit waste, or knowingly permit any party to commit waste, upon the Premises. Tenant shall not use, suffer or permit the Premises or any part thereof or any portion of the property of which the Premises are a part to be used in violation of any Laws, ordinance or regulation of any governmental authority or in any manner that will constitute a nuisance or an unreasonable annoyance to the Project, any other tenant, or to any of the Project's customers, guests and other users, or to any adjoining property owners.

504.     Tenant shall not play or present any music within the Premises that is likely to have a detrimental affect on the Project, that is likely to create a perception that the Project is not safe for families and the general public, or that it is likely to attract organized "gangs", as determined by Landlord in its sole discretion. Tenant shall not play or present any music within the Premises that can be heard outside the Premises. Tenant shall immediately comply with Landlord's written directions concerning any music presented within the Premises. Thus if Landlord instructs Tenant to reduce the volume of the music played or presented within the Premises or cease playing or presenting a particular type of music within the Premises, Tenant shall immediately comply with such instructions.

505.     Tenant acknowledges that Landlord, or an affiliate of Landlord, may, in Landlord's sole and absolute discretion, obtain a license for the Project (the "**Overlay License**"), which, among other things and under certain circumstances, may permit patrons of the Project to have in hand an alcoholic beverage while in the common facilities of the Project.  If Landlord or an affiliate of Landlord has obtained the Overlay License, it shall have the right at any time and in its sole and absolute discretion to surrender, not retain or not renew the Overlay License.  The Overlay License does not grant to any tenant of the Project the right to sell alcoholic beverages. Tenant, at its own expense, shall conform its operations in every respect to the terms of the Overlay License and any amendments, modifications or renewals thereof and to all applicable laws, ordinances, rules and regulations now in force or that are hereafter enacted or adopted, and Tenant shall not use, suffer or permit the Premises or any portion thereof, to be used in any manner that is likely to jeopardize or threaten the granting or viability of the Overlay License.

If Tenant is specifically permitted pursuant to the terms of this Lease to sell alcoholic beverages, it must, at its sole cost and expense, and as a condition of selling alcoholic beverages, obtain the required governmental approval as evidenced by a license or permit to sell alcoholic beverages (the "**Liquor License**").  Tenant, at its own expense, shall comply with all the terms of the Liquor License, applicable law, the rules and regulations promulgated by any alcoholic beverage control board and by Landlord, which rules and regulations as promulgated by the Landlord may also concern the manner in which alcohol is sold and served within the Premises, including but not limited to pricing, promotions or "giveaways". Under no circumstances shall Tenant sell package goods (i.e., alcoholic beverages in unopened or sealed containers) on or from the Premises.  Under no circumstances shall Tenant permit alcoholic beverages sold on or from the Premises to be taken outside of the Premises, without Landlord's prior written consent, which may be withheld in Landlord's sole discretion.  If Landlord grants such consent, Tenant shall comply with all rules and regulations promulgated by Landlord related thereto, and all applicable laws, including the requirement that only plastic cups with Tenant's trademark, trade name, logo, or other identifying markings unique to Tenant shall be permitted outside of the Premises. Such consent may be revoked by Landlord at any time at Landlord's sole and arbitrary discretion. In addition to the insurance required in this Lease, Tenant also shall take out and keep in force at its expense a liquor law liability insurance policy with limits, for each occurrence, of not less than Three Million and 00/100 Dollars ($3,000,000.00) (increased from time to time as required by Landlord), pursuant to which Landlord, Landlord's designated affiliate and any mortgagee of Landlord shall be named as an additional insured.  Tenant hereby indemnifies Landlord and shall hold Landlord harmless from and against any action or inaction on the part of Tenant, its principals, employees, patrons or agents that violate the terms of the Overlay License or any Laws now in force or hereafter enacted pertaining thereto or the provisions of this Section.

506.   Intentionally deleted.

**SECTION 6**
**TERM**

601.     The Term of this Lease shall commence on the Rent Commencement Date and shall end at midnight on the Expiration Date without the necessity of any notice from either party to the other to terminate the same.  Tenant hereby waives notice to vacate the Premises and agrees that Landlord shall be entitled to the benefit of all provisions of law respecting summary recovery of possession from a tenant holding over to the same extent as if any statutory notice had been given. Tenant's obligations with respect to the payment of Rent and all other obligations of Tenant hereunder shall survive the expiration or earlier termination of this Lease.  If requested by Landlord, Tenant shall execute, within thirty (30) days the Rent Commencement Date, an agreement, substantially in the form attached hereto as Exhibit B (the "Agreement Specifying Term of Lease"), confirming the Rent Commencement Date and stating, among other things, that this Lease is in full force and effect.  If Tenant shall fail to execute the Agreement Specifying Term of Lease within ten (10) days after receipt of such agreement from Landlord, the Rent Commencement Date and Expiration Date shall be conclusively deemed to be those dates as set forth by Landlord in such agreement. Tenant hereby constitutes and appoints Landlord its true and lawful attorney-in-fact in Tenant's name (which power of attorney shall be deemed irrevocable and a power coupled with an interest) to execute such agreement if Tenant shall fail to do so within such ten (10)-day period.

602.     Provided (1) Tenant is not in default beyond any and all applicable cure periods, of any term or provision of this Lease; (2) this Lease is in full force and effect, and (3) Tenant is not subject to any insolvency or bankruptcy proceedings, then Tenant shall have the option to extend the term of this Lease for two (2) additional periods of five (5) Lease Years each, commencing on the first day following the last day of the initial Term of this Lease, or on the first day following the last day of the first extension period, as applicable, on the same terms and conditions as contained in this Lease.  Tenant's option to extend the Term of this Lease, as above provided, shall be subject to the conditions precedent that (i) Tenant shall give Landlord written notice of Tenant's exercise of the above option(s) to extend no earlier than fifteen(15) months prior to the end of the original Term, or the applicable extension

period, and no later than twelve (12) months prior to the expiration of the original Term, or the applicable extension period, and (ii) all charges, including Minimum Rent, which shall continue to escalate pursuant to the provisions of Section 201(d), shall continue to be paid as if such extension period(s) were a part of the original Term of this Lease. Following the expiration of the second extension period, Tenant shall have no further right to renew or extend the Lease pursuant to this Section.

**SECTION 7**
**RENT**

**701.**    Tenant shall pay to Landlord the Minimum Rent in the sums set forth in Section 201(d) above and the Monthly Tax Charge, Monthly Common Area Maintenance Charge, Monthly Promotional Charge and any other monthly charges under this Lease in advance on the first day of each calendar month during the Term, without offset, notice, deduction, recoupment, setoff or demand therefor. Rent shall commence to accrue on the Rent Commencement Date. The first full monthly payment of Rent shall be paid as the Rental Deposit upon execution of this Lease. The next payment of Rent shall be due on the Rent Commencement Date equal to a pro-rated amount of the Minimum Rent and Additional Rent applicable to the period from the Rent Commencement Date to the last day of the month in which the Rent Commencement Date occurred (and if the Rent Commencement Date is the first day of a calendar month, the payment of Rent on the Rent Commencement Date shall be that for a full calendar month). For the full calendar year, Lease Year or Tax Year, in which this Lease commences and terminates, Tenant's liability for Tenant's Pro° Rata Share of Taxes, Insurance, Common Area Maintenance Charges, Promotional Fund Charge and any other charges shall be subject to a pro rata adjustment based on the number of days of said calendar year, Lease Year or Tax Year, as applicable, during which the Term of this Lease is in effect.

**702.**    For each Lease Year or portion thereof during the Term, Tenant shall pay Percentage Rent in the amount calculated in accordance with Section 201(e) above, which shall be in addition to Minimum Rent and Additional Rent.  For purposes of Percentage Rent and the Gross Sales City Payment only, and notwithstanding anything herein to the contrary, Lease Year shall mean calendar year (with the Breakpoint as to Percentage Rent if the Breakpoint is a fixed sum prorated in partial years and thresholds as to the Gross Sales City Payment prorated in partial years).  There shall be no abatement, apportionment or suspension of the Percentage Rent payable hereunder except as provided for herein. Commencing with the first (1st) Lease Year of the Term, and continuing throughout the remainder of the Term, the amount of Percentage Rent due under this Lease shall be calculated and shall be payable on or before the thirtieth (30th) day after the end of each Lease Year or portion thereof. The first (1st) payment of Percentage Rent due hereunder shall include all Gross Sales (as defined below) from the Rent Commencement Date to the close of the first Lease Year following the Rent Commencement Date.  Notwithstanding anything herein contained to the contrary, payment of Percentage Rent shall be made by Tenant to Landlord on a monthly basis in each Lease Year as soon as Tenant's Gross Sales for said Lease Year (computed from the beginning thereof) have reached the volume of Gross Sales at which Tenant is required to pay Percentage Rent for such Lease Year.

**703.**    Percentage Rent shall be determined (as provided in Section 201(e) above) based on "Gross Sales" which, as such term is used herein, shall be construed to include the entire amount of the actual receipts, whether for cash or otherwise, of all sales of merchandise, food, drink, admission charges, other charges, service or any other receipt whatsoever of all business conducted at, in, from, about, or upon the Premises, including, but not limited to, catering orders, mail orders, telephone orders, Internet orders and/or other orders in whatever manner received, placed or filled, whether in whole or in part, at the Premises, and including all deposits not refunded to purchasers, orders taken (although said orders may be filled elsewhere), sales to employees, sales through vending machines or other devices, and sales by any subtenant, concessionaire or licensee or otherwise at, in, from, about, or upon the Premises, provided that nothing herein shall (a) prevent Landlord from requiring an additional or different Percentage Rent as a condition to approval of any subtenant, concessionaire or licensee hereunder, (b) permit Tenant to sublet the Premises or grant any license or concession except as expressly permitted pursuant to the terms of Section 23 hereof, or (c) permit Tenant to operate any use other than expressly set forth in Section 201(c). No deduction shall be allowed for (i) uncollected or uncollectible accounts, (ii) any income or similar tax based on income, (iii) any gross receipts tax, or (iv) any cash or credit refund given for any sale made via the Internet and not originating with an Internet order placed in the Premises.  Each sale upon installments or credit shall be treated as a sale for the full price in the month during which such sale is made, irrespective of the time when Tenant shall receive payment therefor. Gross Sales shall not include any (i) sales tax, use tax, or any other tax separately collected by Tenant and paid to any duly constituted governmental authority, (ii) the exchange of merchandise between the stores of Tenant, if any, where such exchange of goods or merchandise are made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which had theretofore been made at, in, from, about or upon the Premises and/or for the purpose of depriving Landlord of the benefit of a sale which otherwise would be made at, in, from, about or upon the Premises, (iii) the amount of returns to shippers or manufacturers, (iv) the actual net amount of refunds, credits or allowances made or allowed by Tenant in accordance with reasonable business practices upon transactions included within Gross Sales (not exceeding in amount the selling price of the item in question) where the item is returned by the purchaser to and accepted by Tenant (provided that anything given in exchange for returned items and any such credits to customers shall be included in Gross Sales); and (v) sales of Tenant's store fixtures which are not a part of Tenant's stock in trade and which Tenant has a right to remove from the Premises.

Tenant's right not to include the items set forth (in Sections i through vi) above in Gross Sales shall be subject to the condition that Tenant shall furnish to Landlord together with Tenant's annual statement of Gross Sales an itemization by category of the total amount not included within Gross Sales. Tenant shall maintain itemized records in accordance with sound accounting principles in connection with each category as permitted hereunder.

**704.**    During the Term, neither Tenant nor Tenant's management, nor any person or entity controlled by Tenant or controlling Tenant, or controlled by the same person or entity or persons or entities who control Tenant, shall own, operate or maintain, or have any significant affiliation, investment or interest, directly or indirectly, through or with any other person, partnership, corporation, other entity, agent or employee in any similar or competing business as that being operated at the Premises, within a radius of ten (10) miles from the outside boundary of the Project (which distance shall be measured in a straight line without reference to road mileage).  Tenant acknowledges that Landlord's obtaining a fair and equitable rental for the Premises under this Lease is dependent upon Tenant concentrating its business efforts within the geographical area in which the Project is located so as to maximize Gross Sales.  Tenant further acknowledges that any activity by Tenant within such geographical area in operating or participating in the operation of a similar or competing business shall necessarily have an adverse effect on the volume of Gross Sales by Tenant at the Premises to the detriment of Landlord and will deprive Landlord of the fair rental to which the parties have agreed.  Accordingly, if during the Term there is a breach of the covenant set forth in the first sentence of this Section 704, then gross receipts of any such other place of business (using the definition of Gross Sales set forth herein as if such definition referred to such other place of business) shall be added to the Gross Sales made from the Premises to determine the Percentage Rent due under this Lease, as fully as though the gross receipts from such other business had actually been made from the Premises. In such event, all of the provisions of this Section 7 shall be applicable to the gross receipts of, and all the books and records pertaining to, such competing store(s). In lieu of adding the gross receipts of such other business to Gross Sales, Landlord shall

have the right, in its sole discretion, to increase the Minimum Rent for the balance of the Term, by an amount equal to Three Dollars ($3.00) per square foot per Lease Year, pro-rated on a monthly basis for so long as such default continues, which additional amount shall be deemed to be liquidated damages for Tenant's breach of this provision (and not a penalty) ("Increased Minimum Rent"). During the period Increased Minimum Rent is in effect, Tenant's gross receipts from the other business shall not be used in computing Percentage Rent.

705.     Within ten (10) days after the end of each calendar month during the Term, Tenant shall submit to Landlord a complete written statement showing the amount of Gross Sales from the Premises (and from such other business as may be required pursuant to Section 704 above) during said calendar month.  If Tenant fails to timely deliver the statements required by this Section 705, Tenant shall pay to Landlord a late charge in accordance with Section 2610 below.

706.     Within forty-five (45) days after the expiration of each Lease Year, Tenant shall deliver to Landlord a written statement certified without material qualification by the independent certified public accountant regularly retained by Tenant, or such other firm or accountant as may be approved in advance in writing by Landlord, setting forth the amount of Tenant's Gross Sales for such Lease Year. All such statements of Gross Sales shall list as separate amounts (a) Gross Sales upon which Percentage Rent shall be computed and (b) other categories of receipts not subject to Percentage Rent.  If the accountant's certification does not verify the amount of Gross Sales for any Lease Year, Tenant shall deliver to Landlord, together with the conflicting accountant's certification, a written statement by the accountant who prepared such certification explaining the discrepancy. If Tenant has previously paid any Percentage Rent and the statement submitted pursuant to this Section 706 indicates total Gross Sales for the Lease Year differing from the amounts reported on the monthly statements submitted for such Lease Year, the amount of Percentage Rent shall be adjusted, and if (a) the Percentage Rent paid is less than what is owed, than the difference, shall be paid by Tenant to Landlord within fifteen (15) days after delivery of such statement by Tenant to Landlord, or (b) the Percentage Rent paid is greater than what is owed to Landlord, then Landlord shall  credit such overpayment against the next amounts of Percentage Rent due under this Lease.  Tenant shall require its subtenants, if any, to furnish similar monthly and annual statements to Tenant within the same periods specified in Sections 705 and 706.  For the last Lease Year, the statements of Gross Sales shall end with the expiration or termination of this Lease.  If Tenant fails to timely deliver the reports required by this Section 706, in addition to any other remedies available to Landlord, Tenant shall pay Landlord a late charge in accordance with Section 2610 below.

707.     Tenant shall record at the time of each sale or other transaction, in the presence of the customer, all receipts from all Gross Sales or other transactions whether for cash, debit or credit in a cash register or in cash registers sealed in a manner approved by Landlord and having such other features as shall be approved in advance in writing by Landlord.  Tenant shall keep on the Premises for three (3) years following the end of each Lease Year adequate records in keeping with GAAP evidencing inventories and receipts of merchandise at the Premises, the gross income, sales and tax returns with respect to such Lease Years at or from the Premises and all pertinent original sales records, which shall include: (a) cash register tapes, including tapes from temporary registers; (b) serially numbered sales slips; (c) the originals of all mail orders at and to the Premises; (d) the original records of all telephone orders at and to the Premises; (e) settlement report sheets of transactions with subtenants, concessionaires and licensees; (f) the original records showing that merchandise returned by customers was purchased at the Premises by such customers; (g) memorandum receipts or other records of merchandise taken out on approval; (h) such other sales records, if any, which would normally be examined by an independent accountant pursuant to accepted auditing standards in performing an audit of Tenant's sales and (i) the records specified in (a) through (h) above of any other persons conducting business upon or from the Premises, including without limitation, subtenants, assignees, concessionaires, or licensees.  Landlord and Landlord's authorized representatives shall have the right to examine the foregoing records during reasonable business hours.

708.     Landlord shall have the right to have an audit made of Tenant's books and records pertaining to all Gross Sales. Tenant shall promptly pay Landlord any deficiency found in Tenant's payment of Percentage Rent. If any statement required by Section 704, 705, 706 or 707 above is found to differ from the audited amount, Tenant shall also pay for any and all costs and fees of such audit within fifteen (15) days after notice from Landlord.

709.     If Landlord is unable to conduct a proper examination and/or audit pursuant to Section 708 above due to Tenant's failure or inability to produce adequate records, the parties agree that Landlord shall have been deprived of an important right under this Lease and, as a result thereof, will suffer damages in an amount which is not readily ascertainable; therefore, in addition to, and not in lieu of, any other remedies which Landlord has under this Lease, at law or in equity, Landlord shall have the right, at its option, to collect, as liquidated damages (and not as a penalty), in addition to all Rent payable hereunder, an amount equal to twenty percent (20%) of the greater of (i) Percentage Rent reported for the period or periods in question or (ii) the Minimum Rent payable for the period or periods in question.

710.     Any payments of Rent or other charges by Tenant or acceptance by Landlord of a lesser amount than shall be due from Tenant to Landlord shall be treated as a payment on account.  The acceptance by Landlord of a payment for a lesser amount with an endorsement or statement thereon, or upon any letter accompanying such payment, that such lesser amount is payment in full, shall be given no effect, and Landlord may accept such payment without prejudice to any rights or remedies which Landlord may have.

711.     If Landlord does not receive any payment of Rent due under this Lease within five (5) days after the payment is due, then Tenant shall pay to Landlord, upon demand, a late charge in accordance with Section 2605 below. The provisions of this Section 7 are cumulative and shall in no way restrict the other remedies available to Landlord in the event of Tenant's default under this Lease.

712.     Notwithstanding anything to the contrary in this Lease, in the event that the Gross Sales for any Lease Year following the first Lease Year are less than the Minimum Sales amount, Landlord shall have the option to terminate this Lease by giving Tenant notice of such termination within six (6) months after Landlord's receipt of Tenant's annual Gross Sales report for the applicable Lease Year, as required under Section 706.  Such termination notice shall be conclusive and the termination of this Lease will be effective thirty (30) days after Landlord's notice to Tenant.

713.     Upon request of Landlord, Tenant shall furnish to Landlord and/or such others as Landlord shall request such information and documentation as shall be reasonably required in connection with tax increment (or similar) financing in connection with the Project or the Development,  and shall otherwise cooperate with Landlord, the City of Kansas City, Missouri, the Tax Increment Financing Commission of Kansas City, Missouri, the State of Missouri, and any related authority, commission or agency involved with the Project or any other portion of the Development .  Upon request of Landlord and/or the Downtown Economic Stimulus Authority of Kansas City, Missouri ("DESA"), Tenant shall provide to Landlord and DESA such periodic written reports with supporting documentation as are reasonably necessary as determined by Landlord and/or DESA to determine the amount of "Other Net New Revenues" as defined in Missouri statutes and City of Kansas City, Missouri ordinances applicable to economic

development ("Development Laws")and otherwise comply with Development Laws and related statutes, ordinances and directives and assess the impact of the Project.

**714.** (a) Instead of requiring Tenant to pay Rent, Additional Rent, or other charges in a manner pursuant to Sections 7 – 12, 17, 26, or elsewhere in this Lease, Landlord may, at its sole option, upon not less than ten (10) days' prior notice to Tenant, require Tenant to promptly execute and deliver to Landlord any documents, instruments, authorizations, or certificates required by Landlord to give effect to an automated debiting system, whereby any or all payments by Tenant (as designated from time to time by Landlord) of whatsoever nature required or contemplated by this Lease shall be debited monthly or from time to time, as determined by Landlord, from Tenant's account in a bank or financial institution designated by Tenant and credited to Landlord's bank account as Landlord shall designate from time to time.

(b) Tenant shall promptly pay all service fees and other charges connected therewith, including, without limitation, any charges resulting from insufficient funds in Tenant's bank account or any charges imposed on the Landlord.

(c) In the event that Tenant elects to designate a different bank or financial institution from which any Rent, Additional Rent, or other charges under the Lease are automatically debited, notification of such change and the required documents, instruments, authorizations, and certificates specified in Paragraph (a) must be received by Landlord no later than thirty (30) days prior to the date such change is to become effective.

(d) Tenant agrees that it shall remain responsible to Landlord for all payments of Rent, Additional Rent, and other charges pursuant to the Lease, even if Tenant's bank account is incorrectly debited in any given month. Such Rent, Additional Rent, and other charges shall be immediately payable to Landlord upon written demand.

(e) Tenant's failure to properly designate a bank or financial institution or to promptly provide appropriate information in accordance with this Section 714, shall constitute an Event of Default.

**715.** For each Lease Year or portion thereof during the Term, Tenant shall pay to the City of Kansas City, Missouri, the Gross Sales City Payment in the amount calculated in accordance with Section 201(i) above, which shall be in addition to Minimum Rent and Additional Rent. Upon payment of the Gross Sales City Payment to the City, Tenant shall provide a copy to Landlord of all correspondence, including a copy of the check evidencing such payment. For purposes of Gross Sales City Payment and notwithstanding anything herein to the contrary, Lease Year shall mean calendar year. There shall be no abatement, apportionment or suspension of the Gross Sales City Payment payable hereunder except as provided for herein. Commencing with the first (1st) Lease Year of the Term, and continuing throughout the remainder of the Term, the amount of the Gross Sales City Payment due under this Lease shall be calculated and shall be payable on or before the thirtieth (30th) day after the end of each Lease Year or portion thereof. The first (1st) payment of Gross Sales City Payment due hereunder shall include all Gross Sales (as defined above) from the Rent Commencement Date to the close of the first Lease Year following the Rent Commencement Date. Notwithstanding anything herein contained to the contrary, payment of the Gross Sales City Payment shall be made by Tenant [on a monthly basis] in each Lease Year as soon as Tenant's Gross Sales for said Lease Year (computed from the beginning thereof) have reached the volume of Gross Sales at which Tenant is required to pay the Gross Sales City Payment for such Lease Year. The City of Kansas City, Missouri (the "City") shall be deemed a third party beneficiary of Tenant's obligation hereunder to pay the Gross Sales City Payment (provided, however, that in the event of a failure by the Tenant to pay the Gross Sales City Payment the City shall pursue its rights and remedies at law and in equity but shall not be entitled to exercise the remedies granted to Landlord under this Lease).

