## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **KANSAS CITY LIVE BLOCK 124 RETAIL** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | **Civil Case No.: 14-CV-3236-GLR** |
| | ) | |
| **KOBE KANSAS, LLC, ET AL.** | ) | |
| | ) | |
| *Defendants*. | ) | |

## ANSWER AND AMENDED COUNTERCLAIM OF DEFENDANTS
## KOBE KANSAS, LLC, YOUNG W. BAE AND CHAN H. BAE

Defendants Kobe Kansas, LLC ("Kobe Kansas"), Young W. Bae and Chan H. Bae (collectively, "Defendants"), by and through their undersigned counsel, hereby answer the Second  Amended Complaint ("Second Amended Complaint") of Plaintiff Kansas City Live Block Retail, LLC ("Plaintiff") and file an Amended Counterclaim.  Except as expressly admitted, qualified or denied herein, Defendants deny each and every allegation and prayer for relief contained in the Second Amended Complaint.

The numbered paragraphs in this Answer correspond to the numbered paragraphs in Plaintiff's Second Amended Complaint, and in response thereto, Defendants state as follows:

### Parties

1.      Defendants are without sufficient knowledge or information to admit or deny the allegations contained in paragraph 1 of the Second Amended Complaint.  To the extent a response is required, Defendants deny the allegations contained in paragraph 1.

2.      Defendants admit the allegations contained in paragraph 2 of the Second Amended Complaint.

3.      Defendants admit the allegations contained in paragraph 3 of the Second Amended Complaint.

## Jurisdiction and Venue

4.      Paragraph 4 states legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations contained in paragraph 4.

5.      The first sentence of paragraph 5 states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations therein.  The second sentence is purportedly language of a written commercial lease and guaranty (the "Lease" and the "Guaranty"), which speaks for itself and is the best evidence of its content.  Any allegations inconsistent with the Lease and the Guaranty are denied.

6.      The first sentence of paragraph 6 states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny it.  The allegation that Defendants consented to venue in this Court is purportedly language of the Lease and Guaranty, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied.

## Facts Common to All Counts

7.      The first sentence of paragraph 7 purports to characterize the language of a written commercial lease dated October 17, 2006 and the Lease, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied.  Defendants admit the allegations contained in the second and third sentences of this paragraph.

8.      Defendants admit they entered into a lease dated October 17, 2006, which was amended by Amendment dated September 15, 2008, but executed on September 24, 2009.  The allegations contained in the remainder of paragraph 8 purport to characterize the language of the Lease, which

2

speaks for itself and is the best evidence of its content.  Any allegations inconsistent with the written Lease are denied, and Defendants otherwise deny all remaining allegations contained in paragraph 8.

9.     The allegations contained in paragraph 9 purport to characterize the language of the Lease, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied and Defendants otherwise deny all remaining allegations contained in paragraph 9.

10.     The allegations contained in paragraph 10 purport to characterize the language of the Lease, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied and Defendants otherwise deny all remaining allegations contained in paragraph 10.

11.     The allegations contained in paragraph 11 purport to characterize the language of the Lease, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied and Defendants otherwise deny all remaining allegations contained in paragraph 11.

12.     The allegations contained in paragraph 12 purport to characterize the language of the Lease, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied and Defendants otherwise deny all remaining allegations in paragraph 12.

13.     The allegations contained in paragraph 13 purport to characterize the language of the Lease, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied, and Defendants otherwise deny all remaining allegations in paragraph 13.

14.     The allegations contained in paragraph 14 purport to characterize the language of the Lease, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied, and Defendants otherwise deny all remaining allegations in paragraph 14.

15.     The allegations contained in paragraph 15 purport to characterize the language of the Lease, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied, and Defendants otherwise deny all remaining allegations in paragraph 15.

16.     The allegations contained in paragraph 16 purport to characterize the language of the Lease, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied, and Defendants otherwise deny all remaining allegations in paragraph 16.

17.     The allegations contained in paragraph 17 purport to characterize the language of the Lease, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied and Defendants otherwise deny all remaining allegations contained in paragraph 17.

18.     Defendants admit that Young W. Bae and Chan H. Bae executed the Guaranty.  The remaining allegations in paragraph 18 purport to characterize the language of the Lease and/or Guaranty, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied, and Defendants otherwise deny all remaining allegations in paragraph 18.

19.     The allegations contained in paragraph 19 purport to characterize the language of the Lease and/or Guaranty, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied and Defendants deny all remaining allegations in paragraph 19.

20.     The allegations contained in paragraph 20 purport to characterize the language of the Lease and/or Guaranty, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied and Defendants deny all remaining allegations in paragraph 21.

21.     The allegations contained in paragraph 21 purport to characterize the language of the Lease and/or Guaranty, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied and Defendants deny all remaining allegations in paragraph 21.

22.     Defendants admit that in 2011 Plaintiff sued Defendants in this Court.  Defendants otherwise deny all remaining allegations contained in paragraph 22.

23.     Defendants admit that on or about November 22, 2011, the parties entered into an Amendment to Lease (the "2011 Amendment").  The remainder of the allegations contained in this paragraph purport to characterize the language of the 2011 Amendment, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent with the written 2011 Amendment are denied, and the Defendants otherwise deny all remaining allegations contained in paragraph 23.