**SECTION 8**
**TAXES**

**801.** Tenant shall pay to Landlord, as Additional Rent, Tenant's Pro Rata Share of all impositions of every kind and nature imposed by any federal, state, regional, municipal, local or other governmental authority or agency in connection with the ownership, operation or use of all or any portion of the Project or, in the event that the Premises shall be deemed exempt from payment of real estate taxes, Tenant shall pay Tenant's Pro Rata Share of any payment in lieu of taxes ("PILOTS") relating to the Project of which the Premises are a part (all of the foregoing collectively referred to herein as "Taxes"). Taxes shall include, but not be limited to, ad valorem taxes, sewer taxes, front-foot benefit charges (public or private), school taxes, special assessments, assessments of the downtown Community Improvement District or the like, supplemental taxes and assessments payable in connection with any transfer of ownership, rental occupancy taxes, gross receipt taxes, other taxes levied directly upon the Project and/or any land associated with the Project, PILOTS and any other taxes or PILOTS, assessments or charges in the manner of taxes, or contained on any tax bill, which Landlord shall be obligated to pay arising out of the use, occupancy, ownership, leasing, management, repair or replacement of the Project, any appurtenances thereto or any property, fixtures or equipment thereon, and shall also include the cost to review, initiate and/or prosecute the appeal or contest of any such Taxes. Taxes shall not include any taxes assessed against any leasehold interest or personal property of any kind owned or placed in, upon or about the Premises by Tenant (which taxes Tenant shall pay as and when the same become due) nor net income taxes assessed against Landlord. If Taxes applicable to the Project include Taxes on non-commercial space, Landlord shall allocate Taxes and Tenant's Pro Rata Share of Taxes so that Tenant's Pro Rata Share of Taxes is based only on the commercial space and Tenant shall pay based on such allocation.

**802.** Tenant shall pay Tenant's Pro Rata Share of Taxes to Landlord in the form of a Monthly Tax Charge, at the same time as Minimum Rent is payable hereunder. The Monthly Tax Charge shall be the initial charge payable by Tenant for Taxes, and Landlord shall advise Tenant of the amount of the Monthly Tax Charge prior to the Rent Commencement Date, provided, however, the failure of Landlord to advise Tenant of the amount of the Monthly Tax Charge prior to the Rent Commencement Date shall not relieve Tenant of its obligations hereunder. Following receipt of all tax bills and assessment bills attributable to any calendar or fiscal year during the Term hereof, Landlord shall furnish Tenant with a written statement of the actual amount of Tenant's Pro Rata Share of Taxes for such year. If the total amount paid by Tenant is different than the actual amount owed, there shall be an appropriate adjustment, with payment being made by the applicable party to the other within fifteen (15) days after the rendering of the statement. Landlord may provide any refund in the form of a credit against the next installment or installments of Rent due from Tenant to Landlord hereunder. If at any time the Taxes increase, Landlord may increase the Monthly Tax Charge accordingly to reflect Tenant's Pro Rata Share of such increase. Landlord's agreement to provide a statement as provided for in this Section is not a condition to the Tenant's obligation to make payment of the Tenant's Pro Rata Share of Taxes.

**803.** TIF Requirements.

(a) The real property on which the Project and the Tenant's Premises are or will be constructed is in the

Redevelopment Area, as defined in the South Loop Tax Increment Financing Plan, Kansas City, Missouri, dated January 14, 2004. Upon the establishment of tax increment (or similar) financing by the City of Kansas City, Missouri, the State of Missouri (or a constituent statutory agency utilized by the City of Kansas City, Missouri (hereinafter, the "Authority")) pursuant to ordinance or contract for the Project or the Development, this Lease is or shall be subject in all respects to any tax increment financing contract relating to the Project and the Premises, the related redevelopment plan and the ordinance establishing the foregoing, and the rights of the City of Kansas City, Missouri and the Tax Increment Financing Commission of Kansas City, Missouri (the "Commission") pursuant to any tax increment financing contract, redevelopment agreement and such ordinance.

(b)     Tenant acknowledges that the Premises are or will be located in a tax increment financing district (the "TIF District"). Tenant shall forward to the City of Kansas City, Missouri (the "City") copies of Tenant's State of Missouri sales tax returns for its property located in the TIF District when and as they are filed with the Missouri Department of Revenue, and, upon request, shall provide such other reports and returns regarding other local taxes generated by Tenant's economic activities in the TIF District and/or the City, as the City shall require, all in the format prescribed by them.

(c)     Tenant and Landlord shall provide at least five (5) days prior to the execution of this Lease (or at other times required by Landlord) any certification to the City that this Lease includes provisions required under any tax increment financing contract related to the Premises in satisfaction of Landlord's obligation set forth thereunder.

(d)     Tenant acknowledges that the Project and the Premises are or may be subject to assessment for annual PILOTS, economic activity taxes, and other obligations, covenants, conditions, restrictions and approval rights as are or will be more fully set forth in the tax increment financing contract relating to the Project, and any related ordinance as well as in the Real Property Tax Increment Allocation Development Act, Mo. Rev. Stat. §§ 99.800 et seq. (the "Act"). Tenant hereby agrees to furnish to the City, the State of Missouri, the Commission or any Authority such documentation as is reasonably required by the City, the State of Missouri or such Authority, or the Commission's Economic Activity Tax Policy and Procedures ("EATS Documentation") that are consistent with the City Charter and Code of Ordinances and Commission requirements. Tenant shall also provide all information as may be requested by the City regarding PILOTS made in connection with the development of the Premises.

**SECTION 9**
**INSURANCE**

901.     Landlord shall provide fire, casualty, liability, umbrella and/or such other insurance coverages ("Insurance") as Landlord, in its sole discretion, deems appropriate for the Project. Landlord's cost for such insurance, and any deductible incurred by Landlord, shall be included as part of the Project's Common Area Maintenance Costs for which Tenant is obligated to pay its Pro Rata Share or other amounts pursuant to Section 10.

902.     (a) During the period commencing on Notice of Possession and ending on the Rent Commencement Date, Tenant shall, at its sole cost and expense, maintain commercial property insurance (Builders' Risk coverage) and plate glass insurance for the full replacement cost of repairing and/or restoring all of the plate glass in or at the Premises.

(b) Tenant shall be responsible for maintaining during the Term causes of loss-special form property insurance, or substitute policy providing equivalent coverage, insuring Tenant's inventory, furniture, fixtures, equipment, leasehold improvements and all other contents in the Premises in an amount not less than the full replacement cost thereof. Such property insurance shall also include builders' risk coverage during the course of any construction in or affecting the Premises. Tenant shall maintain dram shop insurance in amounts required by Landlord if Tenant sells alcoholic beverages. Tenant shall replace any damaged glass with glass of like kind and quality at Tenant's expense within twenty-four (24) hours after the damage occurs from any cause whatsoever.

(c) Tenant shall maintain any workers' compensation insurance required by law.

(d) Tenant shall require any contractor of Tenant performing work on the Premises to carry and maintain, at no expense to Landlord: (i) commercial general liability insurance, including contractors liability coverage, contractual liability coverage, completed operations coverage, broad form property damage endorsement and contractor's protective liability coverage, providing protection with limits for each occurrence of not less than Two Million Dollars ($2,000,000); and (ii) workers' compensation or similar insurance in form and amounts required by any Laws.

903.     From and after Notice of Possession through the Expiration Date, Tenant shall, at its sole cost and expense keep in full force and effect a policy of commercial general liability (at least as broad as ISO form CG 00 01 07 98 or equivalent) with respect to the Premises, the areas adjacent to the Premises (including, but not limited to, the sidewalk and loading dock, and, if applicable, the Outdoor Seating Area) and the business operated by Tenant with a combined single limit for bodily injury, including death, to any person or persons, and for property damage, of not less than Three Million Dollars ($3,000,000.00).

904.     Tenant shall, at its sole cost and expense, keep in full force and effect during the Term business interruption insurance in an amount equal to the annual Rent for a twelve (12) month period plus the Percentage Rent calculated based on Minimum Sales instead of Gross Sales.

905.     Tenant shall, at its sole cost and expense, keep in full force and effect during the Term such other insurance coverages against other insurable hazards as are from time to time reasonably requested by Landlord and the minimum limits of coverage as set forth in this Section 9 may from time to time, at Landlord's option, be increased in a manner consistent with industry standards.

906.     Tenant shall furnish Landlord with certificates of insurance at all times from and after Notice of Possession through and including the Expiration Date. All certificates of insurance shall evidence that Tenant's insurance policies required pursuant to the provisions of this Lease (i) name Landlord, Landlord's Agent, Landlord's Mortgagee(s) and any other parties designated by Landlord as additional insureds and that an endorsement be attached providing for this coverage, (ii) contain a standard mortgagee endorsement satisfactory to Landlord and Landlord's Mortgagee(s) (iii) be primary insurance as to all claims thereunder and provide that any insurance carried by Landlord or any other party is excess and is non-contributing with the subject insurance coverage; (iv) contain a cross-liability endorsement or severability of interest clause in a commercially reasonable form; (v) provide that an act or omission of one of the insureds or additional insureds thereunder which would void or otherwise reduce coverage, shall not void or reduce coverage as to the other insureds or additional insureds; (vi) provide that the insurer thereunder waives any right of recovery by way of subrogation against Landlord and the Landlord Indemnitees (as defined in Section 907) in connection with any loss or damage covered by such insurance policy; (vii) not contain any deductible provision in excess of Ten

Thousand Dollars ($10,000); (viii) initially be for a term of one (1) year and shall contain an endorsement prohibiting cancellation, modification or reduction of coverage without first giving the additional insureds at least thirty (30) days prior notice of such proposed action; and (ix) be in commercially reasonable form. All insurance carriers providing insurance required by this Section 9 must have no less than an A.M. Best's A-/X rating and amounts of such insurance must be approved by Landlord. If such certificates of insurance are not received by Landlord within five (5) days after Notice of Possession and at least fifteen (15) days prior to the expiration of any insurance policy, Tenant shall pay to Landlord, upon demand and in addition to any other rights and remedies of Landlord hereunder, a late charge pursuant to Section 2610 below, and Landlord shall have the right, (but not the obligation) without notice to Tenant and at any time and from time to time, to acquire such insurance, and Tenant shall be obligated to pay Landlord, as Additional Rent, the amount of the premium and all sums incurred by Landlord applicable thereto within five (5) days following notice from Landlord.

**907.** Tenant shall indemnify, defend and hold Landlord and Landlord's lessors, its partners, officers, shareholders, members, managers, owners, trustees, principals, agents, property managers, employees and any Mortgagee(s) (collectively, the "Landlord Indemnitees") harmless from and against all liabilities, obligations, damages, judgments, penalties, claims, costs, charges and expenses, including, without limitation, reasonable architects' and attorneys' fees, which may be imposed upon, incurred by, or asserted against any of the Landlord Indemnitees and arising, directly or indirectly, out of or in connection with (i) Tenant's breach of its obligations under this Lease, (ii) the acts or negligence of the Tenant Parties, (iii) any loading platform area permitted to be used by Tenant, and/or (iv) the use or occupancy of the Premises, the Project or the Development by Tenant's invitees and by the Tenant Parties. If any action or proceeding is brought against any of the Landlord Indemnitees by reason of any of the foregoing, Tenant shall reimburse the Landlord Indemnitees the cost of defending such action or proceeding or, upon Landlord Indemnitees' written request and at Tenant's sole cost and expense, resist and defend such action and proceeding by counsel approved by the Landlord Indemnitees. Any such cost, damage, claim, liability or expense incurred by the Landlord Indemnitees for which Tenant is obligated to reimburse Landlord Indemnitees hereunder or under this Lease shall be deemed Additional Rent due and payable within five (5) days after notice to Tenant that payment is due.

**908.** It is understood and agreed that all property kept, stored or maintained in the Premises shall be so kept, stored or maintained at the sole risk of Tenant. Landlord shall not be liable to Tenant for any loss of business or other consequential loss or damage from any cause whatsoever.

**909.** Each party releases and waives on behalf of itself and on behalf of the insurers of such party's property, any and all claims and any rights of subrogation of any such insurer against the other party, its employees and agents for loss (other than loss or damage resulting from the willful, wrongful act of such other party, its employees and agents but including loss or damage resulting from the negligent acts of such other party, its employees and agents) sustained from any peril to property that is covered under a standard all-risk or Special Form - Causes of Loss policy, or any peril that is required to be insured against herein, whether or not such insurance is actually in force, or from any peril to property actually insured against, though not required to be under this Lease. All insurance policies of Landlord and Tenant required by this Lease shall contain a clause or endorsement pursuant to which the insurance companies waive subrogation and consent to a waiver of right of recovery. Tenant shall provide Landlord with a copy of the endorsement providing for the aforesaid release and waiver of subrogation.

**910.** Tenant shall comply with all requirements and recommendations of Landlord's Insurance carriers. In case of breach of this covenant, in addition to all other remedies of Landlord hereunder, Tenant shall pay to Landlord, as Additional Rent, any and all increases in premiums for insurance carried by Landlord where such increases were caused in any way by the occupancy or use of Tenant or the condition of the Premises.

**SECTION 10**
**COMMON AREA MAINTENANCE**

**1001.** Landlord grants to Tenant, in common with Landlord and others, the non-exclusive right to use the Common Areas to the extent provided by Landlord. Tenant agrees that (i) the Project is under the complete control of Landlord and (ii) that any delivery area may be designated by Landlord in its sole and absolute discretion. Landlord will have the right (a) to enter into, modify and terminate easements and other agreements pertaining to the use and maintenance of the Common Areas; (b) to close all or any portion of the Common Areas to such extent as may, in the opinion of Landlord, be necessary for repairs or alterations or to prevent a dedication thereof or the accrual of any rights to any person or to the public therein; and (c) to do and perform such other acts in and to said areas and improvements as Landlord shall determine to be advisable. Landlord shall have the right, from time to time, in connection with special events produced, sponsored, presented or authorized by Landlord, to limit access to all or part of the Common Areas, the Project or the Development to persons that have paid an admission charge for access to such areas and or are otherwise authorized by Landlord to enter such areas. Tenant acknowledges that Landlord has the right, in its sole and absolute discretion to erect buildings or other structures and to make any changes and improvements in the Project or the Development, including, without limitation, expanding and/or subdividing the Project or the Development, granting licenses and easements to others, and remodeling or changing the interior and/or other exterior surfaces of the Project. Tenant acknowledges that the Common Areas of the Project do not include parking areas, and that any parking areas in, about or around the Project are provided by third parties and are not the responsibility of Landlord. Landlord and Tenant acknowledge that Landlord shall not be obligated to provide any area for the parking of automobiles for the customers, employees, and invitees of Tenant or for other tenants of the Project.

**1002.** Tenant shall pay Landlord, as Additional Rent, Tenant's Pro Rata Share of the Project 's Common Area Maintenance Costs (as defined in Section 1003 below) in equal monthly installments, without offset, notice, deduction, recoupment, setoff or demand, said payments to be based on Landlord's estimate (from time to time) of Common Area Maintenance Costs for each Operating Year. Such monthly payment shall be referred to as the "Monthly Common Area Maintenance Charge", and Landlord shall advise Tenant of the amount of the Monthly Common Area Maintenance Charge prior to the Rent Commencement Date, provided, however, the failure of Landlord to advise Tenant of the Monthly Common Area Maintenance Charge prior to the Rent Commencement Date shall not relieve Tenant of its obligations hereunder. Landlord shall, from time to time, submit a statement to Tenant which shall set forth Landlord's estimate of the Common Area Maintenance Costs, Tenant's Pro Rata Share thereof and Tenant's Monthly Common Area Maintenance Charge. If in any Operating Year or portion thereof Tenant's Pro Rata Share of the Common Area Maintenance Costs exceeds the amount then estimated by Landlord and payable by Tenant, Landlord shall submit a bill to Tenant for its Pro Rata Share of such excess Common Area Maintenance Costs. Within fifteen (15) days from the date of billing by Landlord, Tenant shall pay its Pro Rata Share of such excess Common Area Maintenance Costs, and thereafter, Tenant's Monthly Common Area Maintenance Charge shall be increased by the appropriate amount. Notwithstanding anything herein to the contrary and in lieu of the provisions set forth above in this Section 1002 as to controllable elements, Tenant shall pay Landlord, as Additional Rent, as Tenant's share of the controllable elements of the Project's Common Area Maintenance Costs (as defined in Section 1003 below), Twelve Dollars ($12.00) per square foot of gross leasable area of the Premises for the first Operating Year, in equal monthly installments, without offset, notice, deduction, recoupment, setoff or demand (for purposes

hereof, controllable elements shall mean all elements except insurance and, as to insurance, Tenant shall pay Tenant's Pro Rata Share without regard to and in addition to the amount set forth in this sentence). Such annual sum shall increase at the beginning of the second and each subsequent Operating Year by the greater of four percent (4%) or the increase in the CPI over the rate then in effect. As Tenant's annual payment of Common Area Maintenance Costs is predetermined and not subject to adjustment except as provided herein, Tenant shall have no express or implied right to examine, inspect or audit Landlord's books and records related to such costs.

1003.    The term "Common Area Maintenance Costs" means any and all costs and expenses of any kind incurred by Landlord in managing, maintaining, repairing, replacing, improving, operating and insuring the Common Areas, the Project, all improvements within the Project, without limitation, and an amount equal to twenty percent (20%) of the Common Area Maintenance Costs as an administrative fee. Common Area Maintenance Costs shall also include any reasonable allocation of any of the foregoing types of costs applicable to the Project and all or portions of the Development.

1004.    If Tenant remains open beyond the Minimum Store Hours (the "After Hour Period") and Landlord does not illuminate the Common Areas twenty four (24) hours per day, Tenant will pay to Landlord, within fifteen (15) days after the date of billing by Landlord, Tenant's pro rata share of all costs incurred by Landlord in connection with Tenant's being open during the After Hour Period, including, without limitation, the costs of security (collectively, the "After Hour Cost"). For purposes of this clause, Tenant's pro rata share of the After Hour Cost shall be a fraction with a numerator that shall be the Tenant's gross leasable square footage of the Premises and a denominator that shall be the leased area of all tenants in the Project, including the Tenant, that are open during the After Hour Period. If Tenant and other tenants are open during different lengths of time during the After Hour Period, Landlord shall make an equitable adjustment, as determined by Landlord in Landlord's reasonable judgment.

## SECTION 11
## PROMOTIONAL FUND

1101.    Tenant shall pay to Landlord, as Additional Rent, no later than thirty (30) days after the date of this Lease, the sum specified in Section 201(u) hereof as the Tenant's Grand Opening Promotional Charge to be expended for promotion and advertising of the Project or the Development. Said monies shall be used, together with funds from other tenants and occupants for such pre-opening and Grand Opening promotional purposes as Landlord in its sole discretion shall determine.

1102.    Tenant shall pay to Landlord, as Additional Rent, a monthly sum equal to $629.33 as the Tenant's Initial Monthly Promotional Fund Charge. Such Monthly Promotional Fund Charge shall be paid to Landlord on the same day that Minimum Rent is due hereunder, and shall be the initial charge payable by Tenant to Landlord for promotion and advertising. Said monies may be commingled by Landlord and may be used, together with funds from other tenants and occupants for promotional and other purposes for the Project or the Development as the Landlord in its sole discretion shall determine. Tenant hereby authorizes Landlord to use Tenant's Trade Name and a brief description of Tenant's business in connection with the promotion and advertising program. Tenant's Initial Monthly Promotional Charge shall be increased by three percent (3%) over the rate then in effect on each anniversary of the Rent Commencement Date

1103.    Tenant covenants that, during each Lease Year, Tenant shall spend not less that two percent (2%) of its Gross Sales for advertising. Each such advertisement shall include the name of the Project and/or the Development as required by Landlord from time to time. Landlord shall have the right to use the trade-name of Tenant in all advertisements of the Project or the Development.

## SECTION 12
## DEPOSITS

1201.    Tenant shall pay Landlord upon execution of this Lease the Security Deposit and Rental Deposit (collectively, the "Deposits"). The Security Deposit is to be held as collateral security for the payment of any Rent payable by Tenant under this Lease, and for the faithful performance of all other covenants, agreements and obligations of Tenant hereunder. The Rental Deposit is to be applied to the first installment of Rent due. In no event shall Landlord be obligated to pay interest on the Deposits. Landlord and Tenant expressly agree that the Deposits shall be deemed to be the property of Landlord and may be commingled with Landlord's other funds. In the event of an Event of Default by Tenant under the provisions of this Lease, Landlord may, at its option, apply any sums it has received pursuant to this Section 1201, to cure such default and Tenant shall be obligated to deposit with Landlord, within five (5) days after Landlord's request, the amount necessary to restore the Security Deposit to the amount specified in Section 201(g) hereof.

## SECTION 13
## COVENANTS OF TENANT

1301.    The Tenant Parties shall at all times abide by and observe the rules and regulations set forth in Exhibit F, as the same may be modified by Landlord from time to time, and such other rules and regulations as may be promulgated by Landlord from time to time (the "Rules and Regulations"). Nothing contained in this Lease shall be construed to impose upon Landlord any duty or obligation to enforce the Rules and Regulations, or the terms, conditions or covenants contained in any other lease, as against any other tenant, and Landlord shall not be liable to Tenant for violation of the same by any other tenant, its employees, agents, contractors, invitees, licensees, customers, clients, family members or guests. The failure of Landlord to enforce any of the Rules and Regulations against Tenant and/or any other tenant in the Project shall not be deemed a waiver of any such Rules and Regulations. If there is any inconsistency between this Lease and any current or future Rules and Regulations, this Lease shall govern.