24.     The allegations contained in paragraph 24 purport to characterize the language of the 2011 Amendment, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied, and Defendants deny all remaining allegations in paragraph 24.

25.     Defendants deny the allegation in paragraph 25 regarding any material inducement for Landlord to compromise and settle the Prior Litigation.  The remaining allegations purport to characterize the language of the 2011 Amendment, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied, and Defendants deny all remaining allegations in paragraph 25.

26.     The allegations contained in paragraph 26 purport to characterize the language of the 2011 Amendment, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied and Defendants deny all remaining allegations in paragraph 26.

27.     The allegations contained in paragraph 27 purport to characterize the language of the 2011 Amendment, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied and Defendants deny all remaining allegations in paragraph 27.

28.     The allegations contained in paragraph 28 purport to characterize the language of the 2011 Amendment, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied and Defendants deny all remaining allegations in paragraph 28.

29.     The allegations contained in paragraph 29 purport to characterize the language of the 2011 Amendment, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied and Defendants deny all remaining allegations in paragraph 29.

30.     The allegations contained in paragraph 30 purport to characterize the language of the 2011 Amendment, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied and Defendants deny all remaining allegations in paragraph 30.

31.     The allegations contained in paragraph 31 purport to characterize the language of the 2011 Amendment, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied, and Defendants deny all remaining allegations in paragraph 31.

32.     Defendants deny the allegation in paragraph 32 regarding any material inducement for Landlord to compromise and settle the Prior Litigation.  The remaining allegations contained in paragraph 32 purport to characterize the language of the 2011 Amendment, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied and Defendants otherwise deny all remaining allegations contained in paragraph 32.

33.     The allegations contained in paragraph 33 purport to characterize the language of the 2011 Amendment, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied, and Defendants deny all remaining allegations in paragraph 33.

34.     Paragraph 34 states legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations contained in paragraph 34.

35.     Defendants deny the allegations contained in paragraph 35 of the Second Amended Complaint.

36.     Defendants deny the allegations contained in paragraph 36 of the Second Amended Complaint.

37.     Defendants admit the allegations contained in paragraph 37 of the Second Amended Complaint.

38.     Defendants deny the allegations contained in paragraph 38 of the Second Amended Complaint.

39.     The first sentence of paragraph 39 purports to characterize the language of the Lease, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied.  Defendants deny the allegations in the second sentence of paragraph 39.

40.     Paragraph 40 purports to characterize the language of the Lease, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent with the written Lease are denied, and Defendants otherwise deny all remaining allegations contained in paragraph 40.

41.     Paragraph 41 states legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations contained in paragraph 41.

42.     The first sentence of paragraph 42 purports to characterize the language of the Lease, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied.  Defendants otherwise deny all remaining allegations contained in paragraph 42.

43.     The allegations contained in paragraph 43 purport to characterize the language of the Lease, which speaks for itself and is the best evidence of its content.  Any allegations inconsistent therewith are denied, and the Defendants deny all remaining allegations contained in paragraph 43.

44.     Defendants deny the allegations contained in paragraph 44 of the Second Amended Complaint.

45.     Paragraph 45 states legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations contained in paragraph 45.

46.     Paragraph 46 states legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations contained in paragraph 46.

47.     Defendants deny the allegations contained in paragraph 47 of the Second Amended Complaint.

48.     Defendants deny the allegations contained in paragraph 48 of the Second Amended Complaint.

49.     Defendants deny the allegations contained in paragraph 49 of the Second Amended Complaint.

50.     Defendants admit they are in possession of the Premises.  Defendants deny the remainder of the allegations contained in paragraph 50 of the Second Amended Complaint.

**COUNT I**
**(Breach of Contract against all Defendants)**

51.     Defendants hereby adopt and incorporate by reference their responses to the allegations contained in paragraphs 1-50 above.

52.     Paragraph 52 states legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations contained in paragraph 52.

53.     Defendants deny the allegations contained in paragraph 53 of the Second Amended Complaint.

54.     Paragraph 54 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in paragraph 54.

55.     Paragraph 55 states a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in paragraph 55

56.     Defendants deny the allegations contained in paragraph 56 of the Second Amended Complaint.

57.     Paragraph 57 states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations contained in paragraph 57.

The remaining allegations in the Second Amended Complaint set forth Plaintiff's request for relief to which no response is required.  To the extent a response is required, Defendants deny the remaining allegations set forth in the Second Amended Complaint.

## <u>FIRST AFFIRMATIVE DEFENSE</u>

The Second Amended Complaint fails to state a claim upon which relief may be granted.

## <u>SECOND AFFIRMATIVE DEFENSE</u>

Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrines of waiver, estoppel and ratification for any claim purportedly alleged in the Second Amended Complaint.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the application of the voluntary payment doctrine and/or by the doctrine of accord and satisfaction.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by release.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of res judicata, collateral estoppel, claim preclusion, judgment and/or similar concepts.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by fraud.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by failure of consideration.