**SECTION 14**
**TENANT WORK**

**1401.**   Tenant shall, at its sole cost and expense, provide Landlord, for Landlord's approval, in its sole and absolute discretion, four (4) copies of plans and specifications showing in reasonable detail any and all interior and/or exterior alterations or improvements to complete the Premises in a first-class manner for the Permitted Use and that Tenant proposes to make to the Premises (collectively, the "Tenant's Plans"), within fourteen (14) calendar days after notice from Landlord to Tenant requesting that Tenant begin plans (the "Tenant Plans Due Date"). Any revisions to Tenant's Plans shall be completed and delivered to Landlord within five (5) calendar days after Landlord's comments. Tenant's Plans shall be prepared such that Tenant's Work (as shown in Tenant's Plans), if completed in accordance with Tenant's Plans, shall be in accordance with all Laws, and shall be all work necessary to result in a space fully-completed and outfitted in a first-class manner for the operation of Tenant's business in accordance with the Permitted Use. Tenant's Plans shall also be in accordance with all requirements of all applicable governmental authorities and Laws for submissions to obtain a building permit.  Tenant shall reimburse Landlord for the reasonable costs and expenses of outside consultants incurred by Landlord in reviewing, approving and/or coordinating Tenant's Plans.  Tenant shall not commence any work in the Premises prior to obtaining Landlord's written approval of Tenant's Plans. There shall be no changes to Tenant's Plans once Landlord approves the same, unless Landlord approves the changes in writing. Tenant shall complete Tenant's work in accordance with Exhibit C.

If Tenant shall fail to deliver Tenant's Plans to Landlord on or before the Tenant Plans Due Date, or fails to respond to Landlord's comments as set forth above, or fails to respond to a submission of any plans by Landlord within one week after Landlord delivers same, such failure shall constitute an Event of Default under this Lease and, in addition to any remedies available at law or in equity or under this Lease, Tenant shall be obligated to pay a late charge pursuant to Section 2610 below, and the Fixturing Period set forth in Section 201(m) shall be reduced by one (1) day for each day after the Tenant Plans Due Date that Tenant fails to deliver Tenant's Plans to Landlord (which Tenant's Plans must be in the condition required in this Section 1401) or fails to respond as set forth above. Further, if Tenant has not delivered Tenant's Plans to Landlord within thirty (30) days after the Tenant Plans Due Date, then Landlord's Work as set forth in Exhibit C shall be null and void and Tenant shall be obligated to accept the Premises in "as is" condition upon Landlord's giving of Notice of Possession.

**1402.**   Tenant shall not alter the exterior of the Premises and shall not make any structural or non-structural alterations to the interior of the Premises without first obtaining Landlord's written approval of such alterations, which approval may be withheld in Landlord's sole and absolute discretion.  Tenant agrees that all improvements and fixtures, other than trade fixtures made or installed by it, shall immediately become the property of Landlord and shall remain upon the Premises, unless Landlord requires that Tenant, at its sole cost and expense, remove such alterations or improvements prior to the Expiration Date.  Tenant shall, at its sole expense, promptly repair all damage caused by such removal.  Tenant shall not be compensated for any alteration or improvements left in the Premises at the end of the Term. Except for installation of fixtures and other work to be performed by it in strict accordance with Tenant's Plans as approved by Landlord, Tenant shall not cut or drill into or secure any fixture, apparatus or equipment of any kind to any part of the Premises without first obtaining Landlord's written consent.

**1403.**   Tenant shall not suffer, permit or give cause for the filing of a lien against the Premises or the Project. If any mechanic's or materialman's lien or notice of lien shall at any time be threatened or filed against the Premises or Project by reason of work, labor, services or materials performed or furnished to Tenant or to anyone holding the Premises through or under Tenant, Tenant shall immediately cause the same to be bonded or discharged of record.  If Tenant shall fail to cause such lien or notice of lien to be discharged or bonded within five (5) days after the filing thereof, then, in addition to any other rights and remedies available to Landlord at law, in equity or under this Lease, Landlord may, but shall not be obligated to, discharge or bond off the same by paying the amount claimed to be due or posting a bond, and the amounts so paid by Landlord and all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in paying, bonding off or procuring the discharge of such lien, shall be due and payable by Tenant to Landlord as Additional Rent within five (5) days of Landlord's demand therefor. Tenant shall, upon notice and request in writing by Landlord, defend for Landlord, at Tenant's sole cost and expense, any action or proceeding which may be brought on or for the enforcement of any such lien or order for payment of money, and will pay any damages and satisfy and discharge any judgment entered in such action or proceeding and save harmless Landlord from any liability, claim or damage resulting therefrom.

**1404.**   Landlord shall not under any circumstances be liable to pay for any work, labor or services rendered or materials furnished to or for the account of Tenant upon or in connection with the Premises, and no mechanic's or other lien for such work, labor or services or material furnished shall, under any circumstances, attach to or affect the interest or estate of Landlord in and to the Premises or any alterations, repairs or improvements to be erected or made thereon. Nothing contained in this Lease shall be deemed or construed in any way as constituting the request or consent of Landlord, either express or implied, to any contractor, subcontractor, laborer or materialman for the performance of any labor or the furnishing of any materials for any specific improvement, alteration to or repair of the Premises or any part thereof, nor as giving Tenant any right, power or authority to contract for or permit the rendering of any services or the furnishing of any materials on behalf of Landlord that would give rise to the filing of any lien against the Premises.

**1405.**   All construction in the Premises to be performed by Tenant shall comply with Landlord's design criteria and shall be performed at Tenant's sole cost and expense in strict accordance with Tenant's Plans (or such other plans) as approved in advance in writing by Landlord. All construction or alterations performed in the Premises by Tenant shall be (i) performed in a good and workmanlike manner and in compliance with all Laws affecting or applicable to the Premises or Project and with all other provisions of this Lease, (ii) pursued diligently and in good faith to completion; and (iii) performed in a manner as to not to interfere with the business or operations of Landlord or any other occupant of the Project. Contractors must be licensed and carry such insurance in amounts, with coverage and issued by insurers as provided for in Section 902 (d).  On or before the Rent Commencement Date and thereafter within fifteen (15) days of request by Landlord, Tenant shall provide Landlord with compact disc copies of drawings for all completed Tenant work in the Premises in AutoCAD2000-dwg format or such other medium and /or format as Landlord shall request.

**1406.**   Tenant hereby agrees that in performing any construction in the Premises, it shall make good faith efforts to achieve the goals for Minority Business Enterprise and Women Business Enterprise (MBE/WBE) participation established by the City of Kansas City, Missouri and Landlord and in a manner consistent with the City of Kansas City Code of General Ordinances (the "Kansas City Code"), Article II, Chapter 38, Sections 38-84 and 38-100.

**1407.**   Tenant hereby agrees to certify to Landlord the actual costs incurred by Tenant in constructing and improving the Premises, which costs shall include so called soft costs (i.e. architectural fees, design costs, costs incurred in preparation of plans, permitting fees, attorneys fees, consultants fees. etc.), as well as hard costs for labor, materials, contractor fees, etc. Upon Landlord's request, Tenant shall also provide in sufficient detail documentation necessary to verify and substantiate such costs.

Landlord shall keep such information confidential, provided, however, it shall be permitted to provide such information to the State of Missouri, the City of Kansas City, and/or any applicable agencies.

1408.   Tenant shall bear the entire cost of the Tenant's Work, except that Landlord shall pay a Lease Incentive Payment equal to $40.00 per square foot of gross leasable area as set forth in Section 201(a) above (except that said payment shall not be made to the extent it would exceed Tenant's actual construction costs in connection with Tenant's Work) to Tenant within thirty (30) days after all of the following events have occurred:

(a) Tenant has completed the construction and installation of the Tenant's Work.

(b) Tenant has taken possession of the Premises, is open for business, and has paid the first installment of Minimum Rent.

(c) Tenant has obtained such certificate of occupancy and other permits as are required by Law for Tenant to be permitted to use and occupy the Premises and be open for business, and has given copies thereof to Landlord.

(d) Tenant has delivered to Landlord written waivers or releases of mechanics' and materialmen's liens or of the right to obtain the same, with respect to the Premises and the rest of the Project, by each Person who provided labor or materials in connection with the making of the Tenant's Work, and reasonable documentation of the costs of Tenant's Work.

## SECTION 15
## REPAIRS

1501.   Tenant, at its sole cost, shall repair promptly at its sole expense any damage to the Premises or any other improvement within the Project or the Development caused by or arising out of the use of the Premises or the Project or the Development by Tenant or its employees, agents, customers, invitees, contractors and assigns, regardless of fault or by whom such damage shall be caused, unless caused solely by the gross negligence of Landlord.

1502.   Tenant, at its sole cost, shall be solely responsible for keeping the Premises in first-class appearance and in good condition and repair (including replacement) from Notice of Possession until the Expiration Date (or such later date as Tenant actually vacates the Premises), including, without limitation, all required and necessary repairs and replacements to the doors, windows, glass, floor, ceiling, mechanical, electrical, plumbing and sewage (facilities and lines within the Premises including free flow to the main sewer line), heating, ventilating and air-conditioning systems, and equipment exclusively serving the Premises (whether or not located in the Premises).  Tenant shall not cause the roof of the Premises to be penetrated without first obtaining Landlord's written consent, and, upon obtaining such consent, Tenant agrees that any such work shall be performed by Landlord's roofing contractor at Tenant's sole expense.  Tenant agrees that Landlord may perform any and all repairs and replacements to the sprinkler system at the sole cost of Tenant.

1503.   Tenant, at Tenant's sole expense, shall initiate and carry out a program of regular maintenance and repair of the Premises and shall keep and maintain the Premises in a clean, safe, and sanitary condition in accordance with all Laws and of the requirements of any insurance underwriters, inspection bureaus or a similar agency designated by Landlord, including, without limitation, (i) the painting or refinishing of all areas of the interior and maintaining or replacing of all trade fixtures and equipment, ceiling tile, flooring and other items of display used in the conduct of Tenant's business, so as to impede, to the extent possible, deterioration by ordinary wear and tear and to keep the same in attractive and first-class condition throughout the Term and (ii) obtaining and maintaining, at Tenant's sole cost, service contracts with reputable, licensed mechanical contractors to carry out a program of regular maintenance and repair of the heating, ventilating and air-conditioning systems exclusively serving the Premises, and, if Tenant is required to have a grease trap, the grease trap. From time to time, within five (5) days of Landlord's request, Tenant shall provide copies of such contracts to Landlord.  All Tenant contractors performing alterations or repairs that are required or permitted by this Lease shall be subject to Landlord's prior written approval, which approval shall not be unreasonably withheld.

1504.   If any repairs required to be made by Tenant hereunder are not made within ten (10) days after written notice thereof by Landlord to Tenant, such failure shall constitute an Event of Default under this Lease, and Landlord may, at its option, make such repairs without prior notice to Tenant or liability to Tenant for any loss or damage which may result to Tenant's business by reason of such repairs (including, without limitation, damage to Tenant's business). Tenant shall pay Landlord, within five (5) days of demand therefor, the cost of such repairs plus a repair fee equal to twenty percent (20%) of the cost of such repairs.

## SECTION 16
## SURRENDER OF PREMISES

1601.   Tenant, on the Expiration Date, shall peaceably surrender to Landlord the Premises in broom-clean condition and in good repair, and shall return to Landlord any and all keys (including, without limitation, access cards) furnished to, or otherwise procured by, Tenant relating in any way to the Premises or the Project; provided, however, in no event shall the Premises be deemed surrendered until Tenant has provided Landlord with a certification from a reputable HVAC contractor that the HVAC system is in good repair and condition. Tenant hereby waives any and all notices to vacate. If Tenant fails to remove any of its property at the end of the Term, Landlord shall have the right, at Landlord's election, to deem the same abandoned by Tenant and may dispose of the same at Tenant's expense.

1602.   All trade fixtures owned by Tenant and installed in the Premises shall remain the property of Tenant and shall be removed by Tenant at the expiration of the Term, or any renewal or extension thereof, or other termination thereof, provided Tenant shall not at such time be in default under any covenant, agreement or obligation contained herein; and, if in default, Landlord shall have a lien on such trade fixtures as security against loss or damage resulting from any such default by Tenant, and said fixtures shall not be removed by Tenant until such default is cured or Landlord notifies Tenant to remove such trade fixtures (or any items thereof) from the Premises.

1603.   It shall be an Event of Default under this Lease if Tenant remains in possession of the Premises after the Expiration Date without the written permission of Landlord, and without the execution and delivery of a new lease.  In the event of such default by Tenant, Landlord, at its option, may, in addition to any other remedies available to Landlord at law, in equity or under this Lease, (i) immediately re-enter and take possession of the Premises without process, or by any legal process in force in the jurisdiction in which the Project is located, and hold Tenant liable for any and all damages incurred as a result of such holdover, and for the reasonable value of the use of the Premises which is hereby agreed to be a monthly amount equal to three (3) times the Minimum Rent plus all other Rent required under this Lease at the amounts in effect during the last month of the Term or (ii) treat Tenant as

occupying the Premises as a tenant at will, subject to all the conditions, provisions and obligations of this Lease (but without any right of Tenant hereunder to extend the Term) insofar as the same are applicable to an at-will tenancy. During any such holdover period, monthly Rent shall be three (3) times the Minimum Rent plus all other Rent required under this Lease at the amounts in effect during the last month of the Term.

**1604.** If Tenant fails to remove all of its trade fixtures and other effects, if any, on the Expiration Date, then Landlord may (a) remove the same in any manner that Landlord shall choose and store such trade fixtures and effects without compensation to Tenant or liability to Tenant for loss thereof or damage thereto, and Tenant agrees to pay Landlord upon demand any and all costs and expenses incident to such removal and storage, or (b) without notice, sell such trade fixtures and other effects at private sale and without legal process, for such price as Landlord may obtain, and apply the proceeds of such sale against any amounts due under this Lease from Tenant to Landlord and against any and all expenses incident to the removal, repair of any damage to the Premises resulting or caused by such removal, storage and sale of such trade fixtures and other effects.

## SECTION 17
## UTILITIES AND TRASH

**1701.** Tenant shall, at its sole cost and expense, pay promptly when due all fees, deposits and charges for water, gas, electricity, heat, air conditioning, sewer rentals or service charges, including use and/or connection fees, impact fees, tap fees, hook-up fees and/or standby fees and any other utility charges incurred by Tenant in its use and occupancy of the Premises or furnished to the Premises commencing upon Notice of Possession. If Landlord is required or elects to supply water, gas, electricity, heat, air conditioning, or sewer rentals, or any other utility service, for the Project and/or the Premises, then Tenant shall purchase the same from Landlord at the then-prevailing local rates and charges, and to pay promptly the charges therefor when bills are rendered to Tenant. Tenant shall use reasonable diligence in conservation of utilities. If one or more utilities are provided and are not separately metered to Tenant, Tenant shall pay as additional Rent at the times determined by Landlord for such utilities an amount determined by Landlord based on allocations by Landlord based on estimated usage or size as determined by Landlord from time to time.

**1702.** (a)   If permitted by Law, Landlord shall have the right, in its sole discretion, at any time and from time to time during the Term to either contract for service from different utility companies ("Alternate Service Providers") than those providing utility service on the date hereof ("Utility Service Providers") or continue to contract for service from the Utility Service Providers.

(b)   Tenant shall cooperate with Landlord, the Utility Service Providers, and any Alternate Service Providers at all times and, as reasonably necessary, shall allow Tenant, Utility Service Providers, and any Alternate Service Providers reasonable access to all utility lines, feeders, risers, wiring, and any other machinery within and/or serving the Premises.

(c)   Landlord shall in no way be liable or responsible for any loss, damage, or expense that Tenant may sustain or incur by reason of any change, failure, interference, disruption, or defect in the supply or character of the utilities furnished to the Premises, or if the quantity or character of the utility supplied by any Utility Service Providers or any Alternate Service Providers is no longer available or suitable for Tenant's requirements, and no such change, failure, defect, interference, unavailability, or unsuitability shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rent, or relieve Tenant from any of its obligations under this Lease.

**1703.** Landlord shall not be liable in damages or otherwise for any utility interruption; provided, however, if the interruption of utilities services is not the sole responsibility of the utility service company or the Tenant, upon request and as Landlord's sole obligation, Landlord, at Tenant's cost and expense, shall use commercially reasonable efforts to assist Tenant in obtaining the restoration of such service.

**1704.** Tenant, at Tenant's own and sole expense, shall arrange for all trash generated at or associated with the Premises to be placed in proper trash receptacle(s). Landlord may elect to provide to Tenant and other tenants of the Project a shared dumpster ("Shared Dumpster"). If a Shared Dumpster is provided, Tenant will bear its proportionate share of the cost to operate the Shared Dumpster (which may be based on any commercially reasonable method(s) selected by Landlord from time to time of calculating proportionate share). Tenant shall pay Tenant's share of the Shared Dumpster trash removal service to the third party provider of such services or to Landlord (at Landlord's discretion, if Landlord pays such third party provider). If Landlord deems Tenant's generation and/or generation of trash at the Premises to be excessive, Tenant shall also pay Landlord, as Additional Rent, the costs for the same that exceed normal trash generation for a tenant of comparable size as determined by Landlord. In the alternative to Landlord providing receptacle(s) for trash, Landlord shall have the option to require Tenant to obtain and pay for its own receptacle or dumpster (or to share a receptacle or dumpster with one or more other tenants of the Project, sharing such costs on an equitable manner), and in such event, Tenant, shall arrange for regular, prompt and reliable trash removal. In the alternative, Landlord shall have the right to charge One Dollar ($1.00) per square foot of the Premises for trash removal, increasing by three percent (3%) over the rate then in effect at the beginning of each Lease Year. Landlord shall have the right from time to time to provide for different methods of trash removal and shall have the right to charge Tenant a reasonable amount for trash removal which Tenant shall pay as Additional Rent.

**1705.** Intentionally deleted.

**1706.** Intentionally deleted.

## SECTION 18
## SIGNS

**1801.** Tenant shall, at its own expense and by the end of the Fixturing Period, install and at all times thereafter maintain in good condition and repair an exterior sign of such size, color, design, illumination and location, all as designated and approved by Landlord, which approval may be given or withheld in Landlord's sole and absolute discretion. The sign must conform to all governmental requirements and be in compliance with all Laws and Landlord's Sign Criteria as set forth in Exhibit D hereto. Landlord, in its sole discretion, may modify the sign criteria from time to time, in which event Tenant shall promptly, at its own expense, bring its sign into conformity with Landlord's new sign criteria. On the Tenant Plans Due Date, Tenant shall submit to Landlord four (4) copies of Tenant's sign plans and specifications, showing in complete detail the proposed construction and installation of Tenant's sign (the "Sign Plans"). If Tenant fails to deliver the Sign Plans to Landlord within the time period set forth above, such failure shall constitute an Event of Default under this Lease and, in addition to any other remedies available to Landlord at law, in equity or under this Lease, a late charge shall be assessed against and paid by Tenant pursuant to Section 2610 below. Tenant's exterior sign(s) shall be kept illuminated from dusk until 10:00 p.m. every day or at such other times as prescribed by Landlord.

**1802.** Tenant shall not display any sign, lettering, lights or any other advertising matter of any kind or description on or adjacent to the exterior walls of the Premises, or on the interior and exterior surfaces of windows or other exterior surfaces of the Premises, or elsewhere if visible outside the Premises, unless first approved by Landlord in writing, which approval may be given or withheld in Landlord's sole and absolute discretion. Except for normal size credit card emblems and store hours, all as approved by Landlord, Tenant shall not attach any sign to the inside of any window of the Premises. Tenant shall at no time utilize any scotch plaid decal strips or flashing or neon signs or lights in the Premises, and the bulbs of all Tenant's permitted signs and lights shall be replaced as soon as they become defective or lose their intensity. No rights are granted to Tenant to use the outer walls or the roof of the Premises for any purpose. Tenant shall be responsible, at its sole cost and expense, for the fabrication, installation, maintenance, repair (including replacement) and operation of all its signs. At the expiration or earlier termination of this Lease, Tenant shall pay for the cost of (i) removing all signage, (ii) repairing any damage to the Premises caused by the installation, placement or removal of the signage, and (iii) restoring the affected portion of the Premises to its condition prior to the installation of such signage, normal wear and tear excepted.

**1803.** If Tenant fails to install an exterior sign as depicted on the Tenant's Sign Plans approved by Landlord within the Fixturing Period, such failure shall constitute an Event of Default under this Lease and, in addition to any other remedies available to Landlord at law, in equity or under this Lease, a late charge shall be assessed against and paid by Tenant pursuant to Section 2610 below. In addition, Landlord may, at its option, have a sign installed on behalf of Tenant and Tenant shall pay Landlord, the cost of the sign and installation within fifteen (15) days of invoice from Landlord.

**1804.** Prior to the Expiration Date, Tenant shall remove all signs in or on the Premises and shall repair any damage, including the filling of holes caused by the installation or removal of the signs.

**1805.** If Landlord provides other Tenant identification signs, such as pylon, under canopy or directory signs, Tenant shall pay Landlord, for the cost of such additional signage.