### NINTH AFFIRMATIVE DEFENSE

Any damages otherwise recoverable by Plaintiff may be offset, in whole or in part, by amounts owed to Defendants, in which case Defendants are entitled to an offset against any verdict or judgment, in amounts according to proof at trial.

## TENTH AFFIRMATIVE DEFENSE

Defendants are entitled to contribution and/or indemnity from those individuals or entities responsible for the injuries or damages, if any, of Plaintiff in an amount directly proportional to their relative culpability.

## ELEVENTH AFFIRMATIVE DEFENSE

Defendants' conduct was not the cause in fact of any loss or damage alleged by Plaintiff.

## TWELTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because liquidated damages provisions are unenforceable and/or unreasonable.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of illegality.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by constructive eviction.

## RESERVATION OF RIGHTS

Defendants hereby give notice that they intend to rely upon such other and further defenses as may become available during discovery proceedings in this case, and hereby reserve the right to amend their Answer to assert additional defenses that may be pertinent to Plaintiff's claims.

WHEREFORE, having fully answered, Defendants respectfully request:

A.      That Plaintiff's Second Amended Complaint be dismissed;

B.      That Defendants be awarded their court costs in this action together with reasonable attorneys' fees; and

C.     Such other and further relief as to which Defendants may be entitled or which may be appropriate and just.

## AMENDED COUNTERCLAIM

Counter-Plaintiffs Kobe Kansas, LLC, Young W. Bae and Chan H. Bae (collectively, "Counter-Plaintiffs"), by and through their undersigned counsel and pursuant to Fed. R. Civ. P. 13, hereby file their Amended Counterclaim against Counter-Defendant, Kansas City Live Block 124 Retail, LLC ("Counter-Defendant"), and in doing so allege as follows:

### The Parties

1.     Counter-Plaintiff Kobe Kansas, LLC ("Kobe" or "Tenant"), is a Missouri limited liability company with its principal place of business in Kansas City, Missouri.

2.     Counter-Plaintiffs Young W. Bae ("Young Bae") and Chan H. Bae ("Chan Bae") (collectively, the "Baes") are individuals who reside in the State of Virginia.

3.     Counter-Defendant Kansas City Live Block 124 Retail, LLC ("KC Live" or "Landlord"), is a Maryland limited liability company with its principal place of business in Baltimore, Maryland.

4.     KC Live is controlled by the Cordish Company ("Cordish"), is a Maryland corporation with its principal place of business in Baltimore, Maryland.

### Jurisdiction and Venue

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

6.     This Court has personal jurisdiction over Counter-Defendant because it consented to jurisdiction in this Court pursuant to the terms of a Lease and Guaranty dated September 15, 2008.

7.      Venue is proper in this Court because Counter-Defendant consented to jurisdiction in this Court pursuant to the terms of a Lease and Guaranty dated September 15, 2008.

**Facts**

I.      Advertising for the Power and Light District

8.      The Baes opened a Kobe Japanese Steak and Seafood restaurant in Upper Marlboro, Maryland, known as the Boulevard at the Capital Center, in January 2004.

9.      The Boulevard at the Capital Center was previously owned and/or managed by Cordish.

10.     Cordish is one of the largest U.S.-based national, commercial real estate development and entertainment operating companies.

11.     Cordish develops real estate projects, such as entertainment and mixed-use districts; hotels and casinos, casino hotels, and hotel and casino resorts; shopping centers, college residential units, office and retail space, and luxury residential units; and sports anchored developments.

12.     Cordish owns and/or operates at least 30 mixed-use developments throughout the U.S.

13.     The Baes first met Mr. Michael Morris, the Director of Leasing and Development for the Cordish Company at the time, when Kobe opened at the Capital Center in 2004.

14.     In February 2005, Mr. Morris contacted the Baes about a new development planned in Kansas City, Missouri to be known as the Kansas City Power and Light District (the "Power and Light District" or the "District").

15.     At that time, the Baes only owned and operated restaurants in White Marsh, Maryland and Annandale, Virginia, in addition to the restaurant in Upper Marlboro.

16.     The Baes were unfamiliar with Kansas City, Missouri as they had never traveled there or operated any business there, and had no connection whatsoever to the area.

17.     Over the next several months, Mr. Morris had multiple conversations with the Baes wherein he convinced the Baes that opening a Kobe restaurant in the District would be a good investment because Cordish was working with the local government[1] to create the upscale town center.

18.     The Power and Light District is comprised of approximately nine city blocks, each block constituting a separate limited liability company owned and managed by Cordish-controlled entities.

19.     During these conversations, Mr. Morris told the Baes there would be a convention center, an opera house, a stadium, the headquarters of H & R Block Co. and the headquarters of AMC Theaters all located within the District.

20.     In a further effort to persuade the Baes to invest in the District, Mr. Morris invited the Baes to visit the Power and Light District with him in early September 2005.

21.     The Baes accepted that offer.  During that tour, Mr. Morris advised the Baes that time was of the essence because most of the available premises were already leased to well-known, nationally operated franchises and only a few areas in the District were still available.

22.     Specifically, Mr. Morris stated that P.F. Changs, the Cheesecake Factory, and others had already leased space in the District.

23.     Mr. Morris recommended that the Baes lease the premises in Block 124, across from the main gate of the planned Hilton President Hotel.  *See* Map, L-shaped space in the center of Block 124 across from the Hilton President Hotel, attached hereto as **Exhibit 1**.