## SECTION 19
## RIGHTS OF LANDLORD

**1901.** Landlord reserves the following rights with respect to the Premises:

(i) For Landlord and any Mortgagee, and their representatives, to have free and unrestricted access to, and to enter upon, the Premises at all reasonable hours (or in the event of an emergency at any time) for the purposes of inspecting the Premises, or of making repairs, replacements or improvements in or to the Premises, the building, equipment, or all or any portion of the Project (including, without limitation, sanitary, electrical, heating, air-conditioning or other systems), or of complying with all Laws, or of exercising any right reserved to Landlord under this Lease (including the right during the progress of any repairs, replacements, improvements or other work permitted or required by this Lease to keep and store within the Premises all necessary materials, tools and equipment);

(ii) To show, at reasonable times, the Premises during ordinary business hours to any existing or prospective Mortgagee, tenant, purchaser, assignee of any loan secured by the Project, or any portion thereof, or assignee of any interest in Landlord, and/or to any person contemplating the leasing of the Premises or any part thereof. If during the last month of the Term or any renewal or extension thereof, Tenant shall have removed all or substantially all of Tenant's trade fixtures from the Premises, Landlord may immediately enter and alter, renovate, and redecorate the Premises, without elimination or abatement of Rent, and without incurring any liability to Tenant for any compensation or otherwise, and such acts shall have no effect upon this Lease and shall not be deemed to release Tenant from any of Tenant's obligations under this Lease, including the obligations to return certain property, to repair and restore the Premises and to pay the full Rent and other sums due hereunder;

(iii) To display a "For Sale" sign at any time, and also, after notice from either party of intention to terminate (as permitted pursuant to the provisions of this Lease), or at any time within six (6) months prior to the Expiration Date, a "For Rent" sign, or both "For Rent" and "For Sale" signs, and all of said signs shall be placed upon such part of the Premises as Landlord shall require, except on display windows or doors leading into the Premises. Prospective purchasers or tenants authorized by Landlord may inspect the Premises at reasonable hours;

(iv) To install or place upon, or affix to, the roof and exterior walls of the Premises equipment, signs, displays, antenna, and any other object or structure of any kind;

(v) At any time, and from time to time, to make alterations or additions to, and to build additional stories on, the building in which the Premises are contained, and to build in or on the areas adjoining the Premises, including, without limitation, the Common Areas. Landlord also reserves the right to construct other buildings or improvements or add to existing buildings or facilities in the Project and the Development, to expand and/or subdivide (including condominium regime creation) the Project and the Development, and to permit others to do so, from time to time;

(vi) To discontinue any and all facilities furnished and services rendered by Landlord not expressly covenanted for herein, it being understood that they constitute no part of the consideration for this Lease;

(vii) At any time, and from time to time, to use all or any part of the roof and exterior walls of the Premises for any purpose; to erect scaffolds, protective barriers and other aids to construction on, around and about the exterior of the Premises, provided that access to the Premises shall not be completely denied; to enter the Premises to shore the foundations and/or walls thereof and/or to install, maintain, use, repair, inspect and replace pipes, ducts, conduits and wires leading through the Premises and serving other parts of the Project and/or the Development. Tenant further agrees that Landlord may make any use it desires of the side or rear walls of the Premises, provided that there shall be no encroachment upon the interior of the Premises;

(viii) If an excavation shall be made or authorized to be made upon land adjacent to the Premises, Tenant shall afford to the person causing or authorized to cause such excavation license to enter upon the Premises for the purpose of doing such work as Landlord shall deem necessary to preserve the wall or the building of which the Premises form a part from injury or damage and to support the same by proper foundations, without any claim for damages or indemnification against Landlord or diminution or abatement of rent;

(ix) Landlord shall not be liable in any such case for any inconvenience, disturbance, loss of business or any other losses or annoyance arising from the exercise of any or all of the rights of Landlord under this Section 1901;

(x)     It is understood that Exhibit A is for informational purposes only and shall not be deemed to be a warranty, representation or agreement of any kind on the part of the Landlord. Store references, if any, are not and shall not be deemed to be representations by Landlord to Tenant. The purpose of the plan annexed hereto as Exhibit A is solely to show the approximate location of the Premises. Landlord hereby reserves the right at any time, and from time to time, to make changes or revisions in such plan, including, but not limited to, additions to, subtractions from, and/or relocations or rearrangements of, the buildings, parking areas, and other Common Areas shown on such plan;

(xi)     Landlord reserves the right at any time, and from time to time, to add to and incorporate additional land into the Project and/or the Development and the right to build additional buildings and Common Areas on such additional land. Landlord reserves the right to sever the ownership of or title to the various sections of the Project and/or the Development (including creation of condominium regimes) and/or to place separate Mortgages on such sections, in which case the right of Tenant and other tenants in the Project will be preserved by a written declaration or agreement, to be executed by Landlord and duly recorded, creating mutual, reciprocal and interdependent rights to use the Common Areas and the utilities and facilities needed for the full use and enjoyment of the Premises by Tenant and other tenants or occupants in the Project without impairing any of the duties and obligations of Landlord to Tenant under this Lease. Tenant shall execute from time to time such instruments reasonably required by Landlord and its Mortgagee(s) to effectuate the provisions of this Section 1901(xi);

(xii)    If Tenant shall not be personally present to open and permit an entry onto the Premises at any time when for any reason an entry therein shall be necessary or permissible, Landlord or Landlord's agents may enter the same by a master key, or may forcibly enter the same, without rendering Landlord or such agents liable therefor, and without any abatement of Rent or in any manner affecting the obligations and covenants of this Lease. Landlord shall exercise its rights of access to the Premises permitted under any of the provisions of this Lease in such manner, to the extent practicable, to not unreasonably interfere with Tenant's use and occupancy of the Premises, provided that Landlord shall incur no additional expense thereby (e.g. overtime pay); and,

(xiii)   Landlord has the right, at Landlord's sole and absolute discretion, at any time during the Term, to remodel or change the roof and/or other exterior surfaces of the Project. Tenant understands that, during such remodeling, it might be necessary to remove Tenant's existing sign(s) and that such sign(s) may not be suitable for reinstallation after the remodeling is completed. Such sign(s), or part thereof, which Tenant has installed, shall remain the property of Tenant, but Landlord is released from any and all liability for damages to such sign(s) during its removal, provided said removal was conducted with reasonable care. During any such remodeling, Tenant shall cooperate with Landlord and execute any documentation required or desirable to facilitate the remodeling process. Tenant understands that it may be necessary to erect scaffolds or other construction equipment during the remodeling, but access to the Premises shall not be denied.

## SECTION 20
## DAMAGE TO PREMISES

2001.    If the Premises shall be damaged by fire or other cause, this Lease shall not be terminated and Landlord shall proceed with diligence, subject to the then applicable Laws, building codes, zoning ordinances, and regulations of any governmental authority, and as soon as practicable after such damage occurs, to repair such damage (excluding Tenant's leasehold improvements, trade fixtures, furniture, equipment and personal property or other items Tenant is required to insure or for which it has insurance coverage) at the expense of Landlord, if Landlord is insured with respect thereto to the extent of insurance proceeds made available to Landlord by any Mortgagees, or at the expense of Tenant, if Tenant is required to be insured hereunder with respect to such damage (in either case taking into account the time necessary to effectuate a satisfactory settlement with any insurance company involved and for such other delays as may result from government restrictions, controls on construction, if any, and strikes, emergencies, and other conditions beyond the control of the parties); provided, however, that if the Premises are damaged by fire or other cause to such extent that the damage, in Landlord's reasonable determination, cannot be fully repaired within ninety (90) days from the date of settlement of the insurance claims and Landlord's obtaining building permits, Landlord, upon notice to Tenant, may terminate this Lease, in which event the Rent shall be apportioned and paid to the date of such damage. Notwithstanding anything herein to the contrary, Landlord shall have the right to terminate this Lease if (1) insurance proceeds are insufficient to pay the full cost of such repair and restoration, (2) the holder of any Mortgage fails or refuses to make such insurance proceeds available for such repair and restoration, (3) zoning or other applicable Laws or regulations do not permit such repair and restoration, or (4) damage occurs to twenty-five percent (25%) or more of the floor area of the Premises, the Project or the Development.

2002.    Subject to the provisions of the next succeeding sentence, during the period that Tenant is deprived of the use of the damaged portion of the Premises due to damage by fire or other cause, Tenant shall be required to pay Rent adjusted in the manner described below to cover only that part of the Premises that Tenant is able to occupy, and the Rent for such space shall be that portion of the total Rent which the amount of the gross leasable area of the Premises remaining that can be occupied by Tenant bears to the total gross leasable area of the Premises. If such damage is caused in part by the fault or neglect of the Tenant Parties, or if Landlord, or any Mortgagee, shall be unable to collect the insurance proceeds applicable to such damage because of some action or inaction on the part of Tenant, or the employees, contractors, licensees or invitees of Tenant, such damage shall be repaired promptly, at Tenant's sole cost and expense, either by Landlord or, at Landlord's option, by Tenant, subject to Landlord's direction and supervision, and there shall be no abatement of Rent. Landlord shall not be liable for delays in making of any such repairs that are due to Laws, casualties, strikes, unavailability of labor and materials, and/or other causes beyond the reasonable control of Landlord.

2003.    Tenant shall give Landlord prompt written notice of any accident, fire or damage occurring on or to the Premises or the Project.

## SECTION 21
## CONDEMNATION

2101.    If all of the Premises (or all rights of use or occupancy of the Premises) shall be taken or condemned by any governmental or quasi-governmental authority for any public or quasi-public use or purpose, or purchased by such authority under threat of such taking (collectively, a "Taking"), this Lease shall cease and terminate as of the date when title vests in such governmental or quasi-governmental authority and the Rent shall be abated on the date when such title vests in such governmental or quasi-governmental authority. If less than all of the Premises is the subject of a Taking, the Rent shall be equitably adjusted on the date when title to the portion of the Premises taken vests in such governmental or quasi-governmental authority and the Lease shall otherwise continue in full force and effect. Tenant shall have no claim against Landlord (or otherwise) for any portion of the amount that may be awarded as damages as a result of any Taking, or for the value of any unexpired portion of the Term, or for loss of profits or moving expenses, or for any other claim or cause of action resulting from

such Taking. Tenant shall have the right to make a separate claim against the condemning authority for moving expenses and any other awards to which it may be entitled separately from any award due to Landlord as long as such award to Tenant does not diminish Landlord's award.

## SECTION 22
## BANKRUPTCY

**2201.** The following shall be "Events of Bankruptcy" under this Lease:

(i)    Tenant's or Tenant's guarantor, if any, becoming insolvent, as that term is defined in Title 11 of the United States Code, entitled Bankruptcy, 11 U.S.C. Section 101 et seq. (the "Bankruptcy Code"), or under the insolvency laws of any state, district, commonwealth, or territory of the United States (the "Insolvency Laws");

(ii)    the appointment of a receiver or custodian for all or a substantial portion of Tenant's or Tenant's guarantor's, if any, property or assets, or the institution of a foreclosure action upon all or a substantial portion of Tenant's or Tenant's guarantor's, if any, real or personal property;

(iii)    the filing by Tenant or Tenant's guarantor, if any, of a voluntary petition under the provisions of the Bankruptcy Code or Insolvency Laws;

(iv)    the filing of an involuntary petition against Tenant or Tenant's guarantor, if any, as the subject debtor under the Bankruptcy Code or Insolvency Laws, which is either not dismissed within thirty (30) days of filing, or results in the issuance of an order for relief against the debtor; or

(v)    Tenant's or Tenant's guarantor, if any, making or consenting to an assignment for the benefit of creditors or a common law composition of creditors.

**2202.** Landlord's remedies upon the occurrence of an Event of Bankruptcy shall be as follows:

(i)    Landlord shall have the right to terminate this Lease and/or any services being provided to Tenant under this Lease by giving notice to Tenant, whereupon Tenant shall be immediately obligated to quit the Premises. Any other notice to quit or notice of Landlord's intention to re-enter is hereby expressly waived. If Landlord elects to terminate this Lease, everything contained in this Lease on the part of Landlord to be done and performed shall cease without prejudice, subject, however, to the right of Landlord to recover from Tenant all Rent and any other sums accrued up to the time of termination or recovery of possession of the Premises by Landlord, whichever is later, and any other monetary damages or loss of Rent sustained by Landlord; provided, however, and notwithstanding the foregoing or any remedies set forth in this Section 2202, Landlord shall not have the right to terminate this Lease while a case in which Tenant is the subject debtor under the Bankruptcy Code is pending, unless Tenant or Tenant's trustee in bankruptcy (the "Trustee") is unable to comply with the provisions of Sections 2202(v),(vi) and (vii) below.

(ii)    Upon termination of this Lease pursuant to Section 2202(i), Landlord may proceed to recover possession under and by virtue of the provisions of the Laws of the jurisdiction in which the Project is located, or by such other proceedings, including re-entry and possession, as may be applicable.

(iii)    Upon termination of this Lease pursuant to Section 2202(i), Landlord shall have the option to relet the Premises for such rent and upon such terms as are not unreasonable under the circumstances and, if the full Rent reserved under this Lease (and any of the costs, expenses, or damages indicated below) shall not be realized by Landlord, Tenant shall be liable for all damages sustained by Landlord, including, without limitation, deficiency in Rent, reasonable attorneys' fees, brokerage fees, and expenses of placing the Premises in first-class rentable condition. Landlord, in putting the Premises in good order or preparing the same for re-rental, may, at Landlord's option, make such alterations, repairs or replacements in and to the Premises as Landlord, in its sole discretion, considers advisable and necessary for the purpose of reletting the Premises, and the making of such alterations, repairs or replacements shall not operate or be construed to release Tenant from liability under this Lease. Landlord shall in no event be liable in any way whatsoever for failure to relet the Premises, or if the Premises are relet, for failure to collect the rent under such reletting, and in no event shall Tenant be entitled to receive the excess, if any, of such net rent collected over the sums payable by Tenant to Landlord hereunder.

(iv)    Any damage or loss of Rent sustained by Landlord as a result of an Event of Bankruptcy may be recovered by Landlord, at Landlord's option, at the time of the reletting, or in separate actions, from time to time, as said damage shall have been made more easily ascertainable by successive reletting, or in a single proceeding deferred until the Expiration Date (in which event Tenant hereby agrees that the cause of action shall not be deemed to have accrued until the Expiration Date), or in a single proceeding prior to either the time of reletting or the Expiration Date, in which event Tenant shall pay Landlord the difference, if any, between the present value of the Rent reserved under this Lease on the date of breach, discounted at the per annum rate equal to the discount rate of the Federal Reserve Bank, and the fair market value of the Lease on the date of breach. If Tenant becomes the subject debtor in a case under the Bankruptcy Code, the provisions of this Section 2202(iv) may be limited by the limitations of damage provisions of the Bankruptcy Code. In addition, Tenant shall reimburse Landlord for its reasonable attorneys' fees incurred in enforcing or interpreting the provisions of this Section 22, including, but not limited to, any and all costs incurred in consulting with its attorneys with respect to any suit or dispute under this Lease, whether or not suit is brought, and any and all costs of litigation with respect to such enforcement or interpretation (which, with regard to any suit or dispute whereby Landlord is seeking a monetary recovery, are hereby stipulated to be fifteen percent (15%) of the monies awarded to Landlord).

(v)    If Tenant becomes the subject debtor in a case pending under the Bankruptcy Code, Landlord's right to terminate this Lease pursuant to this Section 22 shall be subject to the rights of Tenant or the Trustee to assume or assign this Lease. Tenant or the Trustee shall not have the right to assume or assign this Lease unless Tenant or the Trustee, within thirty (30) days of the Event of Bankruptcy (a) cures all defaults under this Lease, (b) compensates Landlord for monetary damages incurred as a result of such default, (c) provides "adequate assurance of future performance" (as defined in Section 2202(vi) below) and (d) complies with all provisions of Section 2202 of this Lease.

(vi)    Landlord and Tenant hereby agree in advance that the phrase "adequate assurance of future performance", as used in this Section 2202, includes adequate assurance (a) of the source of Rent and other consideration due under this Lease, and, in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of Tenant and its guarantors, if any, as of the time Tenant became Tenant under this Lease; (b) that any assumption or assignment of this Lease is subject to all the

provisions hereof, including, but not limited to, location, use and exclusivity, and will not breach any such provisions contained in any other lease or financing agreement; (c) that any assumption or assignment of this Lease will not disrupt or adversely affect the tenant mix or balance in the Project; and (d) that any Percentage Rent due under this Lease will not decline substantially.

(vii)     If Tenant or the Trustee, as applicable, is unable (a) to cure Tenant's defaults, (b) to reimburse Landlord for its monetary damages, (c) to pay when due the Rent due under this Lease, or any other payments required of Tenant under this Lease or (d) to meet the criteria and obligations imposed by Section 2202(vi) above, then Tenant agrees in advance that it has not met its burden to provide adequate assurance of future performance, and this Lease may be terminated by Landlord in accordance with Section 2202(i) above.

**2203.**     It is understood and agreed that this Lease is a "Lease of Real Property in the Shopping Center" as such term is used in Section 365(b)(3) of the Bankruptcy Code, 11 U.S.C., Section 101 et seq., and that neither Tenant's interest in this Lease or in any estate created hereby shall pass to any trustee or receiver or assignee for the benefit of creditors or otherwise except as may be specifically provided therein. Nothing contained in this Section 2203 shall be deemed in any manner to limit Landlord's rights and remedies under the Bankruptcy Code, as presently existing or as may be hereafter amended.

## SECTION 23
## ASSIGNMENT AND SUBLET

**2301.**     Without the prior written consent of Landlord in each instance, which consent may be given or withheld in Landlord's sole and absolute discretion, Tenant shall not assign, Mortgage, pledge, encumber, sublet, underlet, license or permit the Premises or any part thereof to be used by others, or otherwise transfer, voluntarily, by operation of law, or otherwise, this Lease or the Premises or any interest herein or therein. Neither the Premises, nor any part thereof, will be used, occupied or managed, or permitted to be used, occupied or managed, by anyone other than Tenant, or used for any purpose other than as permitted under this Lease, or be advertised for subletting. A sale, transfer, assignment, conveyance, endorsement or other disposition of (a) a general partnership interest, if Tenant is a partnership, (b) a managing member's interest, if Tenant is a limited liability company or (c) fifty percent (50%) or more (in the aggregate on accumulative basis) of the capital stock of Tenant (if Tenant is a corporation) or of the interest in capital, profits, or losses of Tenant (if Tenant is a partnership, limited liability company or partnership) shall be deemed to be an assignment of this Lease within the meaning of this Section 2301, unless such sale or transfer is made by (i) a publicly owned corporation, or (ii) involves the sale or issuance of securities registered under the Securities Act of 1933, as amended. Any other transaction that results in a change of operational control of Tenant or the parties to whom the economic impact of Tenant's business accrues shall also be deemed to be an assignment of this Lease within the meaning of this Section 2301. The transactions described in this Section are sometimes referred to in Section 23 as a "Transfer", and the person to whom Tenant's interest is transferred shall sometimes be referred to as a "Transferee."

**2302.**     If Tenant is a partnership, (i) each present and future general partner or venturer shall be personally bound by all of the covenants, agreements, terms, provisions and conditions set forth in this Lease and (ii) in confirmation of the foregoing, at the time that Tenant admits any new general partner to its partnership or venturer to its joint venture, Landlord may require, and Tenant shall deliver, an agreement executed by each new partner in form and substance satisfactory to Landlord whereby such new general partner or venturer shall agree to be personally bound by all of the covenants, agreements, terms, provisions and conditions of this Lease, without regard to the time when such new partner is admitted to the partnership or when any obligations under any such covenants, agreements, terms, provisions and conditions accrue.

**2303.**     Tenant shall have no right to ever subdivide a portion of the Premises. If Tenant desires to sublet the Premises, or assign this Lease, Tenant shall request Landlord's consent by providing written notice to Landlord at least ninety (90) days but not more than one hundred eighty (180) days prior to the proposed commencement date of the subletting or assignment. The notice shall set forth the following: (i) the name of the proposed Transferee, (ii) the tax returns, balance sheets and profit and loss statements for the proposed Transferee or any other person to be liable for Tenant's obligations under this Lease covering the prior three years (or for such shorter period as the proposed Transferee or other person may have been in existence), all certified as true and correct by the proposed Transferee, or an authorized officer thereof or such other person as may be liable for Tenant's obligation under this Lease, (iii) a full description of the terms and conditions of the proposed Transfer, including copies of any and all documents and instruments, any purchase and sale agreements, sublease agreements, assignment agreements and all other writings concerning the proposed Transfer, (iv) a description of the proposed use of the Premises by the proposed Transferee, including any required or desired alterations or improvements to the Premises that may be undertaken by such Transferee in order to facilitate its proposed use, (v) a business plan for the proposed Transferee's operations at the Premises, including a statement of projected income, expense, and cash flow for such operation for the two years following the proposed effective date of the Transfer, (vi) a list of personal, business and credit references of the proposed Transferee, and (vii) the same information set forth in (i) through (iv) and (vi) of this Section 2303 but pertaining to any guarantor or other person who will be liable in any manner for the payment of any amounts under the Lease. Tenant shall also provide within ten (10) days of request any other information, documentation, evidence or certifications that may be requested by Landlord.

**2304.**     Intentionally deleted.

**2305.**     Consent by Landlord to any assignment, subletting or other Transfer shall not include or be construed as consent to any subsequent Transfer by Tenant or its Transferee. Any Transfer by Tenant that does not comply with the provisions of this Section 23 shall be void.

**2306.**     Notwithstanding Landlord's consent, if Tenant sells, sublets, assigns, or otherwise Transfers this Lease and at any time receives periodic rent or other consideration which exceeds that which Tenant would at that time be obligated to pay Landlord under this Lease, Tenant shall immediately pay to Landlord one hundred percent (100%) of the gross increase in rent as the rent is received by Tenant and one hundred percent (100%) of any other consideration received by Tenant from the Transferee.

**2307.**     Should Landlord consent to a Transfer, Tenant, its proposed Transferee and Landlord shall execute an agreement, prepared by or acceptable to Landlord in its sole reasonable discretion, under which the proposed Transferee shall be bound by the terms and conditions of this Lease. Any consent by Landlord to a Transfer shall not in any manner be construed to relieve Tenant, any guarantor or any of their Transferees from obtaining the consent in writing of Landlord to any further Transfer, nor shall the same release or discharge Tenant or any guarantor from any liability, past, present or future, under this Lease, and Tenant and any guarantor shall continue fully liable in all respects hereunder. Further, all of the provisions of this Section 23 shall apply to any proposed Transfer by any Transferee and their respective Transferees. Notwithstanding anything contained herein to the contrary, if Tenant is in default hereunder, Tenant shall not be permitted to make a Transfer.

**2308.**   Notwithstanding any permitted Transfer, Tenant shall at all times remain directly and primarily liable for the payment of Rent and for compliance with all of its other obligations under this Lease. Upon the occurrence of an Event of Default as defined in Section 26 of this Lease, if the Premises or any part of the Premises are then assigned or sublet, Landlord, in addition to any other remedies provided in this Lease or by law, may collect directly from the assignee or subtenant all rents due and becoming due to Tenant under the sublease and apply the rent against sums due Landlord from Tenant under this Lease. The collection directly from an assignee or subtenant shall not be deemed to constitute a novation or release of Tenant from the further performance of Tenant's obligations. Any guaranty of Tenant's performance executed as consideration for this Lease shall remain in full force and effect before and after any Transfer. Landlord may require Tenant, and Tenant agrees, to execute a guaranty of this Lease before Landlord consents to any Transfer. Landlord may proceed directly against Tenant without first exhausting any remedies for default which Landlord may have against any Transferee. In the event of a termination, re-entry or dispossession by Landlord following a sublease by Tenant, Landlord may, at Landlord's option, take over all of the right, title and interest of Tenant (as sublessor) under such sublease, and the subtenant shall, at Landlord's option, attorn to Landlord pursuant to the provisions of such sublease.