---

[1] The city and State ultimately committed more than $500 Million to the project, which was to be repaid in tax revenue from the District over 25 years.

14

24.     Mr. Morris advised the Baes that this site would be the perfect place for a restaurant as it would be located within the heart of the town center and have a lot of foot traffic from visitors to the District.

25.     Mr. Morris further stated that a high rise condominium building would be constructed above the first level retail where he proposed that the Kobe restaurant be located, which would increase their customer base and the amount of foot traffic in that portion of the District.

26.     Mr. Morris represented that given its location, the other major tenants already committed to the District, and the housing that would be built above the premises, the Baes could easily achieve sales of $3,000,000.00 per year with a Kobe restaurant.

27.     In addition, the Baes were sent a DVD from the Cordish Company in early 2006 which included visual and narrative depictions of a Power and Light District that would include office space, residential housing, retail stores and entertainment venues.

28.     The DVD depicted a thriving mixed use development project including condominiums, large and small restaurants, and various gourmet markets and boutiques.  *See* DVD, attached hereto as **Exhibit 2**.

29.     Owners of the District continued to represent publically that the District was expected to be well-occupied by national tenants leading up to its opening in 2008.

30.     On Tuesday, January 5, 2007, Blake Cordish, vice president of Cordish, announced during a press conference that the Power and Light District had "commitments" for 85 percent of the planned 450,000 square feet of retail/restaurant/entertainment component of the mixed-use project.  *See* Article, attached hereto as **Exhibit 3**.

31.     A year after the District had opened, in mid-2009, nearly half of the District remained

15

unoccupied or closed for business.  *See* Article, attached hereto as **Exhibit 4**.

II.    The Lease

32.    Based on Mr. Morris' representations and the other materials provided to the Baes by Cordish, the Baes invested approximately $1,746,113.00[2] to open a Kobe restaurant in the Power and Light District in the space across from the Hilton President Hotel.

33.    KC Live and Kobe entered into a lease dated October 17, 2006[3] for 7,552 square feet of gross leasable area (the "Premises") in what was to be a "mixed use office/residential/retail/entertainment development project" known as the Kanas City Power and Light District in Kansas City, Missouri.

34.    As part of the Lease, the Baes executed a limited personal guaranty (the "Guaranty") of tenant's performance and obligations under the Lease.  A true and accurate copy of the Guaranty is attached as Exhibit G to the Lease, attached hereto as **Exhibit 5**.

35.    The Baes were not permitted to start any work on the Premises prior to obtaining KC Live's written approval of their plans.  *See* **Exhibit 5**, at Section 1401.

36.    Accordingly, the Baes submitted architectural and MET drawings to KC Live for the original space.

37.    KC Live subsequently approved the architectural and MET drawings.

---

[2] The investment included $74,697.00 for a purchase/order system, $208,286.00 for equipment, $120,852.00 for furniture, $1,287,278.00 for construction costs and $55,000.00 for organization costs.

[3] On September 15, 2008, but executed on or about September 25, 2008, the Lease was Second Amended to reflect the correct entity name of the tenant, but otherwise contained the same provisions of the original 2006 lease, with the exception of the added Explanatory Statement on page 1.  The Second Amended Lease is the operative agreement. A true and accurate copy of the Lease is attached hereto and incorporated herein by reference as **Exhibit 5**.

38.     However, when KC Live completed its work pursuant to Exhibit C to the Lease in the original space, the Premises was no longer compatible with the architectural and MET drawings that KC Live had approved.

39.     Specifically, the grading of the Premises made the build-out needed by Tenant impossible because the floor was not level, a fact that had never been revealed to the Baes or noted in the review or approval of the architectural and MET drawings.

40.     Because the original space leased to the Baes was no longer suitable for a restaurant after KC Live completed its work, KC Live's agent(s) advised the Baes that they would have to relocate to the site next door, at the corner of Baltimore Avenue and 13th Street.  *See* Map, Site # 14, attached hereto as **Exhibit 1**.

41.     KC Live's agent(s) advised the Baes that the new location was comparable with the original space.

42.     The Baes were not compensated for the four months of lost time, money and effort associated with beginning their build out in the original location across from the Hilton Hotel.

43.     Instead, the date of Notice of Possession for the Premises was identified as September 9, 2008 and Tenant's Fixturing Period began on September 9, 2008.  *See* **Exhibit 5**.

44.     Based on these dates, the Rent Commencement Date was February 6, 2009.  *See* **Exhibit 5**.

45.     As a result of the delays caused by KC Live, the Baes were forced to start paying Minimum Rent for the Premises long before the restaurant was ready to open.

III.     <u>2009 through 2011</u>

46.     As the Baes prepared to open in April 2009, nearly half of the Power and Light District remained unoccupied. *See* **Exhibit 4**.

47.     On October 17, 2009, Kobe was finally able to open, eight months after the Rent Commencement Date.

48.     Pursuant to Section 1408 of the Lease, KC Live was to pay Kobe a Lease Incentive Payment equal to $40.00 per square foot of gross leasable area, or $302,080.00, within thirty (30) days of Kobe completing Tenant's Work, opening for business and paying its first installment of Minimum Rent, obtaining its certificate of occupancy, and delivering to KC Live waivers or releases of mechanics' or materialmen's liens. *See* **Exhibit 5**.