**2309.**   Tenant shall pay to Landlord $2,500.00 (such amount increasing on each anniversary of the Rent Commencement Date by the CPI increase) for attorney's fees and administrative expense involved with the review, processing or preparation of any documentation in connection with a Transfer, whether or not Landlord's consent to such Transfer is required or obtained.

**2310.**   Anything contained in this Lease to the contrary notwithstanding, and without prejudice to Landlord's right to require a written assumption from each Transferee, any person or entity to whom this Lease is transferred including, without limitation, assignees pursuant to the provisions of the Bankruptcy Code, shall automatically be deemed to have assumed all obligations of Tenant arising under this Lease. If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord and shall remain the exclusive property of Landlord and not constitute the property of Tenant or Tenant's estate within the meaning of the Bankruptcy Code. All such money or other consideration not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and shall be promptly paid or delivered to Landlord.

**SECTION 24**
**SUBORDINATION**

**2401.**   This Lease, automatically and without further act or deed by Tenant, shall be subordinate to any and all Mortgages or any ground lease currently existing or that may hereafter be placed upon the Project, or any portion thereof, and to any and all renewals, amendments, modifications, participations, consolidations, replacements and extensions thereof. Upon the request of Landlord or any Mortgagee or prospective Mortgagee, Tenant shall confirm such subordination by executing and delivering within five (5) days of such request whatever instruments may be required by Landlord or any present or prospective Mortgagee or ground lessor. Tenant hereby constitutes and appoints Landlord its true and lawful attorney-in-fact in Tenant's name (which power of attorney shall be deemed irrevocable and a power coupled with an interest) to execute such confirmation if Tenant shall fail to do so within such five (5)-day period. Said subordination and the provisions of this Section shall be self-operative and no further instrument of subordination shall be required by the holder of any Mortgage or any ground lessor. The holder of any Mortgage to which this Lease is subordinate and any ground lessor shall have the right (subject to any required approval of the holders of any superior Mortgage or ground lessor) at any time to declare this Lease to be superior to the lien, provisions, operation and effect of such Mortgage or ground lease and Tenant shall execute, acknowledge and deliver all documents required by such holder or ground lessor in confirmation thereof. This Lease shall also, without further act or deed by Tenant, be subordinate to any reciprocal easement or similar agreement(s) now or in the future entered into between Landlord and other owners of real estate or tenants within or near the Project or the Development and to any condominium regime(s) now or hereafter affecting the Project or any portion thereof.

**2402.**   Tenant shall, at any time and from time to time within five (5) days following written notice from Landlord, execute, acknowledge and deliver to Landlord and any person designated by Landlord in such notice, a statement in writing: (i) certifying, as true and complete, a copy of and identifying all the documents constituting this Lease and the dates thereof, (ii) certifying that this Lease is unmodified and in full force and effect (or if modified, that the same is in full force and effect as modified and stating the date and identifying such modifications), (iii) stating the last dates to which the Minimum Rent, Percentage Rent and Additional Rent have been paid, the amount(s) thereof and the extent such Rent has been paid in advance, (iv) stating whether Landlord has completed all work or installations required under the Lease, (v) stating whether or not Landlord is in default in the performance of any covenant, agreement or condition contained in this Lease, and, if so, specifying each such default, and (vi) stating or certifying as to such other matters with respect to this Lease, the Premises or the respective parties' obligations hereunder as may be requested by Landlord or by any present or prospective Mortgagee, ground lessor or purchaser of the Premises or Project. Any such statement delivered pursuant hereto may be relied upon by any owner of the Project, or any portion thereof, any prospective purchaser of the Project, or any portion thereof, any Mortgagee, any ground lessor or any prospective assignee of any of the foregoing. The failure of Tenant to deliver any estoppel certificate in the time and in the manner required by this Section 2402 shall be deemed to be Tenant's express acknowledgment that the information set forth in any estoppel certificate delivered to Tenant for execution is true, correct and complete and agreed to by Tenant or, if no such certificate was delivered in advance for Tenant's approval, that the Lease is unmodified, in full force and effect, that no default in payment or performance exists and that any default which may exist is waived by Tenant. Tenant hereby constitutes and appoints Landlord its true and lawful attorney-in-fact in Tenant's name (which power of attorney shall be deemed irrevocable and a power coupled with an interest) to execute such statements if Tenant shall fail to do so within such five (5)-day period. Tenant waives the provisions of any statute or rule of law now or hereafter in effect which may give or purport to give Tenant any right to terminate or otherwise adversely affect this Lease and Tenant's obligations hereunder in the event any foreclosure proceeding is prosecuted or completed or in the event the building in which the Premises are contained, or the Project or Landlord's interest therein is transferred by foreclosure, by deed in lieu of foreclosure or otherwise.

**2403.**   If the Lease is not extinguished upon any such transfer or by transferee following such transfer, then at the request of such transferee, Tenant will attorn to and recognize any purchaser of the Project, or any portion thereof, at a foreclosure sale under any Mortgage, any transferee who acquires the Project, or any portion thereof, by deed in lieu of foreclosure, and the successor and assigns of such purchasers, as successor Landlord under this Lease for the unexpired balance of the Term of this Lease upon the same terms and conditions set forth in this Lease.

**2404.**   Tenant agrees that if any Mortgagee shall succeed to the interest of Landlord under this Lease, such Mortgagee shall not be:

(i)   liable for any act or omission of Landlord;

(ii)     liable for the return of all or any part of the Security Deposit unless such Security Deposit has been turned over to the Mortgagee;

(iii)    subject to any offsets or defenses which Tenant might have against Landlord;

(iv)    bound by any Rent which Tenant might have paid  more than one month in advance; or

(v)     bound by any amendment or modification of this Lease made without such Mortgagee's prior written consent.

**2405.**    Although the provision of Sections 2401, 2403 and 2404 are effective automatically and without further act or deed by Tenant, Tenant shall execute, acknowledge and deliver any and all documents deemed necessary to further evidence Tenant's agreement with these provisions.

**2406.**    If Landlord can obtain approval of this Lease by its existing or future Mortgagees only upon the basis of modifications of the terms and provisions of this Lease, Tenant shall agree to such modifications and shall execute any instruments amending this Lease containing such modifications provided that such modifications do not (i) materially increase Tenant's monetary obligations hereunder or (ii) reduce the term hereof or (iii) otherwise materially and adversely affect any material and substantive right of Tenant expressly granted hereunder, and if Tenant refuses to approve in writing any such modifications within thirty (30) days after Landlord's request therefor, Landlord shall have the right to terminate this Lease.

**2407.**    Within ten (10) days of receipt of a request therefor from Landlord, Tenant shall forward to Landlord a financial statement of Tenant for its most completed fiscal year and/or, if applicable, Tenant's guarantor or surety, in form satisfactory to Landlord, certified by an independent certified public accountant acceptable to Landlord.  If the financial credit rating of Tenant and/or, if applicable, Tenant's guarantor or surety is not acceptable for the purposes of any existing or contemplated financing, Landlord shall have the right to terminate this Lease if Tenant refuses to execute or supply such additional assurances and/or guarantors and/or sureties as Landlord shall state as necessary for such acceptance within thirty (30) days after Landlord's request therefor. If any such right to terminate is exercised pursuant to Section 2406 or 2407, each of the parties shall be released from any other further liability accruing after such date, any of the Deposits made hereunder shall (subject to the other provisions of this Lease) be refunded to Tenant without interest, and neither party shall have any liability to the other by reason of such termination.

**2408.**    Tenant shall give any Mortgagee a copy of any notice of default served upon Landlord, provided that prior to such notice Tenant has been notified, in writing (by way of notice of assignment of rents and leases, or otherwise) of the address of such Mortgagees. Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for in this Lease, then the Mortgagee(s) shall have an additional thirty (30) days within which to cure such default or, if such default cannot reasonably be cured within that time, such additional time as may be necessary if, within thirty (30) days, any such Mortgagee(s) has commenced and is diligently pursuing the remedies necessary to cure such default (including, but not limited to, commencement of foreclosure proceedings, if necessary to effect such cure), in which event this Lease shall not be terminated so long as such remedies are being diligently pursued.

### SECTION 25
### RECORDATION

**2501.**    It is agreed that Tenant shall not record this Lease and/or its Exhibits.  Any violation of this clause shall be deemed an Event of Default on the part of Tenant, and Landlord, in addition to other remedies available for an Event of Default, shall be entitled to take all steps necessary to remove the Lease and/or its Exhibits from any records.

### SECTION 26
### DEFAULT

**2601.**    The occurrence of any of the following shall constitute an event of default (each, an "Event of Default") under this Lease:

(i)      Failure of Tenant to pay any Rent when due;

(ii)     Failure of Tenant to commence business by the end of the Fixturing Period;

(iii)    Discontinuance of the operation of Tenant's business at the Premises;

(iv)    Apparent abandonment and/or abandonment of the Premises;

(v)     An Event of Bankruptcy pursuant to Section 22;

(vi)    Tenant's removal or attempt to remove, or manifestation of an intention to remove, Tenant's goods or property from or out of the Premises (other than in the ordinary and usual course of business) without having first paid and satisfied all obligations to Landlord for all Rent which may become due during the entire Term of this Lease;

(vii)   Breach or failure of Tenant to strictly comply with any of the terms and provisions of Sections 9, 23, 24, 25, 31, the Restaurant Provisions (if any), or the Club Provisions (if any) of this Lease ; or,

(viii)  Tenant's failure to perform any covenant, condition or obligation under this Lease (other than those set forth in Sections 2601(i) through (vii) above) within five (5) days after written notice and demand by Landlord, unless the failure is of such a character as to require more than five (5) days to cure, in which event it shall be an Event of Default upon (a) Tenant's failure to commence and proceed diligently to cure such default with such five (5) day period, and/or (b) Tenant's failure to cure such default within twenty (20) days after Landlord's notice to Tenant of such default; provided, however, no such notice shall be required hereunder if Tenant has received a similar notice within three hundred  sixty-five (365) days prior to such default.

**2602.**    Upon the occurrence of an Event of Default:

(i)      Landlord may terminate this Lease and/or any services provided to Tenant under this Lease, by giving notice of such termination to Tenant, whereupon this Lease shall automatically cease and terminate, and Tenant shall be obligated

to immediately quit the Premises. Any other notice to quit or notice of Landlord's intention to re-enter the Premises is hereby expressly waived. If Landlord elects to terminate this Lease, everything contained in this Lease on the part of Landlord to be done and performed shall cease, without prejudice, however, to the right of Landlord to recover from Tenant all Rent accrued up to the time of termination or recovery of possession by Landlord, whichever is later, any amounts set forth below (including but not limited to Rent through the Expiration Date had there been no such termination) and any other monetary damages or loss of Rent sustained by Landlord.

(ii)     Whether or not this Lease is terminated pursuant to Section 2602(i), Landlord may proceed to recover possession of the Premises under and by virtue of the provisions of the laws of the state where the Premises are located or by such other proceedings, including re-entry and possession, as may be applicable.

(iii)    Should this Lease be terminated pursuant to Section 2602(i) or if Tenant shall abandon or vacate the Premises (whether or not the keys shall have been surrendered or the Rent shall have been paid) before the Expiration Date without having paid the full Rent for the remainder of the Term, Landlord shall have the option to relet the Premises (or any part thereof, alone or together with other premises) for such rent and upon such terms as Landlord (in Landlord's sole, subjective discretion) may deem advisable and, if the full Rent reserved under this Lease (and any of the costs, expenses, or damages indicated below) shall not be received by Landlord, Tenant shall be liable for all damages sustained by Landlord, including, without limitation, deficiency in Rent, attorneys' fees, brokerage fees, and expenses of placing the Premises in first-class rentable condition. Landlord, in putting the Premises in good order or preparing the same for re-rental, may, at Landlord's option, make such alterations, repairs or replacements in and to the Premises as Landlord, in its sole discretion, considers advisable and necessary for the purpose of reletting the Premises, and the making of such alterations, repairs or replacements shall not operate or be construed to release Tenant from liability under this Lease. Landlord shall in no event be liable in any way whatsoever for failure to relet the Premises or, if the Premises are relet, for failure to collect the rent under such reletting, and in no event shall Tenant be entitled to receive the excess, if any, of such net rent collected over the sums payable by Tenant to Landlord.

(iv)    If Tenant shall fail to pay any installment of Rent pursuant to the terms of this Lease, then Landlord may, by giving notice to Tenant, (a) declare the entire Rent reserved under this Lease (or any portion thereof stipulated in such notice) to be due and payable within three (3) days of such notice; or (b) require an additional security deposit to be paid to Landlord within three (3) days of such notice, in an amount determined by Landlord in its sole discretion but not to exceed the Rent reserved during the next twelve (12)-month period.

(v)     Any damage or loss of Rent sustained by Landlord may be recovered by Landlord, at Landlord's option: (i) in one (1) or more separate actions, at any time and from time to time, as and to the extent that said damages and/or loss of Rent shall have accrued; or (ii) in a single action deferred until on or after the Expiration Date (in which event Tenant hereby agrees that the cause of action shall not be deemed to have accrued until the Expiration Date), or (iii) in a single proceeding prior to either the time of reletting or the Expiration Date, in which event Tenant agrees to pay Landlord the present value of the Rent reserved through the Expiration Date (without regard to the earlier termination) under this Lease on the date of breach, discounted at the per annum rate equal to the Federal Reserve Bank discount rate, the latter remedy hereby acknowledged to be a fair estimation of Landlord's damages and not an unenforceable penalty.

(vi)    Nothing contained herein shall prevent the enforcement of any claim Landlord may have against Tenant for anticipatory breach of the unexpired Term. In the event of a breach or anticipatory breach by Tenant of any of the covenants or provisions hereof, Landlord shall have the right of injunction, the right to specific performance, and the right to invoke any remedy allowed at law or in equity or under this Lease.

(vii)   If Tenant fails to conduct its business operations at the Premises during the Minimum Store hours for more than three (3) consecutive business days, it is agreed and understood that Landlord shall have been deprived of an important right under this Lease and, as a result thereof, shall suffer damages in an amount which is not readily ascertainable; therefore, in addition to, and not in lieu of, any other remedies which Landlord has under this Lease, at law or in equity, Landlord shall have the right to collect as liquidated damages (and not as a penalty) three (3) times the Rent due for each month, or portion thereof, that such discontinuance shall persist. Notwithstanding the foregoing in this Section 2602 (vii), Tenant shall not be deemed to have failed to be open for business if Tenant closes (a) for inventory (provided that such closing for inventory does not exceed 48 hours in any twelve (12) month period), (b) for Christmas Day, New Years Day, Labor Day, Memorial Day or Independence Day, or (c) during the period in which the Premises are untenantable due to a fire or other casualty provided Tenant diligently pursues repairs and reopening.

**2603.**   If, under the provisions hereof, Landlord shall institute proceedings against Tenant and a compromise or settlement thereof shall be made, the same shall not constitute a waiver of any other covenant, condition, agreement or obligation contained in this Lease, nor of any of Landlord's rights under this Lease. No waiver by Landlord of any breach of any covenant, condition or agreement contained in this Lease and the Rules and Regulations promulgated hereunder shall operate as a waiver of such covenant, condition, agreement or rule or regulation itself, or of any subsequent breach thereof. No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing and signed by Landlord. No endorsement or statement on any check or letter accompanying a check for payment of Rent shall be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or to pursue any other remedy provided in this Lease.

**2604.**   If Tenant defaults in the making of any payment or in the doing of any act under this Lease required to be made or done by Tenant, then Landlord may, but shall not be required to, make such payment or do such act, and charge the amount of the expense thereof, if made or done by Landlord, with interest thereon at the Lease Interest Rate. Such payment and interest shall constitute Additional Rent hereunder due and payable within five (5) days of Landlord's demand therefor, but the making of such payment or the taking of such action by Landlord shall not operate to cure such default or to estop Landlord from the pursuit of any remedy to which Landlord would otherwise be entitled at law, in equity or under this Lease.

**2605.**   If Tenant fails to pay any Rent in accordance with the provisions of this Lease when such Rent becomes due and payable as specified in Section 711, Tenant shall pay to Landlord a late charge equal to the greater of five percent (5%) of the amount due or Two Hundred Fifty Dollars ($250.00) for each month that such Rent remains unpaid, and, in addition, such unpaid Rent shall bear interest at the Lease Interest Rate. Such late charge and interest shall constitute Additional Rent hereunder immediately due and payable. If payments have been accelerated pursuant to Section 2602(iv) or Section 2602(v) above, all Additional Rent due under any provision of this Lease, including, but not limited to, all charges and interest, shall be due and payable immediately.

**2606.**   Landlord shall have a lien upon all the personal property and fixtures of Tenant in the Premises, as and for security for the Rent and other obligations of Tenant herein provided. In order to perfect and enforce said lien, Landlord may, at any time after

default by Tenant in the payment of Rent or other obligations to be performed or complied with by Tenant under this Lease, seize and take possession of any and all fixtures and personal property belonging to Tenant which may be found in and upon the Premises. If Tenant fails to redeem the fixtures and personal property and fixtures so seized, by payment of whatever sum may be due Landlord under and by virtue of the provisions of this Lease, then, and in that event, Landlord shall have the right, after five (5) days' written notice to Tenant of its intention to do so, to sell such personal property so seized at public or private sale and upon such terms and conditions as to Landlord may appear advantageous, and, after the payment of all proper charges incident to such sale, apply the proceeds thereof to the payment of any balance due to Landlord on account of Rent or other obligations of Tenant pursuant to this Lease. If there shall then remain in the hands of Landlord any balance realized from the sale of said personal property and fixtures as aforesaid, the same shall be paid over to Tenant. The exercise of the foregoing remedy by Landlord shall not relieve or discharge Tenant from any deficiency owed to Landlord which Landlord has the right to enforce pursuant to any other provision of this Lease.

**2607.**   Tenant hereby waives and surrenders all rights and privileges which it might have under or by reason of any present or future law to redeem the Premises, or to have a continuance of this Lease for the remainder of the Term after being dispossessed or ejected therefrom by process of law, or under the terms of this Lease, or after the termination of this Lease as herein provided.

**2608.**   The specified remedies to which Landlord may resort hereunder are cumulative and are not intended to be exclusive of any remedies or means of redress to which Landlord may at any time be lawfully entitled at law, in equity or under this Lease, and Landlord may invoke any remedy (including the remedy of specific performance) allowed at law, in equity or under this Lease as if specific remedies were not provided for herein.

**2609.**   Landlord shall have the right to apply any payments made by Tenant to the satisfaction of any debt or obligation of Tenant to Landlord according to Landlord's sole and absolute discretion and regardless of the instructions of Tenant as to application of any such sum, whether such instructions be endorsed upon Tenant's check or otherwise.

**2610.**   In addition to any other rights and remedies which Landlord may have at law, in equity or under this Lease, if (a) Tenant fails to deliver all insurance certificates required under Section 9 hereof within the number of days required in Section 9; (b) Tenant fails to deliver Tenant's Plans to Landlord pursuant to Section 14 hereof; (c) Tenant fails to deliver the Sign Plans to Landlord pursuant to Section 18 hereof; (d) Tenant fails to deliver the statements of Gross Sales to Landlord pursuant to Sections 705 and/or 706 hereof; or (e) Tenant fails to install an exterior sign as approved by Landlord by the end of the Fixturing Period, then Tenant shall pay to Landlord, upon demand, a late charge of Two Hundred Fifty Dollars ($250.00) for each thirty (30) day period during which any such failure shall continue.

## SECTION 27
### LEGAL PROCEEDINGS AND NOTICES

**2701.**   Should Landlord file suit against Tenant for any reason, including, but not limited to, a suit for possession of the Premises, payment of Rent, damages, or to enforce or interpret the provisions of this Lease, Tenant shall reimburse Landlord for its reasonable attorneys' fees and cost of litigation, which are stipulated, if suit is for past due Rent and/or money damages, to be not less than fifteen percent (15%) of the monies awarded to Landlord.

**2702.**   This Lease is made pursuant to, and shall be governed by, and construed in accordance with the Laws of the State of Missouri and any applicable local, municipal or county rules, regulations, and ordinances. Any action or proceeding arising hereunder shall be brought in the courts of such state; provided, that if such action or proceeding arises under the Constitution, laws or treaties of the United States of America, or if there is a diversity of citizenship between the parties thereto, so that it is to be brought in a United States District Court, it shall be brought in the United States District Court for the District of Maryland. Should any provision of this Lease require judicial interpretation, it is agreed that the court interpreting or considering same shall not apply the presumption that the terms hereof shall be more strictly construed against the party who itself or through its agent prepared the same.

**2703.**   If any provision of this Lease or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Lease shall be valid and be enforced to the fullest extent permitted by law. In the event that any provision of this Lease would be deemed unenforceable due to the excessiveness or unreasonableness of any fee, charge, cost or expense for which payment is required thereby, then such provision automatically shall be deemed to be modified to provide that the amount of such fee, charge, cost or expense shall be the maximum amount permitted by law and such provision, as so modified, shall be enforced.

**2704.**   Tenant hereby waives all rights of redemption granted by any present or future Laws.

**2705.**   All notices, demands and requests (collectively the "notice" or "Notice") which either party hereto either is required to or may desire to serve upon the other shall be in writing and shall be sufficiently served upon such other party, by (a) mailing a copy thereof by certified or registered mail, postage prepaid, return receipt requested, addressed to the party to whom the notice is directed at the "Notice Address" of such party or (b) delivery by a reliable overnight courier (such as Federal Express), all charges prepaid, furnishing a receipt or providing other evidence of delivery upon delivery, and addressed to the party to whom the notice is addressed at the Notice Address of the party or (c) personal delivery. The Notice Address of each party is set forth in Sections 201 (r) and 201 (s). Any Notice to Landlord shall include an additional copy to Landlord at the address set forth in Section 201(n) but marked "Attn: General Counsel". Landlord may send Notice(s) by its attorney from time to time and such notice(s) shall constitute valid Notice(s) hereunder. Notices forwarded pursuant to this Section shall be deemed conclusively to have been received by the addressee, (a) if delivered in person as of the date of the delivery receipt, (b) if forwarded by a private courier service guaranteeing next business day delivery as of the business day next following the date shown on the sender's receipt from such private courier service, and (c) if by United States registered or certified mail as of the third business day next following the date deposited in the United States mail. Either Landlord or Tenant may, at any time and from time-to-time, change its Notice Address by sending a notice in accordance herewith to the other party stating the change and setting forth the new address for notices.