49.     Although Kobe had complied with the foregoing by the end of 2009, KC Live did not pay the Lease Incentive Payment within thirty days as set forth in Section 1408 of the Lease.

50.     When Kobe opened for business, all of the sites adjacent to the restaurant were vacant.

51.     In fact, because Kobe sits at the corner of the block and all of the sites around it are vacant, it is rendered an island unto itself with no viable neighbor and very little foot traffic.

52.     In addition, nearly half of the sites in the District remained vacant and the residential condominium building had yet to be built.

53.     Despite statements to the contrary, neither P.F. Changs nor the Cheesecake Factory ever became tenants in the District.

54.     Further, because Kobe was no longer located across from the Hilton Hotel as the original location had been, the restaurant was not visible from within the District.

55.     Similarly, because the residential condominiums were never built, there was no customer base residing in the District as had been represented to the Baes.

18

56.     As a result, Kobe had little to no foot traffic around its restaurant.

57.     However, KC Live continued to make public statements that development in the District was not complete.

58.     In fact, in mid-2010, KC Live, through its agent Nick Benjamin, represented that development in the District was ongoing as it was contemplated to progress chronologically, from east to west, with retail being the last piece of the puzzle. *See* Article dated April 16, 2010, attached hereto as **Exhibit 6**.

59.     He also stated that there was still 60,000 square feet of space in the District left to lease in mid-2010. *See* **Exhibit 6**.

60.     As a result, the Baes reasonably believed that development was ongoing and that the area around the Kobe was the last to be developed since it was the farthest to the west.

61.     From 2009 through 2011, Kobe's annual sales averaged at $875,000.00, seventy-five percent lower than the $3,000,000.00 Mr. Morris had anticipated, and much lower than the Minimum Sales identified in the Lease.

62.     Further, because the District lacked any significant number of customers, Kobe struggled to maintain employees because they were not able to make tips.

63.     During that time, Counter-Plaintiffs got behind on their rent while waiting for the remainder of the District, and particularly the west side where the Kobe restaurant was located, to open and generate a higher and more consistent volume of customers.

64.     On August 5, 2011, KC Live sued Kobe and the Baes in this Court, claiming $1,420,000.00 in late opening charges and past due rent.

65.     Despite, or perhaps in light of, the District's poor performance and inability to generate the patronage necessary to generate revenue for its tenants, Kobe was one of many tenants that KC Live sued for unpaid rent.

66.     Other restaurants in the District faced the same challenges as Kobe, and many were already embroiled in disputes with KC Live resulting from the poor performance of the District by the time Kobe opened for business.  For example, Bice Bistro[4], The Peachtree Restaurant[5], Ragland Road[6], Vinino, Famous Dave's Legendary Barbeque, Genghis Grill[7], Ted's Montana Grill, Fran's Restaurant, Yummo and Chefburger[8] all closed within approximately two to three years of opening, allegedly as a result of the District's poor performance, resulting in bankruptcy or eviction for nonpayment of rent.

67.     Seven of these 12 restaurants, cafes and bistros (Bice Bistro, The Peachtree Restaurant, Ragland Road, Vinino, Famous Dave's Legendary Barbeque, Ted's Montana Grill and Chefburger) opened during the first phase of the development of the District in 2008, and had closed by the end of the 2011.

---

[4] Upon information and belief, the District filed a lawsuit against the operator of Bice Bistro in spring 2009 claiming that the owners of the Italian restaurant owed the District $358,900.00.

[5] Upon information and belief, in June 2010, the operator of The Peachtree Restaurant filed for Chapter 11 bankruptcy. The District was the largest creditor with a $203,000.00 claim for unpaid rent.

[6] Upon information and belief, in August 2011, the operator of Raglan Road filed for Chapter 11 bankruptcy.  The District was among the biggest creditors with a $378,629.00 claim for unpaid rent. The District had sued the operator in June 2011 seeking eviction.

[7] Daniel Albert, owner and operator of Genghis Grill, was quoted in the Kansas City Business Journal in October 2011 as stating that the operation fought for more than two years but didn't make any money in the eight-block downtown entertainment district.  "We came here expecting great things, and it's been a nightmare since signing the lease," Albert said.

[8] Upon information and belief, KC Live also claimed that Yummo and Chefburger were behind on rent.

68. Many of these restaurants' owners cited the lack of steady patronage, difficulties with access and parking that kept customers away, early controversy about the dress code, and persistent vacancy as reasons they were unable to survive in the District.

69. Ultimately, without Counter-Plaintiffs ever filing a pleading, KC Live offered an Amendment to Lease in November 2011 in exchange for dismissal of the suit (the "2011 Amendment"). *See* 2011 Amendment, attached hereto as **Exhibit 7**.

70. Pursuant to the 2011 Amendment, Kobe allegedly owed $2,122,430.88. *See* **Exhibit 7**.

71. Despite the large sum allegedly owed by Kobe, if Kobe and the Baes agreed to the 2011 Amendment, KC Live agreed to accept $350,446.93 and waive the balance. Specifically, Kobe would make a payment of $175,223.47 upon execution of the 2011 Amendment and another payment of $175,223.46 within sixty days. *See* **Exhibit 7**.