**2706.**   Tenant hereby (i) irrevocably appoints Tenant's Agent for Service of Process as Tenant's agent to accept service of process in any action or proceeding for the enforcement against Tenant of any obligation or liability under this Lease, (ii) agrees that any such action or proceeding against Tenant may be commenced in any court of competent jurisdiction by service of process upon Tenant's Agent for Service of Process with the same effect as if Tenant were physically present in the location where service was made upon Tenant's Agent for Service of Process and had lawfully been served with process in such location and (iii) directs

Tenant's Agent for Service of Process to forward a copy of any notice, process or pleading served on Tenant's Agent for Service of Process to Tenant in the same manner in which notices are to be delivered to Tenant pursuant to Section 2705.

## SECTION 28
### SUCCESSORS AND ASSIGNS

**2801.**    If in connection with or as a consequence of the sale, transfer or other disposition of the Project, or any portion thereof, Landlord ceases to be the owner of the Project, Landlord shall be entirely freed and relieved from the performance and observance thereafter of all covenants and obligations under this Lease on the part of Landlord to be performed and observed, it being understood and agreed in such event (and it shall be deemed and construed as a covenant running with the land) that the person succeeding to Landlord's ownership of said Project shall, subject to the provisions contained in Section 2401, thereupon and thereafter assume, and perform and observe, any and all of such covenants and obligations of Landlord thereafter accruing while such party is the owner of the Project. Any Deposits or other security given by Tenant to secure performance of Tenant's obligations hereunder may be assigned and transferred by Landlord to its successor in interest, and Landlord shall thereby be discharged of any further obligation relating thereto.

**2802.**    If there shall be more than one party constituting Tenant, they shall all be bound jointly and severally by the terms, covenants, agreements and obligations under this Lease, and the word "Tenant" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more; and if there shall be more than one party constituting Tenant, any notice required or permitted by the terms of this Lease may be given by or to any one thereof and shall have the same force and effect as if given by or to all thereof. No rights, however, shall inure to the benefit of any assignee, sublessee or other transferee, of Tenant unless the Transfer to such transferee has been approved by Landlord in writing in accordance with this Lease but no approval of a sublease shall be deemed to create a privity or landlord and tenant relationship between Landlord and any subtenant.

**2803.**    This Lease and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Landlord, Tenant and their respective successors and assigns; provided, however, no rights shall inure to the benefit of any assignee or successor of Tenant to the extent such assignee or successor acquired any purported interest herein in violation of Section 23. Upon any sale or other transfer by Landlord of its interest in the Premises, and assumption of possession of the Premises by the transferee, such transferee shall be solely responsible for all obligations of Landlord under this Lease accruing thereafter and Landlord shall be fully and forever released of its obligations hereunder.

## SECTION 29
### BROKERS AND AGENTS

**2901.**    Each of the parties hereto represents and warrants that, other than the brokerage commission payable by Landlord to Charles E. Smith Commercial Realty pursuant to a separate agreement, there are no other brokerage commissions or finders' fees of any kind due in connection with this Lease, and each of the parties hereto shall indemnify the other against, and hold it harmless from, any and all liabilities, damages, costs, claims and obligations arising from any such claim (including, without limitation, the cost of attorneys' fees in connection therewith) by any party claiming through them.

**2902.**    The Landlord's Agent(s) listed in Section 201(n) are acting as Landlord's Agent only and shall not in any event be held liable to Tenant for the fulfillment or non-fulfillment of any of the terms, covenants, conditions or obligations of this Lease or for any action or proceedings that may be taken by Landlord against Tenant, or by Tenant against Landlord, including, but not limited to, any such action arising out of, in connection with or in any manner relating to, the performance or nonperformance by Landlord's Agent of any act pursuant to this Lease or Landlord's direction. Any waiver by Tenant of Landlord's liability under this Lease, including, but not limited to, any waiver of subrogation rights, shall apply with equal force and effect to Landlord's Agent. Landlord shall have the right to designate a new Landlord's Agent, from time-to-time, upon notice to Tenant.

## SECTION 30
### PERSONAL PROPERTY

**3001.**    This Lease shall constitute a security agreement under the Uniform Commercial Code of the jurisdiction in which the Project is located. None of the goods, wares, merchandise, inventory, furniture, fixtures, machinery, equipment or other personal property of Tenant situated on or in the Premises shall be removed from the Premises without the prior written consent of Landlord unless all Rent, and all other charges and sums then due to Landlord shall have been paid and discharged in full, and no Event of Default by Tenant has occurred. Upon the occurrence of an Event of Default by Tenant under this Lease, Landlord shall have the option, in addition to any other remedies provided at law, in equity or under this Lease to enter into the Premises with or without the permission of Tenant and take possession of any and all goods, wares, merchandise, inventory, furniture, fixtures, machinery, equipment and other personal property of Tenant situated on or in the Premises without liability for trespass or conversion and to enforce the first lien and security interest hereby granted in any manner provided by law. Upon Landlord's request, Tenant shall execute and deliver to Landlord one or more U.C.C. Financing Statements evidencing the foregoing lien in favor of Landlord (in a form required by Landlord and Law). If Tenant shall fail to execute such U.C.C. Financing Statements within ten (10) days of Landlord's request, Tenant hereby constitutes and appoints Landlord its true and lawful attorney-in-fact in Tenant's name (which power of attorney shall be deemed irrevocable and a power coupled with an interest) to execute such U.C.C. Financing Statements.

## SECTION 31
### ENVIRONMENTAL COVENANTS AND PROHIBITED MATERIALS

**3101.**    Tenant shall maintain the Premises, and its operations thereon, in compliance with all federal, state and local laws, ordinances, rules, regulations and legally enforceable policies and guidelines regarding the environment, human health or safety ("Environmental Laws") which apply to the Premises or its use. Tenant shall cure in compliance with Environmental Laws any hazardous substances, hazardous wastes, toxic substances, pollutants or contaminants (as those terms are defined in any of the Environmental Laws or at common law, hereinafter "Hazardous Substances") discharged by the Tenant Parties, on, at or under the Premises, but Tenant shall not be responsible for curing any Hazardous Substances existing on the commencement date of the Lease or caused by the Landlord Parties during the term of the Lease. Tenant shall not install any underground or aboveground storage tanks on the Premises without Landlord's prior written permission, which may be withheld in Landlord's sole discretion. In no event shall Tenant store, locate, generate, produce, process, treat, transport, incorporate, discharge, emit,

release, deposit or dispose of any Hazardous Substances in, upon, under, over or from the Premises except in the normal course of operation of the Premises and provided that Tenant complies with all applicable Environmental Laws with respect to any Hazardous Substances in, upon, under, over or from the Premises in the normal course of operation of the Premises.

**3102.** Notwithstanding the expiration or earlier termination of this Lease, if upon the expiration or earlier termination of this Lease there exists a violation of Environmental Laws at the Premises for which Tenant is liable or if Tenant has failed to fulfill its obligations under this Section 31, and if such violation or failure precludes another tenant from commencing its work or operations at the Premises, Tenant shall reimburse Landlord for Landlord's lost rental plus the amount required for Landlord to cure the violation of Environmental Laws and to cure Tenant's default by fulfilling Tenant's obligations under this Lease, if possible.

**3103.** Tenant shall indemnify, defend and hold Landlord and the Landlord Indemnitees harmless from any and all fines, suits, procedures, claims, liabilities, costs and actions of any kind, including counsel fees (including those incurred to enforce this indemnity or for any other purpose) arising out of or in any way related to (1) the use, handling, generation, treatment, storage, disposal, other management or Release of any Hazardous Substances, in or about the Project, the Development or the Premises, whether or not the Tenant Parties may have acted negligently with respect to such Hazardous Substances, by Tenant or the Tenant Related Parties, or (2) Tenant's failure to comply with the provisions of Section 31 of this Lease. Tenant's obligations and liabilities under this Lease survive the expiration or earlier termination of this Lease, and shall continue for so long as Landlord remains responsible or liable under Environmental Laws or otherwise for either any spills or discharges of Hazardous Substances or for any violations of Environmental Laws which occurred during Tenant's possession of the Premises, unless caused by the Landlord Parties. Tenant's failure to abide by the terms of this Section 31 shall be enforceable by injunction.

## SECTION 32
### APPROVALS

**3201.** Except as otherwise expressly set forth in this Lease, any discretionary action or decision or approval or consent requested or required of Landlord under this Lease may be made, granted or denied by Landlord in its sole, absolute and unfettered discretion. Tenant hereby expressly acknowledges and agrees that Landlord shall not be held liable to Tenant, any person claiming under Tenant or any third party as a result of Landlord's approval or failure to approve or consent to any discretionary action or decision requested or required by Landlord under this Lease. If Landlord is found to be in breach of this Lease as a result of Landlord's failure to grant such approval or consent despite the foregoing provisions of this Section 32, Tenant's sole and exclusive remedy shall be to obtain injunctive relief directing Landlord to grant or deny such approval or consent. Landlord's consent or approval of any request by Tenant shall not be deemed a consent to or approval of such action on any subsequent occasion or a consent to or approval of any other action on the same or any subsequent occasion.

**3202.** Neither Landlord's approval of the Tenant's Plans and Sign Plans, nor any other inspections or approvals of the improvements on the Project or plans for construction thereof by the Landlord Parties or inspecting engineers, shall constitute a warranty or representation as to the technical sufficiency, adequacy or safety of the plans, structures, any of their component parts, or any other physical condition or feature pertaining to the improvements, it being acknowledged by Tenant that Landlord has made such approvals solely as a landlord in determining and protecting the value of its property for internal purposes, and not as an expert in construction-related matters.

## SECTION 33
### LIABILITY OF LANDLORD

**3301.** Notwithstanding anything to the contrary contained in this Lease, Tenant acknowledges and agrees that Landlord is not and shall not be liable to Tenant, its employees, agents, contractors, business invitees, licensees, customers, clients, family members, guests, or any other person claiming under or through Tenant, for any damage, compensation or claim arising from the necessity of repairing or replacing any portion of the Premises or the Project, interruption in the use of the Premises, accident or damage resulting from the use or operation (by Landlord, Tenant or any other person or persons whatsoever) of the Premises or the Project or any part thereof or anything contained therein or the termination of this Lease by reason of the destruction of the Premises or the Project, or from any fire, and/or any other casualty, robbery, theft or mysterious disappearance, or for any personal injury arising from the use, occupancy and condition of the Premises or the Project, unless subject to Section 909, any of the foregoing is solely attributable to the willful misconduct of Landlord. Notwithstanding the foregoing, in no event shall Landlord or its agents or employees have any liability to Tenant for any damage caused by any other tenants or occupants of the Premises or the Project or the Development or any other person claiming under or through Tenant, or their agents or employees, or for any damage caused by governmental or quasi-governmental authorities or public or private utilities or their agents or employees. Tenant shall not be entitled to any abatement or diminution of Rent as a result of any of the foregoing occurrences, nor shall the same release Tenant from its obligations under this Lease or constitute an eviction. Any goods, property or personal effects of Tenant, its employees, agents, contractors, business invitees, licensees, customers, clients, family members or guests, stored or placed in or about the Premises shall be at their sole risk, and Landlord shall not in any manner be held responsible therefor. Tenant acknowledges that Landlord is not under any obligation to carry insurance on the Premises or Tenant's furniture, furnishings, fixtures, equipment and/or improvements in or to the Premises. It is expressly understood and agreed that Tenant shall look solely to its business interruption and property damage insurance policies, and not to the Landlord Indemnitees for reimbursement for any damages or losses incurred as a result of any of the foregoing occurrences, and that said policies must contain waiver of subrogation clauses.

**3302.** Tenant shall neither assert nor seek to enforce any claim, and hereby waives any and all rights to assert or claim, for breach of this Lease against any of Landlord's assets other than Landlord's interest in the Project, or any portion thereof, and Tenant shall look solely to such interest for the satisfaction of any liability of Landlord under this Lease, it being specifically agreed that in no event shall Landlord (or any of the officers, trustees, directors, partners, beneficiaries, joint venturers, members, stockholders, or other principals or representatives, disclosed or undisclosed) ever be personally liable for any such liability. In no event shall Landlord (or any of the officers, trustees, directors, partners, beneficiaries, joint venturers, members, stockholders, or other principals or representatives, disclosed or undisclosed) ever be liable for consequential damages. If by reason of Landlord's failure to complete construction of the Project or the Premises, Landlord is held to be in breach of this Lease, Tenant's sole and exclusive remedy shall be a right to terminate this Lease.

<u>SECTION 34</u>
ENTIRE AGREEMENT AND MISCELLANEOUS

**3401.** The submission of this Lease by Landlord for examination by Tenant does not constitute a reservation of, or option for, the Premises, and this Lease shall become effective only upon execution and delivery by all parties hereto; <u>provided, however,</u> Tenant's execution and delivery of this Lease to Landlord shall be deemed an irrevocable offer to Lease upon the terms and conditions contained in this Lease for a period of thirty (30) business days from the date of delivery of the signed Lease to Landlord. There are no oral agreements between the parties hereto affecting this Lease, the Premises, the Project and/or the Development and this Lease supersedes and cancels any and all previous written or oral negotiations, arrangements, letters of intent, lease proposals, brochures, agreements, representations, promises, warranties and understandings between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. All prior communications from Landlord with respect to estimated charges payable by Tenant hereunder are for information only and are not to be construed as representations of the actual charges that Tenant is required to pay hereunder, or as binding upon Landlord in any manner whatsoever. Without limiting the foregoing, Tenant hereby expressly acknowledges that the Landlord Parties have made no representations, warranties, inducements or promises with respect to the Project, the Development or the Premises or this Lease or estimated Gross Sales or the number or kind of tenants in the Project or the Development except as herein expressly set forth. Tenant acknowledges that prior to entering into this Lease, Tenant has satisfied itself of all its concerns, if any, by conducting an independent investigation into all prior information provided by (or statements made by) Landlord or its agents (including, without limitation, Landlord's Agent). Tenant acknowledges that it does not have any exclusive rights in the Project with respect to the sale of its merchandise or the provision of its services.

**3402.** Nothing contained in this Lease shall be deemed or construed to create a partnership or joint venture of or between Landlord and Tenant, or to create any other relationship between the parties hereto other than that of Landlord and Tenant.

**3403.** Time shall be of the essence in the performance of all obligations of Tenant under this Lease.

**3404.** The Exhibits attached hereto (or contemplated to be completed and attached to this Lease within the time periods specified in this Lease) are hereby made a part of this Lease as fully as if set forth in the text of this Lease.

Unless expressly set forth to the contrary in this Lease, any site plans or tenant lists set forth in this Lease or in Exhibits to this Lease are not intended, in any way, to constitute a representation or warranty by, or on behalf of, Landlord (a) as to the past, current or future layout of the Project or the Development or (b) as to the past, existing or future tenants or occupants in the Project or the Development. Any site plans or listing of tenants or occupants in the Project or the Development set forth in this Lease are for the sole purpose of showing the approximate location of the Premises in the Project and are to be used for no other purposes whatsoever. The labeling of any past, current or future tenants or occupants in the Project or the Development on any Exhibit to this Lease is not intended to represent or warrant that such listed tenants or occupants have been, are or will be tenants or occupants in the Project or the Development.

**3405.** Tenant, at its sole expense, shall comply, and shall cause the Premises to comply, with all Laws, rules, orders and regulations, including without limitation, all energy-related requirements, of Federal, state, county, and municipal authorities and with any direction of any public officer or officers, pursuant to law, which shall impose any duty upon Landlord or Tenant with respect to or arising out of Tenant's use or occupancy of the Premises, including, without limitation, the Americans With Disabilities Act, as amended from time to time. Tenant shall reimburse and compensate Landlord for all expenditures made by, or damages or fines sustained or incurred by, Landlord due to nonperformance or noncompliance with or breach or failure to observe an item, covenant, or condition of this Lease upon Tenant's part to be kept, observed, performed or complied with. If Tenant receives notice of any violation of law, ordinance, order or regulation applicable to the Premises, it shall give prompt notice thereof to Landlord.

**3406.** Notwithstanding any provision in this Lease to the contrary, if the Term has not commenced within twenty-one (21) years after the Date of Lease, this Lease shall automatically terminate on the 21st anniversary of the Date of Lease. The sole purpose of this provision is to avoid any possible interpretation of this Lease as violating the Rule Against Perpetuities or other rule of law against restraints on alienation.

**3407.** Masculine, feminine or neuter pronouns shall be substituted for one another, and the plural shall be substituted for the singular number, in any place or places herein in which the context may require such substitution.

**3408.** Any headings preceding the text of the several Sections and subparagraphs hereof are inserted solely for convenience of reference and shall not constitute a part of this Lease, nor shall they affect its meaning, construction or effect.

**3409.** If Tenant is a corporation, the individual(s) executing this Lease on behalf of Tenant hereby covenant(s) and warrant(s) that: Tenant is a duly formed corporation qualified to do business and in good standing in the State of Missouri; Tenant will remain qualified to do business and in good standing in said state throughout the Term; and such person(s) are duly authorized by such corporation to execute and deliver this Lease on behalf of the corporation. If such corporation is not qualified as stated herein, or is not duly existing, the individual(s) signing on behalf of the corporation hereby acknowledge and agree that they individually, jointly, and severally, shall be responsible for all terms, covenants, and obligations of this Lease; in addition to said corporation. Further, if Tenant is a corporation and a second officer fails to attest to this Lease, then Tenant shall be deemed to represent that such attestation is not required for the corporate signature to be valid and binding upon the corporation.

**3410.** If Tenant is a partnership or limited liability partnership or company, the individual(s) executing this Lease on behalf of Tenant hereby covenant(s) and warrant(s) that: Tenant is a duly formed partnership or limited liability partnership or company, as applicable, qualified to do business and in good standing in the State of Missouri; Tenant will remain qualified to do business and in good standing in said state throughout the Term; and such person(s) are duly authorized by the applicable entity to execute and deliver this Lease on behalf of the partnership or limited liability partnership or company. If the applicable entity is not qualified as stated herein, or is not duly existing, the individual(s) signing on behalf of such entity hereby acknowledge and agree that they individually, jointly, and severally, shall be responsible for all terms, covenants, and obligations of this Lease; in addition to said entity.

**3411.** The term "including", as used in this Lease, shall mean in each instance "including, without limitation" and the listed items following such term shall be construed to be exemplary and not exhaustive.

**3412.** This Lease may not be modified or amended except by a written instrument signed on behalf of Landlord and Tenant.

**3413.   Right to Terminate.** Intentionally deleted.

**3414.**   Tenant will not discriminate in the conduct and operation of its business in the Premises against any person or group of persons because of the race, creed, color, sex, age, national origin or ancestry of such person or group of persons.

**3415.**   Tenant shall not impose any counterclaim or counterclaims in any proceeding for possession of the Premises or summary proceeding, or other action based on termination or holdover, except to the extent that Tenant's failure to make such claim in such proceeding would, as a matter of law, preclude Tenant from raising such claim in any other proceeding or forum.

**3416.**   Upon execution of this Lease by Tenant and thereafter within ten (10) days after written request from Landlord, Tenant shall deliver to Landlord a copy of an audited financial statement or annual report of Tenant and any guarantor for the most recently completed fiscal period and tax returns for the most recent three (3) years.

**3417.**   At anytime and from time to time throughout the term of this Lease, Landlord shall have the right to relocate the Premises (or substitute premises) to another premises in the Project or the Development. In the event Landlord makes such election, (a) Landlord shall notify Tenant of such election in writing at least thirty (30) days prior to the date on which such relocation shall be required to occur, (b) the new premises shall be comparable in size to the existing Premises, (c) Landlord shall pay the commercially reasonable cost of moving Tenant's fixtures, equipment and inventory to the new premises, and (d) this Lease shall remain in effect pursuant to its terms (including rental) with respect to the substitute premises. In such event, Landlord shall prepare an amendment to this Lease evidencing the relocation of the Premises and reflecting the square footage of the substitute premises, and Tenant shall execute such amendment to the Lease. Following such relocation, the term "Premises", as used in this Lease, shall mean the substitute premises. If the substitute premises are not owned by Landlord, Landlord may assign to the owner who shall enter into the amendment and take over as Landlord.

**3418.**   Nothing contained in this Lease shall be construed so as to confer upon any other party the rights of a third party beneficiary except rights contained herein for the benefit of a Mortgagee and the City, as expressly set forth herein.

**3419.**   Landlord's agents and employees may purchase food, beverages, and/or merchandise from Tenant without identifying themselves so as to verify that all customers are being treated in a courteous and businesslike manner, that the use of the Premises corresponds with the use provided for in this Lease and that each customer receives a receipt for all purchases. If any inspection made pursuant to this section discloses that Tenant is not properly receipting for all purchases or is otherwise in default, Tenant shall pay Landlord's cost of such inspection. At the conclusion of any inspection, Landlord shall have the right to return such unused merchandise to Tenant for a full refund.

**3420.**   Except for the payment of monetary obligations, if Landlord is delayed or prevented from performing any of its obligations under this Lease by reason of strike, labor troubles, governmental action or inaction, or complying with governmental order, or any similar cause whatsoever beyond its control, the period of such delay or such prevention shall be deemed added to the time herein provided for the performance of any such obligation by Landlord.

**3421.**   Tenant hereby acknowledges and agrees that this Lease is intended to be a complete net lease to Landlord, except as expressly herein set out, that Landlord is not responsible for any costs, charges, expenses and outlays of any nature whatsoever arising from or relating to the Premises, or the use and occupancy thereof, or the contents thereof or the business carried on therein, and Tenant shall pay all charges, impositions, costs and expenses of every nature and kind relating to the Premises, except as expressly otherwise agreed herein.

**3422.**   Tenant further acknowledges that the Project is to be developed and constructed, and that Landlord's development and construction of the Project and the Development, as well as completion or renovation of the Common Areas and other premises, may cause interference or interruption with the Common Areas and Tenant's business. Notwithstanding any interruption or interference, under no circumstances will Landlord be liable in damages or otherwise to Tenant or Tenant's permittees, licensee, invitees, clients, customers, employees, or contractors due to Landlord's development and construction of the Project and the Development, nor shall any interruption or interference be construed as an eviction (actual or constructive) of Tenant, nor be deemed a cause for abatement of Rent by Tenant, nor relieve Tenant from the fulfillment of any covenant, condition, or term of this Lease.