72. Accordingly, KC Live agreed to waive all but a fraction of the $2,122,430.88 allegedly owed by Kobe under the terms of the 2011 Amendment:

> Provided Tenant strictly (including timeliness) complies with the provisions of this Agreement and the Lease through the end of the Term, those sums set forth in Exhibit A that are not paid by the two payments set forth above shall be waived by Landlord.

*See* **Exhibit 7**.

73. Additionally, the 2011 Amendment reduced the total amount that Kobe was required to pay each month as it relieved Kobe from paying Common Area Maintenance charges. Specifically the 2011 Amendment provided:

> Provided Tenant strictly (including timeliness) complies with the provisions of this Agreement and the Lease, for the period beginning November 1, 2011 and ending October 31, 2013, Tenant shall not be obligated to pay any amounts pursuant to Section 1002 of the Lease[...]

*See* **Exhibit 7**.

74.     Kobe and the Baes accepted the terms of the 2011 Amendment, relying on KC Live's assurances that the vacant spaces in the District would be leased.

75.     Kobe made the initial $175,223.47 payment pursuant to the 2011 Amendment at the time it executed the same, along with its rent payment for December 2011.  *See* Copy of Cancelled Checks send via FedEx to KC Live on November 28, 2011, attached hereto as **Exhibit 8**.

76.     Kobe made the second payment of $175,223.46 within sixty days of executing the 2011 Amendment in accordance with its terms.  *See* Copy of Cancelled Check and attached letter sent via FedEx to KC Live on January 19, 2012, attached hereto as **Exhibit 9**.

77.     Kobe subsequently made monthly rent payments from November 2011 through October 2013.

78.     KC Live accepted, retained and deposited each check without protest or complaint and KC Live did not notify Kobe at any time that it was in default or in violation of the 2011 Amendment or the Lease.

79.     Moreover, from October 2011 through September 2012, Kobe and the Baes experienced their most profitable year to date with average annual sales at the restaurant of $935,000.00.

80.     Though this was still much lower than the $3,000,000.00 Mr. Morris had projected and represented, and much lower than the Minimum Sales identified in the Lease, it was a steady increase from the sales of the first two years of business in the District.

81.     Further, on or about April 23, 2012, Cordish announced that the District was 85% occupied.  *See* Article, attached hereto as **Exhibit 10**.

IV.     2013 to Present

82.     From October 2012 through September 2013, average sales at Kobe dropped from around $935,000.00 to approximately $800,000.00, a decrease of 15% from the year before and 26% of the $3,000,000.00 in sales Mr. Morris had projected and represented.

83.     Further,  a long line of restaurants had closed and no comparable restaurants had opened in their place, despite KC Live's reassurances, including but not limited to:

    a.   Famous Dave's Barbeque;

    b.   Vinino;

    c.   Chefburger;

    d.   Raglan Road;

    e.   Ted's Montana Grill;

    f.   The Peachtree Restaurant;

    g.   Genghis Grill;

    h.   Bice Bistro; and

    i.   Fran's Restaurant.

84.     Based on growing concerns about the KC Live's failure to maintain the District as a thriving mixed use development, in late spring of 2013, Kobe's agents requested a meeting with KC Live agent Bob Fowler.  Over the course of several meetings, they informed KC Live they wanted to buy out the Lease because the business was basically nonexistent and the sales were so low, that they were operating in the red and losing too much money to remain open.

85.     Mr. Fowler strung them along for several months, ultimately informing Kobe's agents that they would be fined three times the amount of the monthly rent if they did not stay open.

86.     During this time, the summer and early fall of the 2013, the District saw no improvements in patronage or occupancy rates and gross sales remained at approximately twenty percent of that represented by Mr. Morris in 2005.

87.     Kobe continued to operate at a significant loss and, in November 2013, ceased paying rent.

88.     From October 2013 through September 2014, annual sales at the Kobe restaurant dropped even lower to approximately $610,000.00, a decrease of nearly 25% from the year before and 20% of the $3,000,000.00 in sales Mr. Morris had projected and represented.

89.     In November 2014, KC Live undertook construction immediately in front of the Kobe restaurant.

90.     Kobe sits at the corner of Baltimore Avenue and 13th Street and, since November 2014, 13th Street has been entirely closed to all through traffic.

91.     Moreover, since November 2014, unsightly traffic control devices, cones, scaffolding, construction materials, fences, and other such items have been placed directly in front of the Kobe restaurant, both obscuring it from view and blocking the entrance for patrons. *See* Photographs, attached hereto as **Exhibit 11**.

92.     Even worse, a portable toilet was set up directly in front of the door to the Kobe restaurant and has remained in that spot ever since.

93.     KC Live, by wrongful conduct and omission of a duty under the Lease, substantially interfered with the Kobe restaurant's beneficial use of the Property.

94.     KC Live's acts in this regard resulted in diminution in the value of the Lease.

95.     Despite these actions by KC Live, it has been impossible for the Baes to vacate the Property because of KC Live's threats of seeking three times the amount of rent due for the remainder of the Lease term.