**3423.**   Tenant covenants that this Lease is made and accepted upon and subject to the condition that there shall be no discrimination by Tenant against or segregation of any person or group of persons on account of sex, marital status, race, color, creed, religion, national origin or ancestry, familial status or handicap in the operation of the Premises, nor shall Tenant or any person claiming under or through Tenant, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of the Premises. Without limiting the generality of the foregoing, Tenant covenants to comply with the provisions of Chapter 38 of the Kansas City Code, the rules and regulations relating to those sections, and any additions or amendments thereto.

**3424.**   Landlord and Tenant acknowledge that the Premises shall be located in a Project planned for development. The proposed development is subject to Landlord obtaining satisfactory financing, subject to the cost of said development being satisfactory to Landlord, and subject to Landlord obtaining all necessary permits and approvals from local, State and Federal governmental agencies. Accordingly, in the event Landlord shall not obtain satisfactory financing or permits necessary for the project development, or in the event that the projected costs of construction shall not be satisfactory to Landlord, or in the event Landlord shall determine that the economic viability of the proposed development has changed, all in the Landlord's sole discretion, Landlord shall have the right to terminate this Lease upon sixty (60) days notice to Tenant at any time prior to tender of possession of the Premises, and each party shall be released from all liability hereunder and from any liability whatsoever to the other for any expense incurred arising out of this Lease or in any other way related to Landlord's decision to discontinue development of the Project. Landlord shall have the unilateral right to assign this Lease after the date hereof without Tenant's consent. Tenant agrees to accept any assignee as the Landlord hereof and to attorn in every respect to such assignee as if the original Landlord hereunder.

**3425.**   Tenant acknowledges that at the execution of this Lease, Landlord may not own or have a ground lease on the Premises. However, Landlord shall acquire all necessary rights, title and interest in and to the Premises (by fee ownership, ground lease, or otherwise) on or prior to the delivery of the Notice of Possession. Landlord shall have the right to enable the Project or any portion thereof, together with any and all buildings and all other structures, improvements and other permanent fixtures which are or may be constructed hereafter thereon, to be owned by certain type of common ownership known as condominium ownership. At Landlord's election from time to time, the Premises and the Project or portions thereof shall be subject to, and entitled to benefit of, (i) the provisions, rights, privileges, terms and conditions of the Uniform Condominium Act of 1983, Chapter 44 of the

Revised Statutes of Missouri, as amended (the "Act") and (ii) any Declaration of Condominium or the like recorded or to be recorded with the Jackson County Recorder of Deeds, a copy of which has been or will be provided to Tenant (the "Declaration"). Tenant shall be subject to the rules, regulations, covenants, conditions, reservations, easements, charges and assessments set forth in the Declaration.

## SECTION 35
## RESTAURANT PROVISIONS

Without limiting Tenant's obligations elsewhere under this Lease, Tenant shall provide the following services and maintenance at its sole cost and expense:

(a)     Tenant shall cause extermination services, including treatment for insects, spiders, rats, mice, moles and other rodents, to be provided to the Premises by a reputable exterminator on a monthly basis, or more often as Landlord, in Landlord's reasonable discretion, may require, at Tenant's expense.

(b)     In order to eliminate the problem of sewer back-ups and health hazards, Tenant shall install grease traps in the Premises, the type and manner of installation of such grease traps being subject to Landlord's prior written approval and all governmental laws and requirements, and shall establish a quarterly cleaning program with respect thereto. In addition to the quarterly cleaning of the grease traps, Tenant shall use "Cloroben PT" or a similar type of chemical in all drain lines, in accordance with the manufacturer's recommendations, to help dissolve any grease build-up. Tenant shall provide Landlord with copies of its cleaning contract for its grease traps and its extermination contracts prior to the Rent Commencement Date and upon request by Landlord thereafter. Without limitation of any of the foregoing, Tenant shall do whatever is necessary in order to maintain properly the grease trap and prevent, at all times, any overflow or discharge of grease at the surface of the grease trap manhole. The grease trap and all plumbing pipes shall be rooted and cleaned regularly and as often as necessary to prevent clogging or discharge. In the event of any such overflow or discharge, Tenant shall be responsible for all costs of cleanup of the overflow or discharge, including all costs of removing grease, and repair, restoration or replacement of property damaged by such overflow or discharge.

(c)     The kitchen exhaust systems, including roofing hoods, ducts and fans used in connection with the kitchen operation, whether located in or outside of the Premises, shall be maintained by Tenant in good condition so as to meet the highest standard of cleanliness and health. Tenant shall establish a quarterly (or more frequent as Landlord may require) cleaning program with respect thereto with a reputable contractor. Tenant shall provide Landlord with a copy of its cleaning contract for the exhaust system prior to opening for business and thereafter as requested by Landlord. Tenant shall do whatever is necessary in order to properly maintain the exhaust system. In the event of discharge, Tenant shall be responsible for all costs of clean up, including all costs of repair, restoration or replacement of property damaged by such discharge. Tenant's cleaning contract shall provide for grease deposit removal from all surfaces (powder coating is not permitted).

(d)     Tenant shall store all trash and other waste in odor and vermin proof containers, such containers to be kept in temperature controlled areas not visible to members of the public. Tenant shall, at Tenant's expense, attend to the frequent disposal of such materials. Trash removal must be done by Tenant using containers approved by Landlord and at such times and in such manner as Landlord may reasonably direct and subject to such rules and regulations in respect thereto as Landlord may, from time to time, adopt.

(e)     Tenant shall make the following items part of a continuing maintenance program in order to reduce the possibility of fire:

(i)     Cooking hood filters and/or grease extractors should be cleaned weekly.

(ii)     The entire exhaust system should be inspected by a properly trained, qualified, and certified company or person quarterly.

(iii)     After inspection, if components are found to be contaminated with deposits from grease laden vapors, the entire exhaust system (hoods, grease removal devices, fans, ducts, and other included appurtenances) should be cleaned by a properly trained, qualified and certified company or person. The cleaning should be to bare metal using mechanical means (scraping, washing, steam cleaning, etc.) and not coated with chemicals or powder. A certificate of service should be provided by any contracted service.

## SECTION 36
## CLUB PROVISIONS

3601.   Intentionally deleted.

## SECTION 37
## WAIVER OF JURY TRIAL

3701.   TO INDUCE LANDLORD AND TENANT TO ENTER INTO THIS LEASE, LANDLORD AND TENANT EACH HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY OF ANY OR ALL ISSUES ARISING IN ANY ACTION OR PROCEEDING BETWEEN LANDLORD AND TENANT OR THEIR SUCCESSORS, ASSIGNS, PERSONAL OR LEGAL REPRESENTATIVES AND HEIRS UNDER OR IN CONNECTION WITH THIS LEASE OR ANY OF ITS PROVISIONS. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY LANDLORD AND TENANT, AND LANDLORD AND TENANT EACH ACKNOWLEDGE THAT NEITHER LANDLORD NOR TENANT NOR ANY PERSON ACTING ON BEHALF OF LANDLORD OR TENANT HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. LANDLORD AND TENANT EACH FURTHER ACKNOWLEDGE THAT HE, SHE OR IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS LEASE WITH LEGAL COUNSEL.

IN WITNESS WHEREOF, the parties hereto have executed this Lease under their respective seals as of the day and year first above written.

WITNESS:                           **LANDLORD:**
                                    Kansas City Live Block 124 Retail, LLC

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

ATTEST/WITNESS:

By: _____
Name: _____
Title: _____

[Corporate Seal]

TENANT: Kobe Kansas, LLC

By: _____
Name: Chan H. Bae
Title: Managing Member
Federal Tax ID # 27-0257414

The undersigned, guarantors of the foregoing Lease, join herein to evidence their agreement to the terms of the Explanatory Statement at the beginning portions of this Lease.

_____
Young W. Bae

_____
Chan H. Bae

STATE OF _Virginia_ : COUNTY OF _Fairfax_ :

I HEREBY CERTIFY that on this 22nd day of September, 2009, before me, a Notary Public for the state and county aforesaid, personally appeared _Chan Hee Bae_ known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument who acknowledged that he is the _Managing Member_ of Kobe Kansas, LLC, a Missouri limited liability company, that he has been duly authorized to execute, and has executed, the foregoing instrument on behalf of the said entity for the purposes therein set forth, and that the same is its act and deed.

IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

_____
Notary Public

My Commission Expires: 6/30/2012

Kelly Young Min Kang
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #345805
My Commission Expires
June 30, 2012

STATE OF _Virginia_ : COUNTY OF _Fairfax_ :

I HEREBY CERTIFY that on this 22nd day of September, 2009, before me, a Notary Public for the state and county aforesaid, personally appeared Young W. Bae, known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument who acknowledged the foregoing instrument to be his/her act and deed.

IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

_____
Notary Public

My Commission Expires: 6/30/2012

Kelly Young Min Kang
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #345805
My Commission Expires
June 30, 2012

STATE OF _Virginia_ : COUNTY OF _Fairfax_ :

I HEREBY CERTIFY that on this 22nd day of September, 2009, before me, a Notary Public for the state and county aforesaid, personally appeared Chan H. Bae, known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument who acknowledged the foregoing instrument to be his/her act and deed.

IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

_____
Notary Public

My Commission Expires: 6/30/2012

Kelly Young Min Kang
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #345805
My Commission Expires
June 30, 2012

STATE OF _____ : COUNTY OF _____ :

I HEREBY CERTIFY that on this _24th_ day of _August_, 2009, before me, a Notary Public for the state and county aforesaid, personally appeared _Blaire Tondis_ known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument who acknowledged that he is the _Authorized Rep_ of Kansas City Live Block 124 Retail, LLC, a Maryland limited liability company, that he has been duly authorized to execute, and has executed, the foregoing instrument on behalf of the said entity for the purposes therein set forth, and that the same is its act and deed.

IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

_____
Notary Public

My Commission Expires: __4-20-2010__



Exhibit A

**EXHIBIT B**
**TO**
**LEASE**

Agreement Specifying Term of Lease

Attached to and made part of the Lease dated the ____ day of _____, 20__, by and between _____LLC, as Landlord, and _____, as Tenant (the "Lease").

Landlord and Tenant do hereby confirm and acknowledge the following: (i) the Rent Commencement Date is hereby established to be _____, 20__; and (ii) the Expiration Date is hereby established to be _____, _____.

This Agreement shall be binding on the parties hereto, their successor and assigns and all subtenants of Tenant and any other party claiming under or through Tenant. The Lease is in full force and effect as of the date hereof in accordance with its terms, and Tenant is in possession of the Premises. Landlord has fulfilled all of its obligations under the Lease that were required to be fulfilled by Landlord on or prior to the Rent Commencement Date and Tenant has no claim or right of set-off against any Rent (as defined in the Lease) under the Lease.

This Agreement was entered into as of ____ of ____ 20__.

WITNESS:                              **LANDLORD:**

                                      _____, LLC

By:_____                       By:_____
Name:_____                  Name:_____
Title:_____                 Title:_____

ATTEST/WITNESS:                       **TENANT:**

By:_____                       By:_____
Name:_____                  Name:_____
Title:_____                  Title:_____
                                      Federal Tax ID #_____
                                      Missouri Tax ID # _____

[Corporate Seal]

_____              _____
Name:_____                  Name:_____
                                      Social Security #:_____

_____              _____
Name:_____                  Name:_____
                                      Social Security #:_____

**Exhibit "C"**

**POWER & LIGHT DISTRICT - KANSAS CITY, MO**

**WARM DARK SHELL**

**DETAILED DESCRIPTION OF LANDLORD'S WORK**

A.      <u>GENERAL</u>

These specifications are prepared to aid Tenant in preparing and executing Tenant's improvement plan. Tenant should refer to the building plans and specifications indicated on the Lease Outline Drawing or As-Built Drawing (herein referred to as L.O.D.) provided by Landlord, and confirm all measurements and as-built conditions with Landlord's tenant coordinator, and by visual inspection of the Premises before starting construction. In cases where these requirements are in conflict with Landlord's completed building plans or completed buildings, information in the completed building plans or completed building shall take precedence over these requirements. Prior to starting construction, Tenant shall provide completed working drawings and specifications for the construction of the Premises, in a preliminary and then final submission in order to receive Landlord's written approval. Tenant's contractor must be approved by Landlord prior to the start of construction.

B.      <u>LANDLORD'S WORK</u>

1.      Premises shall be defined as being limited to the Tenant's spaces, excluding common area spaces beyond the control of the Tenant.

2.      Landlord shall provide 2" potable water supply in compliance with the local jurisdiction's requirements or any other governing agency to the Tenant leased premises.

3.      If applicable, the Landlord shall provide 2" natural gas supply in compliance with the local jurisdiction's requirements or any other governing agency. Landlord to provide metered gas line with shut-off valve within five feet (5') of the premises at a location specified by Tenant.

4.      Landlord to provide a 4" sanitary sewer line in compliance with the local jurisdiction's requirements or any other governing agency. Existing sewer lines are to be rodded and visually inspected for damage and repair as required. Landlord to bring the sanitary sewer line to within five feet (5') of the Premises.

1

5.  At Landlord's election, either: (a.) Tenant will provide a grease interceptor sized as required by the local jurisdiction or any other governing agency for the anticipated load in a location acceptable to Landlord; or (b.) Landlord will provide a grease interceptor sized as required by the local jurisdiction or any other governing agency for the anticipated load in a location acceptable to Landlord and Tenant shall reimburse Landlord for such direct cost. If, at its election, Landlord provides a shared grease interceptor then Tenant shall be responsible for reimbursing Landlord for its pro rata cost of same. The Grease interceptor shall be maintained by the Landlord, at the Tenant's expense, which shall be in addition to common area maintenance expenses.

6.  Landlord shall provide fire protection main service to the Tenant lease space. Service shall be sized in accordance with NFPA 13 for proper flow at required pressure to accommodate total fire protection coverage of the Tenant leased space.

7.  Landlord to provide open faced metal stud demising walls. Tenant shall be responsible for Gypsum Wallboard and finishes on its side of all demising & perimeter walls. Landlord shall be responsible for all fire separation between the Tenant premises and all adjacent common areas as required by the local jurisdiction on any other requirement.

8.  Landlord shall provide all common area and base building glazing and storefront and maintain its watertight condition throughout the term of the Lease. Tenant will be responsible for any desired enhancements and/or embellishments to the base building storefront or glazing systems.

9.  Landlord will provide rooftop HVAC equipment to provide heating and cooling of Tenant space, anticipating the Tenant's use of VAV boxes. The sizing of the units will be based 150 tons per square foot. Supplemental heat will be provided by the Tenant's VAV boxes. Tenant will provide an energy management system to control the equipment.

10. Tenant shall provide fire rated duct shafts up to the roof or exterior as required by the local jurisdiction or any other governing agency for the Tenant's kitchen exhaust system and make-up air system (if necessary for operation).

11. Landlord shall provide a metered electrical service consisting of 400 AMP 277v/480v/3 Phase. If the meter is located outside of the Premises, Landlord will bring service to the premises and terminate the service at the disconnect adjacent to a breaker panels and step

2

down transformers to be provided by the Tenant. The size of the service may increase at the Tenant's expense as required by the calculated demand load of the Tenant. Tenant will be responsible for all distribution from within Tenant's premises.

12. Landlord shall provide a building that is structurally sound and watertight, that complies with the local jurisdiction's requirements or any other governing agency for the intended use. All roof penetrations to be installed by Landlords Roofing contractor at Tenants expense. Landlord shall be responsible for construction and maintaining the integrity of the exterior skin of the building.

13. To the extent that Tenant's Premises is located on the second floor or above a parking facility, Landlord shall deliver a concrete floor and shall have a structural engineer registered in the State which the project is located certify that the floor's structural system is adequate to support a live load of 100 lbs. per square foot. Any modifications to required to adjust the interior floor elevation shall be a Tenant's expense. To the extent that Tenant's Premises is located on grade, then Landlord shall deliver a dirt floor and Tenant shall be responsible for the floor.

14. Landlord shall provide a lease area that is free from any hazardous substances or materials. Landlord shall provide any and all certificates that may be required by the local jurisdiction or any other governing agency.

15. Landlord shall provide a fully accessible and adequately illuminated route for the public into the Tenant leased space.

16. Landlord shall provide access to all adjacent and remote spaces as required for the completion of the Tenant build out.

17. Landlord shall provide sufficient space and accommodation, in accordance with the requirements of the local jurisdiction of any other governing agency, for the adequate and proper access, handling, interim storage and delivery of all food and merchandise and removal of all trash and waste generated by the Tenant.

18. Landlord shall provide assistance in obtaining al required local jurisdiction and any other governing agency approvals necessary for the construction and operation of the Tenant leased spaces.

19. Tenant shall obtain the local jurisdiction and any other government agency approvals for all Tenant exterior signage including but not limited to signs, awnings, flags, icons and marquees. Tenant shall

3

provide electrical service and structural supports for all of Tenant's signs to be located on the exterior of the Development.  Tenant will provide all power and structure for all other Tenant signage.  All Tenant signage will be supplied and installed by Tenant. All tenant signage design, construction and installation is subject to Landlord's approval in its sole and absolute discretion.

20.     Landlord to provide roof top area of no less that 1,500 square feet for use by tenant's refrigeration, exhaust, and other roof top systems.

4

**EXHIBIT D**
**TO**
**LEASE**

<u>Sign Criteria</u>

The following criteria shall govern the design, color, size, illumination, location and manner of installation of all of Tenant's signs to be placed on or near the Premises and/or the Project:  To be supplied by Landlord.  If criteria not supplied, signage shall be subject to Landlord's approval and shall be designed and installed consistent with the requirements of Landlord.

EXHIBIT E
TO
LEASE

Prohibited Uses, Exclusives, and Restrictions

Tenant shall not use or permit the use of the Premises for any other business or purpose, except as set forth in Section 201(c) of this Lease and in strict accordance with the Rules and Regulations. No part of the Premises shall be used for any purpose other than retail sales and/or services, offices, restaurants or other commercial purposes which are permitted by applicable zoning and other Laws and which are typically found in first-class retail or entertainment centers in the City or County in which the Project is located. No part of the Premises shall be used for any use that would increase the demand or requirement for parking in the Project in excess of that required by the Permitted Use. The restrictions set forth in this Exhibit shall not be deemed to bind Landlord. No part of the Premises shall be used in a way that endangers the health or safety of any user of the Project. Landlord shall have the right, in Landlord's sole and absolute discretion, to waive all or any of the prohibitions set forth above upon such matters, terms and conditions as Landlord, in its sole discretion, may determine.

The term "Tenant" as utilized in this Exhibit "E", shall mean the Tenant and any and all assignees, sublessees and/or licenses of the Tenant and its successors and assigns.

**PROHIBITED USES:**

Tenant shall not use the Premises for any of the following uses:

1.      Tenant shall not use the Premises for any use which is likely to injure the reputation of the Project, including but not limited to, any use which is disreputable or immoral or would require a license pursuant to laws or regulations governing adult entertainment activities including massage parlors.

2.      flea market
3.      swap shop or "outlet store" selling merchandise that is used, damaged or discontinued
4.      massage parlor
5.      adult book store
6.      barber college
7.      place of instruction, reading room or any operation catering primarily to students or trainees rather than to customers
8.      funeral parlors
9.      facility for the sale of paraphernalia for use with illicit drugs
10.     carnival, amusement park or circus
11.     new or used car dealership
12.     gas station
13.     auto repair shop

**EXCLUSIVES**

The following provisions are exclusive use provisions found or likely to be found in other leases in the Project. Tenant shall not use the Premises for any use, which would violate any of the following existing or future exclusive use provisions:

1. Any future existing bona fide exclusive granted to any tenant of the Project so long as (1) such lease is in existence, (2) such lease is with a tenant occupying not less than 10,000 square feet of gross leasable floor area.

2. Tenant shall not use any part of its Premises for: (A) The sale of (1) books, (2) periodicals, (3) pre-recorded video products and/or (4) pre-recorded music products such as compact discs, cassette tapes and records and accessories (with respect to each of the foregoing items in any current or future format of such enumerated items) ("Tenant's Exclusive Items") unless (i) the subject matter of such items is directly related and ancillary to the primary use of such other tenant's premises (e.g., a computer store which sells books or periodicals dealing with computer products), or (ii) not more than the lesser of three hundred (300) square feet of surface display area or ten percent (10%) of the total gross leasable area of such tenant's premises is devoted to the retail display of such related items; or (B) The operation of a "cafe" or a coffee bar featuring, nonexclusively, hot and cold coffee and tea beverages in any format, whether as an incidental or primary use. For purposes of this paragraph, a "coffee bar" shall be deemed to mean a facility primarily operated or identified as an establishment specializing in coffee and tea drinks (such as "Starbucks," "Seattle's Best Coffee" or "Caribou Coffee"). Notwithstanding the foregoing, the foregoing restrictions regarding the operation of a café or coffee bar shall not apply to the operation of restaurants whose sale of coffee and tea beverages is incidental to the operation of a night club or restaurant, including but not limited to, restaurants such as Einstein's, Chesapeake Bagel, Rocky Mountain Chocolate, Au Bon Pain, Panera Bread, Ghiradelli Chocolate, Candy Express, Sweet Tooth, Chick Fil' A, Cosi, Krispy Kreme and Jamba Juice.

3. Tenant shall not use any part of the Premises for the retail sale of bagels.

4. Tenant shall not use any part of the Premises for the operation of a pharmacy department requiring the services of a registered pharmacist.

5. Tenant's gross sales from the sale of submarine or hero sandwiches at the Premises shall not exceed twenty five percent (25%) of Tenant's total gross sales at the Premises.

6. Tenant shall not use any part of the Premises for the sale of video game hardware and software and computer game software.

7. Tenant shall not operate any part of the Premises as a health club, gym or spa and shall not provide any fitness or exercise services in the Premises.

8. Tenant shall not use any part of the Premises for the sale of greeting cards.

9. Tenant's gross sales of ice cream and/or frozen yogurt at the Premises shall not exceed twenty percent (20%) of Tenant's total gross sales at the Premises.

10. Tenant shall not operate any part of the Premises as an Applebee's, Chili's, Bennigan's, Max & Irma's, or O'Charley's.

11. Tenant's gross sales from the sale of Chinese food at the Premises shall not exceed twenty percent (20%) of Tenant's total gross sales at the Premises.

12. Tenant may not operate a bowling alley or pool hall in the Premises.  The Premises may not contain any bowling lanes and may only contain a maximum of three (3) pool tables.