96.     From October 2014 through September 2015, annual sales dropped even lower to approximately $490,000.00 as result of the KC Live's misrepresentations of the quality and quantity of tenants that would occupy the District, and their intentional interference with the Kobe restaurant's business.

97.     This was a decrease of nearly 20% from the year before and 16% of the $3,000,000.00 in sales Mr. Morris had projected and represented.

98.     To date, at least 12 of the approximately 45 sites at the District remain vacant suggesting that vacancy remains much lower than the 85% represented by KC Live and its agents in 2007 and again in 2012. *See* **Exhibits 2 and 10**.

99.     To date, all three sites sitting adjacent to Kobe remain vacant, and have never been occupied since Kobe opened for business five and half years ago[9].

100.    To date, one residential housing complex sits several blocks away from the Kobe restaurant, but no condominiums were built above the Premises as represented by Mr. Morris in 2005.

101.    To date, Kobe continues to see actual annual sales eighty-five percent lower than the $3,000,000.00 represented by Mr. Morris, and instead closer to approximately $500,000.00, due to the lack of occupancy in the District, the lack of housing in the District, the construction KC Live undertook directly in front of the restaurant, and the resultant lack of foot traffic in the District.

---

[9] At some point during the last year, "Visit KC," a welcome center type storefront, has been placed in a previously vacant space on the opposite corner of the block but, unsurprisingly, generates no significant foot traffic.

102.     As a result of the misrepresentations by KC Live and its agents, Counter-Plaintiffs have lost their investment of $1,746,113.00 and have an operating loss of approximately $1,700,000.00.

## COUNT I
### (Fraudulent Inducement)

103.     Counter-Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

104.     KC Live and/or its agents represented that residential condominiums were going to be built above Kobe's restaurant to induce the Baes to sign the Lease.

105.     Mr. Morris represented that the condominiums were going to be built above the Property to induce the Baes to sign the Lease.

106.     The Cordish Company, on behalf of KC Live, sent the Baes a DVD that represented that housing would be built in the District to induce the Baes to sign the Lease.

107.     These representations were false as no such condominiums have been built.

108.     The representation that residential condominiums were going to be built above Kobe's restaurant was material to Counter-Plaintiffs' decision to invest in opening a restaurant in the District.

109.     Having condominiums above the restaurant would inevitably increase Kobe's business.

110.     KC Live and/or its agents knew that condominiums were not going to be built above Kobe's restaurant or ignored the truth when making this representation to the Baes, as the condominiums were built several blocks from the Kobe restaurant.

111.     KC Live and/or its agents represented that condominiums were going to be built above the Premises so that the Baes would believe they were making a good investment and sign the Lease.

112.    KC Live and/or its agents' representation to the Baes that condominiums were going to be built above the Premises when this representation was false was an intentional wanton, willful, and outrageous act.

113.    KC Live and/or its agents acted with reckless disregard for Counter-Plaintiffs' rights and interests when they represented that condominiums were going to be built above the Premises when this representation was false.

114.    The Baes and/or Kobe were unaware that the representation that condominiums would be built above the restaurant was false.

115.    The Baes and/or Kobe relied upon the truth of the representation that condominiums would be built above the restaurant in deciding to sign the Lease and spend $1,746,113.00 in opening the restaurant.

116.    Section 1901(v) of the Lease concerns KC Live's right to build above the Premises, which corroborated the Baes' and/or Kobe's belief that the representation was accurate and gave them the right to rely upon the representation.  *See* **Exhibit 5.**

117.    As a result of the misrepresentations by KC Live and/or its agents, Counter-Plaintiffs have been consequently and proximately injured because they have lost their investment of $1,746,113.00 and have an operating loss of approximately $1,700,000.00.

118.    KC Live and/or its agents represented that the tenants occupying the District would include well-known national franchises such as P.F. Changs and the Cheesecake Factory to induce the Baes to sign the Lease.

119.     The Cordish Company, on behalf of KC Live, sent the Baes a DVD that represented that there would be both large and small restaurants occupying the District to induce the Baes to sign the Lease.

120.     These representations were false because few if any national franchises have been tenants in the District, and P.F. Changs and the Cheesecake Factory have never been tenants in the District.

121.     Moreover, most of the restaurants that once leased space in the District have since vacated due to the poor performance of the District, and KC Live has failed to replace them with comparable tenants, or any tenants at all.

122.     In fact, the District has been persistently vacant and the three sites that sit adjacent to Kobe's restaurant have been vacant for nearly ten years.

123.     The representation that the District would be occupied by well-known national franchises was material to Counter-Plaintiffs' decision to invest in opening a restaurant in the District.

124.     Kobe's business would inevitably increase if in fact the District were occupied by well-known national franchises.

125.     KC Live and/or its agents knew that well-known national franchise had not committed to opening restaurants in the District, or ignored the truth, when making this representation to the Baes.

126.     KC Live and/or its agents represented that well-known national franchises had committed to opening restaurants in the District so that the Baes would believe they were making a good investment and sign the Lease.

127.     KC Live and/or its agents' representation to the Baes that well-known national franchise had not committed to opening restaurants in the District when this representation was false was an intentional wanton, willful, and outrageous act.