13. Tenant may not operate any part of the Premises as a comedy club.

## Additional Restrictive Provisions:

If Tenant has been granted an exclusive use pursuant to the provisions of its Lease, such exclusive use shall no longer be binding on Landlord or any other occupants of the Project if Tenant, (A) no longer conducts its business for the protected use (including the sale of any such protected items) for more than six (6) consecutive months other than due to casualty, condemnation, remodeling, Force Majeure and the like or (B) reduces the space devoted to such protected use (including the sale of any such protected items) to less than three thousand (3,000) square feet of gross leasable area of the Premises.

While in business, Tenant must operate on a full-time basis during at least normal business hours, Sunday through Saturday; no business shall be operated on a part-time basis (i.e., for only a portion of the week).

Tenant shall not operate its business in any manner which is inconsistent with the operation of a first class, family-oriented, urban office/retail/entertainment/hotel/conference center mixed use project that includes retail stores, having uses such as specialty retail stores, a grocery store (but not a discount grocery store), one or more department stores (which may be discount department stores such as Wal-Mart, KMart and Target).  Tenant shall not allow the Premises to be used as a swap shop, outlet store, secondhand store or any other business that buys used, damaged, overstocked or discontinued merchandise from a retailer in bulk and sells such merchandise on a "close out," "odd lot," "cancellation," "second," "factory reject," "sample," "floor model," "over-stock," "distressed," "bankruptcy," "fire sale," "damaged" or other basis that is not a first class retail format of the type found in centers of similar quality to the retail portion of the Project (provided the same shall not be deemed to prohibit the sale of antiques, used pianos or other high quality used goods or the operation of a catalog store)).

If Tenant is expressly permitted to operate an arcade, game room, bowling alley, billiard room, restaurant, nightclub, bar or the like, such operation shall be of the same or higher quality as would be consistent with the quality of operations found in the other first class, family-oriented projects owned and operated by affiliates of The Cordish Company on the Effective Date under the names "Power Plant" and "Power Plant Live" in Baltimore, Maryland, "Bayou Place" in Houston, Texas, and 4th Street Live in Louisville, Kentucky.

Tenant's trade or business: shall not consist predominantly of the development or holding of intangibles (as defined in the U.S. Internal Revenue Code from time to time) for sale or license; and shall not consist predominantly of the operation of any private or commercial golf course, country club, massage parlor, hot tub facility, suntan facility, racetrack or other facility used for gambling, or residential rental property [which is defined in Section 168(e)(2)(A) of the U.S. Internal Revenue Code as any building or structure where 80% or more of the gross rental income is derived from dwelling units], and the investment may not be directly or indirectly subsidized by other federal tax benefits such as the low-income housing tax credit; and shall not be a store, the principal business of which is the sale of alcoholic beverages for consumption off-premises; and shall not be farming [as defined in Section 2032A(e)(5)(A) or (B) of the U.S. Internal Revenue Code].

**EXHIBIT F**
**TO**
**LEASE**

Rules and Regulations

A.      Tenant shall be obligated to do the following:

(i)      Keep the Premises, including all exterior surfaces and both sides of all glass clean, orderly and sanitary;

(ii)     Keep the outside areas adjacent to the Premises clean, orderly and free of ice and snow, rubbish, obstructions and merchandise;

(iii)    Display the certificate of occupancy for the Premises in the Premises (if required by applicable Laws) and provide Landlord with a copy of the certificate of occupancy for the Premises;

(iv)    Keep the Premises free of garbage and trash and remove the same from the Premises to containers approved by Landlord;

(v)     Maintain the Premises free of insects, rodents, vermin and other pests;

(vi)    Keep all mechanical apparatus free of vibration and noise;

(vii)   Procure and maintain at its sole cost and expense any permits and licenses required in the transaction of Tenant's business;

(viii)  Conduct its business in all respects in a dignified manner in accordance with the high standards of first-class store operations;

(ix)    Load and unload goods at such times in the areas and through such entrances as may be designated by Landlord;

(x)     Maintain the temperature in the Premises to prevent freezing of plumbing lines and fixtures;

(xi)    If the Premises connects to a climate controlled interior mall or other area, operate heating and cooling equipment to maintain store temperature between 68°F and 74°F in the winter and between 72°F and 78°F in the summer, or in accordance with the then prevailing Laws respecting minimum and maximum winter and summer store temperatures;

(xii)   Keep its show windows dressed, using only professionally prepared signage which must be submitted to Landlord for approval prior to installation;

(xiii)  Keep its show windows and exterior signs illuminated from dusk to 10:00 p.m. every day or such other times as required by Landlord from time to time;

(xiv)   Keep the Premises open during the hours prescribed in Section 201;

(xv)    Abide by all Rules and Regulations set forth in this Exhibit F as may be changed by Landlord from time to time;

(xvi)   Tenant and its employees shall park their cars only in such areas as may be designated for that purpose by Landlord. Tenant shall furnish Landlord with State automobile license numbers used by Tenant or its employees within five (5) days after taking possession of the Premises and shall thereafter notify Landlord by the first day of each January, April, July and October of any changes in such information.  If Tenant or its employees shall fail to park their cars in the designated parking areas, Landlord shall have the right to charge Tenant, as Additional Rental, the sum of Twenty-Five Dollars ($25.00) per day per car parked in violation of this Section.  Tenant shall notify its employees in writing of the provisions of this Section.

B.      Tenant agrees not to do the following:

(i)      Display any sign visible outside the Premises without first having obtained Landlord's written permission;

(ii)     Use the Premises or any other part of the Project for any Prohibited Use;

(iii)    Cause the accumulation of garbage, trash, rubbish or refuse in the Premises, the Project, or the Development;

(iv)    Display or store merchandise outside the Premises;

(v)     Distribute hand bills or other advertising matter or solicit business in the Common Areas, or elsewhere in the Development;

(vi)    Permit parking of any vehicle for more than 24 hours;

(vii)   Attach any awning, antenna, or other projection to the roof or the outside walls of the Premises or the building of which the Premises are a part;

(viii)  If the Premises are in an enclosed mall, be open for business on any day unless the mall is opened and operated by Landlord;

(ix)    Use or permit the use of objectionable advertising mediums such as loud speakers or other mediums that irritate or have the tendency to irritate other tenants within the Project or the Development or their customers or invitees.

Specific Rules and Regulations Regarding Liquor Service and Live Entertainment:

1.    Tenant shall not play or present any music within the demised premises that is likely to (A) have a detrimental affect on the Project or the Development, (B) create a perception that the Project or the Development is not safe for families and the general public, or (C) attract organized "gangs", as determined by Landlord in its sole discretion.  Tenant shall not play or present any music within the Premises that can be heard outside the Premises.  Tenant shall immediately comply with Landlord's written directions concerning any music presented within the Premises.  Thus if Landlord instructs Tenant to reduce the volume of the music played or presented within the Premises or cease playing or presenting a particular type of music within the Premises, Tenant shall immediately comply with such instructions.

2.    If Tenant operates the Premises as a bar or nightclub, Tenant shall be required to charge a minimum Five Dollar ($5.00) cover charge for entry by the public into the Premises on Friday and Saturday evenings from 9:00 p.m. until closing.  Said cover charge shall only entitle patrons of Tenant to enter the Premises.  Tenant shall not provide its patrons with any other form of remuneration, such as drink vouchers, in consideration of said cover charge. Tenant shall enforce a dress code for its customers acceptable to Landlord.

EXHIBIT G
TO
LEASE

Guaranty

In order to induce Kansas City Live Block 124 Retail, LLC ("Landlord") to execute and deliver that certain Lease (the "Lease") between Landlord and Kobe Kansas, LLC ("Tenant") for the Premises containing approximately 7,552 square feet of gross leasable area in Block 124 in Kansas City, Missouri ("Project "), and in consideration thereof, the undersigned ("Guarantor") hereby unconditionally, absolutely and irrevocably guarantees to Landlord, and its successors and assigns, the prompt and full payment (and not merely the collectibility) and performance and observance by Tenant of each and every item, covenant, condition, provision and obligation to be paid, kept, observed or performed by Tenant under the Lease, together with any and all costs and expenses, including reasonable attorneys' fees, which may be incurred by Landlord in connection with any default by Tenant under the Lease or enforcing the Lease and/or this Guaranty (collectively the "Obligations"). Guarantor expressly acknowledges that he, she or it has reviewed the Lease and understands the same. If there is more than one Guarantor, the terms and conditions of this Guaranty shall apply to all Guarantors jointly and severally. The liability of Guarantor is coextensive with that of Tenant and also joint and several, and legal action may be brought against Guarantor and carried to final judgment either with or without making Tenant or any assignee or successor thereof as a party thereto.

The undersigned further covenants and agrees that Landlord may at any time or from time to time, in its sole and absolute unfettered discretion, without notice to, or consent from, the Guarantor and without in any way releasing, affecting, or impairing the obligations and liabilities of the Guarantor hereunder:

(a)     Extend or change the time of payment of any rent due under the Lease or any other payment required to be made by Tenant under said Lease, or the manner, place, or terms of performance or observance of any of the terms, covenants, conditions, provisions or obligations to be kept, observed or performed by Tenant under the Lease; and/or

(b)     Modify any of the terms, covenants, conditions or provisions of the Lease, or waive compliance with any of the terms, covenants, conditions, provisions or obligations under the Lease.

Payment by the undersigned under this Guaranty is to be made without requiring any proceedings to be taken against Tenant for the collection of any amounts owed by Tenant under the Lease or for the keeping, performing or observing of any of the terms, covenants, conditions, provisions or obligations to be observed by Tenant under the Lease. The undersigned hereby completely and fully waives (a) notice of acceptance of this Guaranty, (b) presentment for payment, (c) notice of dishonor or default of Tenant under the Lease, (d) protest and notice of protest thereof, (e) any right of setoff, counterclaim or deduction against amounts due under this Guaranty, (f) the right to interpose all substantive and procedural defenses of the law of guaranty, indemnification and suretyship, except the defenses of prior payment or prior performance, and (g) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

Without limiting the generality of the foregoing, the liability of the undersigned under this Guaranty shall not be deemed to have been waived, released, discharged, impaired or affected by (a) reason of any waiver or failure to enforce or delay in enforcing any of the Obligations, or (b) the granting of any indulgence or extension of time to Tenant, or (c) the assignment of the Lease, or the subletting of the Premises by Tenant, with or without Landlord's consent, or (d) the expiration of the Term of the Lease, or (e) if Tenant holds over beyond the Term of the Lease, or (f) any merger or reorganization of the release or discharge of Tenant or any other guarantor in any voluntary or involuntary receivership, bankruptcy, winding-up or other creditors' proceedings, or (g) the rejection, disaffirmance or disclaimer of the Lease by any party in any action or proceeding, or (h) the release of any collateral held for the Obligations or release of the Guarantor or any other guarantor, or (i) any defect or invalidity of the Lease, or (j) the transfer by Guarantor of any or all of the capital stock or other ownership interests of Tenant. The liability of the Guarantor shall not be affected by any repossession, re-entry or re-letting of the Premises by Landlord, provided, however, that the net payments received by Landlord after deducting all costs and expenses of repossession and/or reletting the same (including, without limitation, any attorney fees, brokerage fees and any reasonable costs or expenses incurred in redecorating, remodeling, or altering the Premises for reletting), shall be credited from time to time by Landlord to the account of Tenant and Guarantor and Guarantor shall pay any balance owing to Landlord from time to time, immediately upon being given written notice of demand by Landlord in the manner for providing notice set forth in the Lease.

This Guaranty shall be binding upon the undersigned, his or its respective successors, assigns, personal or legal representatives and heirs, and shall inure to the benefit of Landlord and Landlord's successors and assigns. The undersigned hereby consents and agrees that this Guaranty may be assigned by Landlord, without recourse, in connection with any sale or assignment by Landlord of part or all of its interest in the Project in which the demised premises under the Lease are contained.

This Guaranty shall remain in full force and effect until the payment or performance of all of the Obligations and the other amounts payable under this Guaranty (whether or not the Lease shall have been terminated). Until the payment and performance of all the Obligations and the amounts payable under this Guaranty, Guarantor: (a) shall have no right of subrogation against Tenant by reason of any payments or acts of performance by the Guarantor in compliance with the obligations of the Guarantor under this Guaranty; (b) waives any right to enforce any remedy which Guarantor now or hereafter shall have against Tenant by reason of any one or more payments or acts of performance in compliance with the obligations of Guarantor under this Guaranty; and (c) subordinates any liability or indebtedness of Tenant now or hereafter held by Guarantor to the obligations of Tenant to the Landlord under the Lease.

The terms, covenants, conditions and obligations contained in this Guaranty may not be waived, changed, modified, discharged, or abandoned, except by agreement in writing, signed by the party or parties against whom enforcement of any waiver, change, modification, discharge or abandonment is sought. Guarantor agrees that it will, from time to time, within ten (10) days after Landlord's request, execute and deliver a statement certifying that this Guaranty is unmodified and in full force and effect. Guarantor hereby constitutes and appoints Landlord its true and lawful attorney-in-fact in Guarantor's name (which power of attorney shall be deemed irrevocable and a power coupled with an interest) to execute such statement if Guarantor shall fail to do so within such ten (10)-day period.

All notices or other communications to be provided pursuant to this Guaranty shall be in writing and shall be deemed to be properly served if sent by registered or certified mail or Federal Express or similar courier service with overnight delivery or via professional messenger service (with receipt therefor) or by certified or registered mail, return receipt requested, (i) if to Landlord, 601 E. Pratt Street, 6th Floor, Baltimore, Maryland 21202, and (ii) if to Guarantor, at the address set forth below. All notices or

other communications to be provided pursuant to this Guaranty sent by certified or registered mail, return receipt requested, first-class postage prepaid shall be deemed effective when they are mailed, otherwise such notices shall be effective upon receipt.

The Guarantor hereby (i) irrevocably appoints _____ (the "Guarantor's Agent for Service of Process"), as the Guarantor's agent to accept service of process in any action or proceeding for the enforcement against Guarantor of any obligation or liability under this Guaranty, (ii) agrees that any such action or proceeding against the Guarantor may be commenced in any court of competent jurisdiction by service of process upon the Guarantor's Agent for Service of Process with the same affect as if the Guarantor were physically present in the same location where the Guarantor's Agent for Service of Process was served and had lawfully been served with process in such location and (iii) directs Guarantor's Agent for Service of Process to forward a copy of any notice, process or pleading served on Guarantor's Agent for Service of Process to Guarantor in the same manner in which notices are to be delivered to Guarantor pursuant to the preceding paragraph.

This Guaranty shall be governed by and construed in accordance with the laws of the State of Missouri applicable to agreements made and to be wholly performed within the State of Missouri.  Guarantor hereby consents to the jurisdiction of any competent court within Missouri in Landlord's discretion, including, without limitation, Federal courts of the United States.

Notwithstanding anything herein to the contrary, provided Tenant has opened for business and has otherwise complied with its obligations in accordance with the Lease as of the Rent Commencement Date, and provided all suppliers of labor and/or material in connection with Tenant's initial construction of the Premises have been paid in full as of the Rent Commencement Date,  Guarantor's liability hereunder shall not exceed the sum equal to twenty-four months' of Rent in effect at the time of the Event of Default by Tenant for which Landlord seeks to enforce this Guaranty from time to time, plus the unamortized amount of the Lease Incentive Payment referred to in Section 1408 of the Lease (based on a ten year amortization), plus costs of collection including reasonable attorneys' fees.  The limitation contained in this paragraph shall be of no force or effect if at the time of the Event of Default by Tenant for which Landlord seeks to enforce this Guaranty, Tenant is not the lien-free owner of all equipment, fixtures, trade fixtures and other assets used in the operation of Tenant's business or there have been in the prior twenty-four months any transfers of any assets of Tenant to anyone other than unaffiliated third parties for fair value.

**Waiver of Jury Trial.  LANDLORD AND GUARANTOR EACH HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY ON ANY OR ALL ISSUES ARISING IN ANY ACTION OR PROCEEDING BETWEEN LANDLORD AND GUARANTOR OR THEIR SUCCESSORS, ASSIGNS, PERSONAL OR LEGAL REPRESENTATIVES AND HEIRS UNDER OR IN CONNECTION WITH THIS GUARANTY OR ANY OF ITS PROVISIONS.  THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY LANDLORD AND GUARANTOR, AND LANDLORD AND GUARANTOR EACH ACKNOWLEDGE THAT NEITHER LANDLORD NOR GUARANTOR NOR ANY PERSON ACTING ON BEHALF OF LANDLORD OR GUARANTOR HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT.  LANDLORD AND GUARANTOR EACH FURTHER ACKNOWLEDGE THAT HE, SHE OR IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS LEASE WITH LEGAL COUNSEL.**

IN WITNESS WHEREOF, the undersigned has executed this Guaranty effective as of the 15th day of September, 2008, and executed on this __ day of September, 2009.

WITNESS:

GUARANTOR(S)

_____(SEAL)
Young W. Bae
Social Security #: 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
Home Address:
9040 Royal Estates Dr
Vienna, VA 22182

_____(SEAL)
Chan H. Bae
Social Security # 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
Home Address:
9040 Royal Estates Dr
Vienna, VA 22182

STATE OF Virginia     :  COUNTY OF Fairfax     :

I HEREBY CERTIFY that on this 22nd day of September, 2009, before me, a Notary Public for the state and county aforesaid, personally appeared Young W. Bae, known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument who acknowledged the foregoing instrument to be his/her act and deed.

IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

_____
Notary Public

Kelly Young Min Kang
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #345805
My Commission Expires
June 30, 2012

My Commission Expires: 6/30/2012

STATE OF Virginia     :  COUNTY OF Fairfax     :

I HEREBY CERTIFY that on this 22nd day of September, 2009, before me, a Notary Public for the state and county aforesaid, personally appeared Chan H. Bae, known to me or satisfactorily proven to be the person whose name is subscribed to the foregoing instrument who acknowledged the foregoing instrument to be his/her act and deed.

IN WITNESS WHEREOF, I have set my hand and Notarial Seal, the day and year first above written.

Notary Public

My                                    Commission                        Kelly Young Min Kang
                                                                        NOTARY PUBLIC
                                                              Commonwealth of Virginia
                                                                    Reg. #345805
                                                              My Commission Expires          Expires:
                                                                    June 30, 2012

Exhibit H
Menu

## Appetizers

5. Shrimp Tempura — 3 piece shrimp with vegetables — $8.95
6. Scallop Tempura — 3 piece scallop with vegetables — $8.95
7. Vegetable Tempura — 3 piece scallop with vegetables — $5.95
8. Gyoza (6 piece) — Vegetable dumplings — $5.95
9. Soft Shell Crab Tempura — Lightly fried soft shell crab with Japanese tempura sauce — $8.95
10. Sushi — A four piece sample sushi of the day — $7.95
11. Sashimi — A sample of raw tenderest raw fish — $8.95
12. Soup and Salad — $3.50

## Entrees
**Served with KOBE soup, salad, shrimp appetizer, Hibachi vegetables, steamed rice, Hibachi ginger sauce, seafood sauce**

10. Steak & Scallops — New York strip steak & scallops prepared with herbs — $22.95
11. Steak & Shrimp — New York strip steak & shrimp prepared with herbs — $22.95
12. Filet Mignon & Shrimp — Tender filet mignon & shrimp prepared with special herbs — $24.95
13. Filet Mignon & Scallops — Tender filet mignon & scallop prepared with special herbs — $24.95
14. Shrimp & Chicken — Seasoned with herbs — $21.95
15. Shrimp & Scallops — Seafood cooked with mushrooms, a hint of lemon — $25.95

## Combination Entrees

5. Hibachi Scallops — Sauteed in lemon and KOBE sauce — $19.95
6. Hibachi Salmon Steak — Fresh salmon Sauteed in garlic butter with teriyaki sauce (optional) — $18.95
7. Hibachi Lobster — Lobster cooked with special herbs and a hunk of lemon — Market Price
8. Steak and Chicken — New York strip steak & chicken prepared with delicate herbs, sesame seeds & KOBE sauce — $19.95
9. Steak & Shrimp — New York strip steak & shrimp prepared with herbs — $22.95
11. Filet Mignon & Chicken — Tender filet mignon & chicken prepared with special herbs — $21.95

16. Filet Mignon, Shrimp & Scallops — Tender filet mignon with seafood combination — $28.95
17. Filet Mignon & Lobster — Tender filet mignon with lobster — $28.95
18. Seafood Combination — Lobster tail, scallops & shrimp prepared with herbs and KOBE sauce — $29.95
19. KOBE Deluxe — Tender filet, lobster tail & scallops prepared with a hint of garlic butter & special herbs — $21.95
20. Vegetable Delight — Fresh garden vegetables prepared with herbs & KOBE sauce (as of any appetizer) — $13.95

## Children's Menu under 10
**Served with KOBE soup, salad, Hibachi vegetables, steamed rice, Hibachi ginger sauce and seafood sauce**

21. Hibachi Chicken — $9.5
22. Hibachi Steak — $10.5
23. Hibachi Shrimp or Scallops — $12.5
• KOBE Fried Rice — $11

## Desserts
• Ice Cream — green tea, chocolate or vanilla ice cream — $2.5

KOBE Fried Rice $1.50
Fluffy white rice seasoned just for you by our chef

# Lunch Menu

## Lunch Box
*(served with Kobe soup, Salad, Tempura, Steamed Rice, 3 pcs Roll)*

- Chicken Teriyaki — $8.95
- Beef Teriyaki — $9.95
- Salmon Teriyaki — $8.95

## Sushi Box
*(served with miso soup or salad)*

- Sushi Combo A — $11.95
  6pcs Nigiri sushi & 6pcs California roll
- Sushi Combo B — $14.95
  6pcs California set & 6 pcs Tuna roll & 6 pcs
  Nigiri sushi, 5 pcs Sashimi

## Entrees
*(served with miso soup, Salad, Hibachi Vegetables, Steamed Rice)*

1. Steamed Chicken — $9.95
2. Hibachi Steak — $11.95
3. Hibachi Filet Mignon — $13.95
4. Hibachi Shrimp — $12.95



**WHITE MARSH**
8165 F Honeygo Blvd
Baltimore, MD 21236
Tel. 410-931-8900
Fax. 410-931-9557

**KOBE**
JAPANESE STEAK HOUSE

**KOBE**
JAPANESE STEAK HOUSE