128.     KC Live and/or its agents acted with reckless disregard for Counter-Plaintiffs' rights and interests when they represented that well-known national franchises had committed to opening restaurants in the District when this representation was false.

129.     The Baes and/or Kobe were unaware that the representation that well-known national franchises had committed to opening restaurants in the District was false.

130.     The Baes and/or Kobe were similarly unaware that KC Live would fail to replace restaurants that vacated the District which comparable restaurants, or any at all.

131.     The Baes and/or Kobe relied upon the truth of the representation that well-known national franchises had committed to opening restaurants in the District in deciding to sign the Lease and spend $1,746,113.00 in opening the restaurant.

132.     The Baes and/or Kobe had the right to rely upon these representations because the information was within a scope of information only known to KC Live and/or its agents.

133.     As a result of the misrepresentations by KC Live and/or its agents, Counter-Plaintiffs have been consequently and proximately injured because they have lost their investment of $1,746,113.00 and have an operating loss of approximately $1,700,000.00.

134.     KC Live and/or its agents represented that a Kobe restaurant could easily achieve sales of $3,000,000.00 per year in the Premises to induce the Baes to sign the Lease.

135.     The Cordish Company, on behalf of KC Live, sent the Baes a DVD that represented that the District would be a thriving scene for a restaurant to induce the Baes to sign the Lease.

136.     These representations were false because, over five years after opening, the actual annual sales are only about $400,000.00.

137.     The representation that a Kobe restaurant could easily achieve sales of $3,000,000 per year in the Premises was material to Counter-Plaintiffs decision to invest in opening a restaurant in the District.

138.     If sales were $3,000,000.00, the Baes would have already been able to recapture their investment of $1,746,113.00.

139.     If sales were $3,000,000.00 per year in the Premises, Kobe and/or the Baes would be able to operate at a profit.

140.     KC Live and/or its agents knew that a restaurant in the District was not expected to gross sales of $3,000,000.00 per year in the District, or ignored the truth when making this representation to the Baes, because the District was not slated to be fully occupied or to have nationally-franchised tenants.

141.     KC Live and/or its agents represented that a Kobe restaurant could easily achieve sales of $3,000,000.00 per year in the Premises so that the Baes would believe they were making a good investment and sign the Lease.

142.     KC Live and/or its agents' representation to the Baes that a Kobe restaurant could easily achieve sales of $3,000,000.00 per year in the Premises when this representation was false was an intentional wanton, willful, and outrageous act.

143.     KC Live and/or its agents acted with reckless disregard for Counter-Plaintiffs' rights and interests when they represented that a Kobe restaurant could easily achieve sales of $3,000,000.00 per year in the Premises when this representation was false.

144.     The Baes and/or Kobe were unaware that the representation that a Kobe restaurant could easily achieve sales of $3,000,000.00 per year in the Premises was false.

145.    Section 201(f) of the Lease defined Minimum Sales[10] as $2,291,250.00, which corroborated the Baes and/or Kobe's belief that the representation was accurate and gave them the right to rely upon the representation.

146.    The Baes and/or Kobe relied upon the truth of the representation that a Kobe restaurant could easily achieve sales of $3,000,000.00 per year in the Premises in deciding to sign the Lease and spend $1,746,113.00 in opening the restaurant.

147.    The Baes and/or Kobe had the right to rely upon these representations because the information was within a scope of information only known to KC Live and/or its agents.

148.    As a result of the misrepresentations by KC Live and/or its agents, Counter-Plaintiffs have been consequently and proximately injured because they have lost their investment of $1,746,113.00 and have an operating loss of approximately $1,700,000.00.

149.    Despite exercising reasonable diligence, Counter-Plaintiffs did not become aware of the falsity of the foregoing misrepresentations until, at the earliest, October 2010.

WHEREFORE, Counter-Plaintiffs, Kobe Kansas, LLC, Young W. Bae and Chan H. Bae, demand judgment in the amount of $3,446,113.00 for actual damages, plus punitive damages in the amount of $1,000,000.00, plus reasonable attorneys' fees and litigation costs to which Counter-Plaintiffs are contractually entitled, plus any additional damages to which Counter-Plaintiffs are entitled, and such other and further relief as this Counter deems just and necessary.

---

[10] According to Section 712 of the Lease, "in the event the Gross Sales for any Lease Year following the first Lease Year are less than the Minimum Sales amount, Landlord shall have the option to terminate this Lease by giving Tenant notice of such termination within six (6) months after Landlord's receipt of Tenant's annual Gross Sales report for the applicable Lease Year." *See* **Exhibit 5**.

Dated: March 22, 2016                    Respectfully submitted,

                                         _____/s/_____
                                         Avery Barton Strachan (Bar Number: 27556)
                                         William N. Sinclair (Bar Number: 28833)
                                         Kerri L. Smith (Bar Number: 05452)
                                         Silverman | Thompson | Slutkin | White LLC
                                         201 North Charles Street, Suite 2600
                                         Baltimore, Maryland 21201
                                         Phone: (410) 385-2225
                                         Facsimile: (410) 547-2432
                                         astrachan@mdattorney.com
                                         bsinclair@mdattorney.com
                                         ksmith@mdattorney.com
                                         *Counsel for Defendants*