**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| **KANSAS CITY LIVE BLOCK 124 RETAIL, LLC** | * | |
| | * | **Case No. 14-cv-03236-GLR** |
|     **Plaintiff and Counter-Defendant,** | * | |
| | * | |
| **v.** | * | |
| **KOBE KANSAS, LLC,** *et al.* | * | |
| | * | |
|     **Defendants and Counter-Plaintiffs.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFF/COUNTER-DEFENDANT'S MEMORANDUM
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT AS TO (1) THE SECOND AMENDED COMPLAINT, AND (2)
COUNT I OF DEFENDANTS/COUNTER-PLAINTIFFS' COUNTERCLAIMS**

Plaintiff and Counter-Defendant, Kansas City Live Block 124 Retail, LLC ("KC Live" or

"Landlord"), submits the following Memorandum in Support of its Motion for Partial Summary

Judgment as to (1) the Second Amended Complaint, and (2) Count I of the Counterclaims filed

by Defendants and Counter-Plaintiffs, Kobe Kansas, LLC ("Kobe"), Young W. Bae ("Mr. Bae"),

and Chan H. Bae ("Ms. Bae") (collectively, the "Baes," "Defendants" or "Tenant").

## INTRODUCTION

This lawsuit concerns unpaid rent and related sums owed to KC Live by the Baes

pursuant to the terms of a commercial lease agreement and guaranty. In October 2006 the Baes

leased space in a mixed-use development project in Kansas City, Missouri for an upscale

Japanese steakhouse. The Baes opened their restaurant late, in October of 2009, and also failed to

pay the monthly rent. In 2011 Landlord sued the Baes for damages from the late opening and

failure to pay rent under the lease. The 2011 lawsuit was resolved through a lease amendment in

which, among other things, the parties stipulated that Tenant owed Landlord $2,122,430.88 through July 31, 2011. Landlord then conditionally waived this stipulated amount upon payment of $350,446.93 **and** Tenant's strict compliance with the lease (including timely payment of rent) through the end of the term in February 2019. The Baes, however, admittedly stopped paying rent in November 2013. Accordingly, there is no genuine dispute of material fact that, as of February 3, 2017, the Baes owe a total of $3,481,728.25, which consists of: (1) the balance owed on the stipulated amount as of July 31, 2011 ($1,771,983.95), and (2) unpaid rent and late charges for the period August 1, 2011 through May 13, 2016, plus interest, in the total amount of $1,709,744.30. Landlord also is entitled to its reasonable attorneys' fees in an amount to be determined following resolution of all other claims in this matter.[1]

The Baes' primary "defense" in this matter is premised upon Count I of its Amended Counterclaim (repeated in its Supplemental Counterclaim), for fraud in the inducement. In short, the Baes contend they would not have entered into the lease in 2006 but for Landlord's misrepresentations regarding lease commitments with prospective tenants. However, this claim is legally barred for at least three (3) reasons. First, even when viewed in the light most favorable to the non-movant, the Baes' evidence falls far short of establishing the nine (9) elements of a fraud claim under Missouri law. Glaringly, the Baes' sworn deposition testimony contradicts the two allegations from their pleadings on which this Court permitted them to proceed with their claim (ECF No. 26). First, the Baes concede that they were never told by Landlord that **any** tenant, including The Cheesecake Factory or P.F. Changs, had **signed** a lease for space in the

---

[1] In this lawsuit Landlord also seeks rent from May 13, 2016 through the end of the Lease term, plus liquidated damages for Tenant's failure to operate its business in accordance with the minimum hours required by the Lease and for Tenant's total abandonment of the Premises in May 2016. Landlord recognizes there are genuine disputes of material fact that preclude summary judgment for either party at this time. Landlord's right to enforce the liquidated damages provisions of the Lease is the subject of Tenant's Motion for Partial Summary Judgment (ECF No. 67), and Landlord's response thereto (ECF No. 72).

District, nor were they told when any other tenant might come to the District. Viewed as a whole, the evidence reveals that, at most, any discussions between the Baes and Landlord in 2005 regarding prospective tenants were clearly in the context of discussing potential future development of the District, and thus are not actionable. As to the second surviving allegation, the Baes admitted in deposition that Landlord never told **them** that it had tenant "commitments" for 85% of the planned square footage in the District. The only "evidence" offered in support of this allegation is a January 10, 2007 article that the Baes' **counsel** obtained from a website and printed out eight (8) years later, in January 2015. When shown the article—which in the key paragraph quotes only one word ("commitments") supposedly spoken by Blake Cordish during a press conference—the Baes were forced to concede they had never read the article. Even more fatally, there is no evidence to suggest that there **were not** future "commitments" for 85% of the planned square footage in the District in January 2007. Finally, even if Landlord had made such a representation to the Baes in 2007—and Landlord did not—the Lease was signed in 2006, and thus the representation post-dates the execution of the Lease and could not constitute grounds for fraud in the inducement.

Second, even if the Baes could establish the elements of a fraud claim, it would be barred by the doctrines of waiver and estoppel. The Baes allege that they were told in September 2005 that The Cheesecake Factory, P.F. Changs, and other unspecified "fancy restaurants" were expected to be tenants in the District. During deposition the Baes repeatedly identified the absence of The Cheesecake Factory and P.F. Changs as justification for their fraud claim. But the Baes concede that, other than a September 2005 visit, they **never** had any other discussions with Landlord regarding those potential tenants or any others. Over six (6) years later, still having never raised these issues or concerns with Landlord, the Baes entered into the November 2011

lease amendment. At this time, they had been operating their restaurant for over two (2) years, during which time numerous other tenants had come to the District (but not The Cheesecake Factory or P.F. Changs). The Baes admit being concerned about the absence of these two tenants at the time they entered into the 2011 amendment, but decided to not raise their concerns at that time because they wanted Landlord to settle and dismiss the pending lawsuit. Under Missouri law, the Baes' decision to ratify and amend the lease in 2011 constitutes a waiver of any complaint they were fraudulently induced to enter into the lease in 2006. Similarly, the fraudulent inducement claim is precluded by the doctrine of estoppel, as it is undisputed that KC Live relied on the Baes' representations in the November 2011 lease amendment.

Third, the Amended Counterclaim is barred by the economic loss doctrine. Under Missouri law, a plaintiff may not recover economic losses for fraud in the inducement where the parties' contract expressly addresses the subject matter of the alleged fraud. Here, the alleged representations are that the Baes were told in September 2005 that certain types of tenants were expected to come to the District. However, Sections 3401 and 3404 of the lease—which lease was negotiated by the Baes' legal counsel—explicitly addresses that subject matter by providing that Landlord had made no representations regarding "the number or kind of tenants in the Project or the Development except as herein expressly set forth," and that "any site plans or tenant lists set forth in [the lease] are not intended, in any way, to constitute a representation or warranty by … Landlord … as to … future tenants or occupants in the Project or the Development." Because the Lease terms squarely address the subject matter of the alleged misrepresentations, they are not actionable under Missouri law.

For these reasons, explained further below, KC Live is entitled to partial summary judgment in its favor on its Second Amended Complaint in the amount of $3,481,728.25, and on Count I of the Baes' Amended and Supplemental Counterclaims.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Bonds v. Leavitt*, 647 F.Supp.2d 541, 553 (D. Md. 2009). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A material fact is one that "might affect the outcome of the suit under the governing law." *Id*. at 248. A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club*, *Inc*., 346 F.3d 514, 525 (4th Cir. 2003). While the Court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002), the Court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)). If the

opposing party fails to demonstrate, through admissible evidence, a genuine issue of material fact for trial, summary judgment should be granted. *Celotex*, 477 U.S. at 322-23.

<u>**UNDISPUTED PROCEDURAL & FACTUAL BACKGROUND**</u>

**1. The Power & Light District and Block 124**

Landlord owns Block 124 in a mixed use development project in Kansas, City, Missouri known as the Power & Light District (the "District"). *See* Affidavit of Robert C. Fowler ("Fowler Aff.") filed contemporaneously herewith, ¶ 7. The District is an expansive project encompassing eight (8) blocks. *Id*. The District was always intended to have a phased opening, with various sectors of the District opening at different times and additional tenants moving into the District as development continued and was completed. *Id*.

**2. The Lease And Guaranty**

On October 17, 2006, Landlord and Kobe entered into a commercial lease agreement (the "Lease") for 7,800 square feet of gross leasable area in Block 124 of the District. *Id*. ¶ 8. A copy of the 2006 Lease is attached hereto as **Exhibit 1**. At the same time, the Baes executed a personal guaranty (the "Guaranty") of Tenant's performance and obligations under the Lease. *Id*. ¶ 9. A true and correct copy of the Guaranty is included as Exhibit G to the Lease. The Baes were represented by counsel—Jenny Shin ("Ms. Shin")—in the negotiation of the Lease and Guaranty, reviewed the Lease and Guaranty with their counsel, had their counsel (who was fluent in Korean and English) read it to them, and signed the Lease and Guaranty in their counsel's presence. *See* Chan Bae Deposition Transcript Excerpts ("Chan Bae Tr."), attached hereto as **Exhibit 2**, 80:19-82:21; Young Bae Deposition Transcript Excerpts ("Young Bae Tr."), attached hereto as **Exhibit 3**, 57:13-59:15. It is the Baes' present view that the Lease contained terms that are favorable to the Landlord; however, they acknowledge they executed the Lease

with knowledge of those terms and in consultation with their attorney. Young Bae Tr. 58:12-59:3.

Section 3401 of the Lease provides, in relevant part, as follows:

> There are no oral agreements between the parties hereto affecting this Lease, the Premises, the Project and/or the Development and this Lease supersedes and cancels any and all previous written or oral negotiations, arrangements, letters of intent, lease proposals, brochures, agreements, representations, promises, warranties and understandings between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. … Without limiting the foregoing, <u>Tenant hereby expressly acknowledges that the Landlord Parties have made no representations, warranties, inducements or promises with respect to the Project, the Development or the Premises or this Lease or estimated Gross Sales **or the number or kind of tenants in the Project or the Development** except as herein expressly set forth.</u> Tenant acknowledges that prior to entering into this Lease, Tenant has satisfied itself of all its concerns, if any, by conducting an independent investigation into all prior information provided by (or statements made by) Landlord or its agents (including, without limitation, Landlord's Agent). Tenant acknowledges that it does not have any exclusive rights in the Project with respect to the sale of its merchandise or the provision of its services.

(emphasis added). Section 3404 of the Lease provides, in relevant part:

> Unless expressly set forth to the contrary in this Lease, <u>any site plans or tenant lists set forth in this Lease or in Exhibits to this Lease are not intended, in any way, to constitute a representation or warranty by, or on behalf of, Landlord</u> (a) as to the past, current or future layout of the Project or the Development or (b) <u>as to the past, existing or future tenants or occupants in the Project or the Development</u>.

(emphasis added).

### 3. The Baes Reaffirmed The Lease And Guaranty No Less Than Four (4) Times Over The Next Five (5) Years.

The Lease was subsequently amended, restated, and/or affirmed on four (4) more occasions over a five (5) year period. To wit: after signing the original Lease in October 2006, the Baes signed an Amendment to Lease in September 2008, a revised Lease in September 2009,

a Tenant Estoppel Certificate in 2009, and yet another amendment to the Lease in November 2011. As explained further below, on each of these occasions the Baes, represented by legal counsel, reaffirmed the Lease, affirmed that Landlord had fully complied with its obligations under the Lease, and reaffirmed the language in Sections 3401 and 3404 of the Lease.

In September 2008, the parties entered into an Amendment to Lease (the "2008 Amendment") to update the location of the Premises to the northwest corner of Block 124 (depicted on Exhibit A to the Lease and the 2008 Amendment). Fowler Aff. ¶ 10. A copy of the 2008 Amendment is attached hereto as **Exhibit 4**. The 2008 Amendment changed the gross leasable space of the Premises from 7,800 square feet to 7,552 square feet, and lowered the Minimum Rent from $183,300 to $177,472 annually. Ex. 4, §§ 1, 2, 4. In entering into the 2008 Amendment, the Baes agreed that "[a]ll other terms and conditions of said Lease shall remain and continue in full force and effect…." *Id*. § 5. The Baes also agreed, represented, and warranted "that the Lease is in full force and effect and that Landlord is not in default or breach of any of its obligations under the Lease." *Id*. As with the Lease, the Baes were represented by their counsel, Ms. Shin, with respect to the 2008 Amendment. Chan Bae Tr. 94:20-22; *see also* Fowler Aff. ¶ 24.

On September 24, 2009 (but effective as of September 15, 2008), the parties signed a revised Lease and Guaranty in order to correct Kobe's name and address several other issues. Fowler Aff. ¶ 11. A copy of the revised Lease and Guaranty is attached hereto as **Exhibit 5**. The revised Lease incorporated the original Lease and 2008 Amendment. Ex. 5, p. 1. The only substantive change to the revised Lease is an explanatory statement on the first page which addresses issues regarding parking, Kobe's failure to properly incorporate, and Kobe's late opening of the Premises—none of which is at issue in the instant lawsuit. *Id*. In signing the

revised Lease, the Baes "specifically agree[d] and acknowledge[d] that Landlord has fully complied with all of its obligations of this Lease, as well as the Lease as amended as set forth above…." *Id*. The parties agree that the revised 2009 Lease is the operative Lease between the parties. Fowler Aff. ¶ 11; Amended Counterclaim (ECF No. 42-12), ¶ 33, n. 3 and Exhibit 5 thereto. *Id*. As with the prior iterations, the Baes' counsel, Ms. Shin, represented and advised the Baes in the transaction. Chan Bae Tr. 102:7-15; *see also* Fowler Aff. ¶ 24.

Also in 2009, Kobe signed a Tenant Estoppel Certificate (the "Estoppel Certificate") in connection with Landlord's request for financing from Bank of America, N.A. Fowler Aff. ¶ 12. A copy of the Estoppel Certificate is attached hereto as **Exhibit 6**. In the Estoppel Certificate, Kobe, by and through its Managing Member, Chan H. Bae, affirmed as follows:

> (6) That all conditions of said Lease to be performed by Landlord and necessary to the enforceability of said Lease have been satisfied;
>
> (7) That there are no defaults by Landlord thereunder, and no event has occurred or situation exists which would, with the passage of time, constitute a default under the Lease . . . ;
>
> (9) That on this date there are no existing defenses, offsets, claims or credits which the undersigned has against the enforcement of said Lease by Landlord except for prepaid rent through _____ (not to exceed two months);

Exh. 3, p. 1, ¶¶ 6, 7 and 9; *see also* Chan Bae Tr. 107:20-22 (authenticating signature). Kobe further represented that, "[i]f any statement contained herein shall become untrue within the next sixty (60) days, the undersigned agrees to give immediate written notice thereof to Bank of America, N.A." *Id*, p. 3, second ¶ 7. It is undisputed that Kobe never gave any such notice to Bank of America, KC Live, or anyone else. Fowler Aff. ¶ 12.

In November 2011, the parties entered into a second lease amendment, as discussed below.

### 4. KC Live's 2011 Lawsuit Against Defendants For Unpaid Rent Results In The 2011 Amendment

Kobe was required by the lease to open for business on February 6, 2009. Fowler Aff. ¶ 13. It did not open until October of 2009—eight (8) months late. *Id*. After Kobe opened, it failed to pay rent. *Id*. Consequently, in August 2011, Landlord sued Defendants in this Court for unpaid rent and other amounts owed under the Lease and Guaranty, in the case styled *Kansas City Live Block 124 Retail, LLC v. Kobe Kansas, LLC et al.*, Case No. 1:11-CV-02171-WDQ (the "2011 Action"). Fowler Aff. ¶ 14.

The Baes retained Ms. Shin as counsel in conjunction with the 2011 Action and negotiated a settlement. Chan Bae Tr. 118:10-18.The terms of the settlement were memorialized in a Lease Amendment dated November 22, 2011 (the "2011 Amendment"). Fowler Aff. ¶ 15. A copy of the 2011 Amendment is attached hereto as **Exhibit** 7.[2] The Baes admit that they read, understood, agreed to, and signed the 2011 Amendment under advice of counsel in order to settle the 2011 Action and despite any misgivings they may have personally had regarding its terms. Chan Bae Tr. 119:14-123:1; Young Bae Tr. 84:11-86:16.

Pursuant to the 2011 Amendment, and in exchange for Landlord's concessions (including dismissal of the 2011 Action, conditional abatement of past-due rent and other charges, and future conditional abatement of CAM charges), Defendants acknowledged and stipulated that they owed Landlord $2,122,430.88 (the "Stipulated Amount") in rent, interest, late charges, and liquidated damages under the Lease and Guaranty as of July 31, 2011. Exh. 7, ¶ 2 (and Exhibit A

---

[2] A copy of the 2011 Amendment is also attached to and incorporated in Defendants' Amended Counterclaim by reference as Exhibit 7.

thereto)[3]; *see also* Fowler Aff. ¶ 16. The Baes also confirmed that, under its express terms, the Guaranty was now a full guaranty rather than limited. *Id.*

Through the 2011 Amendment, Defendants expressly waived all defenses to the Stipulated Amount. *Id.* In addition, the Baes affirmatively represented, warranted, and agreed that, among other things, the Lease was in full force and effect and they had no basis to assert any claim against Landlord for breach of the Lease or any other obligation.[4] Fowler Aff. ¶ 17. These concessions were important and material to Landlord, and it never would have settled the 2011 Action without them. *Id.* Indeed, each and every one of the Defendants' representations in the 2011 Amendment was relied upon by KC Live when it agreed to settle and dismiss the 2011 Action, conditionally waive the amounts then-owed under the Lease, and conditionally abate Common Area Maintenance ("CAM") charges through October 31, 2013. *Id.*

KC Live's abatement of a portion of the Stipulated Amount, as well as all CAM charges for the period November 1, 2011 through October 31, 2013, was explicitly conditioned on

---

[3] The 2011 Amendment specifically identifies and itemizes the amount owed to KC Live as follows:

| | |
|---|---|
| Rent Owed Before Tenant Opening Late | $224,313.57 |
| Interest Owed Before Tenant Opening Late | $7,885.20 |
| Late Charges Owed Before Tenant Opening Late | $57,721.15 |
| Liquidated Damages Owed for Tenant Opening Late | $463,749.00 |
| Rent Owed After Tenant Opening Late | $288,732.96 |
| Interest Owed After Tenant Opening Late | $59,457.68 |
| Late Charges Owed After Tenant Opening Late | $317,961.59 |
| Late Charges on Liquidated Damages for Late Opening | $605,531.55 |
| Interest Charges on Liquidated Damages for Late Opening | $97,078.19 |
| **Total** | **$2,122,430.88** |

[4] Specifically, in the 2011 Amendment the Baes expressly agreed, represented, and affirmed that KC Live "has fully complied with its obligations under this Lease and that [Kobe] and [the Baes] *have no basis to assert any claim of breach by [KC Live] of its obligations under the Lease or otherwise*." Exh. 7, ¶ 8 (emphasis added). The Baes also expressly agreed and warranted that, except as specifically modified by the 2011 Amendment, *"[a]ll other terms and conditions of said Lease shall remain and continue in full force and effect and shall be deemed unchanged*," and "the Lease is in full force and effect and that Landlord [is] not in default or breach of its obligations under the Lease." *Id.* ¶ 10 (emphasis added).

Tenant's strict compliance with the terms of the 2011 Amendment and the Lease through the end of the term (i.e., February 2019). Exh. 7, ¶¶ 1-2.[5]

Pursuant to the 2011 Amendment, Defendants made two (2) initial payments totaling $350,446.93, which was credited towards the Stipulated Amount. Fowler Aff. ¶ 19. Accordingly, the remaining balance of the Stipulated Amount under the 2011 Amendment is $1,771,983.95.

Upon entering into the 2011 Amendment, KC Live dismissed the 2011 Action without prejudice. Fowler Aff. ¶ 18.

5. **Defendants Have Not Paid Rent Since November 2013, Have Not Operated The Minimum Hours Required By The Lease Since Before July 2014, And Ceased Restaurant Operations In April 2016.**

The Baes admit that they have not paid any rent to KC Live since November 2013. Chan Bae Tr. 129:11-18. Kobe is required by the Lease to operate at least from 11 a.m. to 10 p.m. Sunday through Thursday, and at least 11 a.m. to 11 p.m. Friday and Saturday. Exh. 1, § 201(q). Kobe has failed to operate in accordance with that schedule since it opened. Fowler Aff. ¶ 21; *see also* Young Bae Tr. 73:19-74:8.The Baes also admit that Kobe has not been open for lunch since at least July 2014, and that Kobe has not operated on Sundays since even before that time. Chan Bae Tr. ¶ 135:9-14 (admitting that Kobe had not served lunch since July 2014); Young Bae Tr. 110:8-11 (admitting that Kobe had not operated on Sundays since before it stopped serving lunch); *see also* Supplemental Counterclaim (ECF 55-1), ¶ 102.1 (admitting that Kobe has failed to serve lunch since July 2014).

---

[5] Notwithstanding KC Live's agreement to conditionally abate certain charges, the parties expressly acknowledged and "agree[d] … that an Event or Events of Default exist over Tenant's failure to pay the amounts due under the Lease and Landlord is conditionally agreeing not to exercise its remedies under the Lease on account thereof pending strict compliance with the provisions of the Lease and this Agreement." Exh. 4, ¶ 2. The 2011 Amendment also specified that "[e]xcept as otherwise specifically provided herein, Tenant shall pay on a timely basis all Rent due under the Lease and shall otherwise comply with its obligations under this Agreement and the Lease." *Id*. ¶ 6.

The Baes also admit that, as of April 2016, they had effectively closed the Kobe restaurant (*i.e.*, its manager and chef had left, it was not serving food, and thereafter it only sold an occasional soda, alcoholic beverage, or carry-out order[6]). *See* Chan Bae Tr. 136:2-137:15 (chef left in April 2016 and Kobe did not serve food after that); 151:20-152:12 (Kobe maybe sold two drinks after its chef left); Young Bae Tr. 101:8-103:20 (some alcoholic drinks and one or two carry-out orders were sold), 108:13-15 (manager also left Kobe in April 2016). Kobe failed to notify Landlord of any of these operational changes. Chan Bae Tr. 137:16-19; Fowler Aff. ¶ 25.

On May 13, 2016, having received information from a third party that Kobe had abandoned and ceased operations at the Premises, KC Live sent a letter to the Baes notifying them that they had "vacated and closed the Premises" and were "failing to operate according to the minimum hours as required by the Lease." Fowler Aff. ¶ 26. A copy of this letter is attached hereto as **Exhibit 8**.[7] In the letter, KC Live demanded that Defendants "reopen and operate the Premises in accordance with the Lease," and provided Defendants with a point of contact in order to regain access to the premises. *Id*. Defendants initially responded to the letter by indicating that they would re-open for business, and represented numerous times to KC Live that they were coming to pick up a new key, then abruptly changed their minds and decided to remain closed in violation of the lease. *Id*.; *see also* June 2, 2016 email from A. Strachan to T. Reinecker informing Landlord of Defendants decision not to reopen the Premises, attached hereto as **Exhibit 9**.[8]

---

[6] Despite repeated requests, Kobe has failed to produce any sales records that might corroborate the Baes' claim that Kobe sold even a few drinks and carry-out orders in April and May 2016.

[7] A copy of this letter is also attached to Defendants' Supplemental Counterclaim as Exhibit 14 (ECF No. 55-5).

[8] A copy of this email is also attached to Defendants' Supplemental Counterclaim as Exhibit 18 (ECF No. 55-9).

Kobe has remained closed since May 2016, and the Baes have informed KC Live that they have no intention of re-opening for business or honoring any of the provisions in the Lease. *Id*. ¶ 27. KC Live has not terminated the Lease, has provided the Baes access to the Premises when requested, and has not re-let the Premises. *Id*. ¶¶ 28-30.

## 6. There Is No Dispute That, As Of February 3, 2017, Landlord Is Owed $3,481,728.25

The total amount owed by the Baes as of February 3, 2017 is $3,481,728.25, which consists of the following:

- $1,771,983.95, which is the amount due as of July 31, 2011, stipulated to by Tenant pursuant to Exhibit A to the 2011 Amendment to the Lease, with credits for payments made.

- $289,434.73, which is the unpaid rent for the period August 1, 2011 through October 31, 2013, plus late charges, with credit for payments made.

- $1,420,309.57, which is the unpaid rent for the period November 1, 2013 through May 13, 2016, inclusive of late charges and interest (calculated through February 3, 2017), and with credit for payments made.

These amounts are fully documented and supported through the Affidavit of Jeffrey Wainger ("Wainger Aff."), Senior Accountant for the Cordish Companies, filed contemporaneously herewith, and Exhibits A and B thereto.

For purposes of this Motion, Landlord is seeking only rent and late charges through May 13, 2016 (*i.e.*, the date Landlord contends Tenant abandoned the Premises), plus accumulated interest as of February 3, 2017. *Id*. ¶ 7. Landlord contends that it is entitled under the Lease, and intends to seek at trial, rent and liquidated damages for the period May 13, 2016 through the end of the Lease term in February 2019, plus liquidated damages to which Landlord is entitled due to Tenant's abandonment of the Premises and due to Tenant's failure to operate according to the Minimum Store Hours set forth in the Lease. *Id*., ¶¶ 8-9, 11.

Additionally, pursuant to the Lease, Landlord is also entitled to recover its reasonable attorneys' fees. *Id.* ¶ 10. Landlord has incurred significant attorneys' fees due to Tenant's breaches of its obligations under the Lease. *Id.*

### 7. The Baes' Counterclaim For Fraud In The Inducement

On January 30, 2015, the Baes filed a Counterclaim containing a single count for fraudulent inducement. (ECF No. 17). On March 23, 2015, KC Live filed a motion to dismiss the Counterclaim. (ECF No. 21). Although the motion to dismiss was denied by the Court on October 16, 2015 (ECF No. 26), the Court rejected certain allegations made by the Baes, holding that "the three representations that KC Live attacks are not actionable because they are predictions for the future."[9] Mem. Op. at 10 (ECF No. 26). The Court permitted the Baes to proceed with their claim only on the basis of two (2) alleged representations:

1) That "KC Live represented to the Baes in late 2005 that most of the available premises in the District were already leased to well-known, nationally-operated franchises." (the "First Alleged Misrepresentation").

2) That KC Live stated "in 2007 that there were commitments of 85% of the lease space in the district." (the "Second Alleged Misrepresentation").

*Id.* at 10-11.

The Baes subsequently filed an Amended Counterclaim (ECF No. 42-12), also containing just a single count for fraudulent inducement (Count I), and then a Supplemental Counterclaim (ECF 55-1), which incorporates Count I and adds a claim for declaratory judgment (Count II). Prior to conducting discovery, KC Live moved for summary judgment on the Amended Counterclaim, arguing that the fraudulent inducement claim was barred by the doctrines of

---

[9] The Court concluded that the following three alleged misrepresentations are not actionable: (1) That residential condominiums were going to be built above Kobe's restaurant. Counterclaim ¶¶ 84-96; (2) that the tenants occupying the Power and Light District would include well-known national franchises. *Id.* ¶¶ 98-110; and (3) that a Kobe restaurant could achieve sales of $3 million in the Power and Light District. *Id.* ¶¶ 112-124. Mem. Op. at 10 (ECF No. 26).

waiver and estoppel (ECF No. 36), but the Court denied the Motion without prejudice, finding

that there were potential disputes of fact that warranted further discovery. (ECF No. 56).

With respect to the First Alleged Misrepresentation, the Amended Counterclaim alleges

that "Mr. Michael Morris ["Mr. Morris"], the Director of Leasing and Development for the

Cordish Company at the time," told the Baes during a September 2005 tour of the District that

"most of the available premises were already leased to well-known, nationally operated

franchises." Amended Counterclaim (hereinafter "CC"), ¶¶ 13, 21. During their depositions,

however, the Baes offered only the following testimony. First, Ms. Bae testified:

- That during the visit to the development site in Kansas City in September 2005, Mr. Morris told the Baes that P.F. Chang's and The Cheesecake Factory, as well as a restaurant called "Sake Pop"[10] and other unspecified "fancy restaurants" were "already leased." Chan Bae Tr. 51:8-52:5.

- That Mr. Morris did not explain what he meant by "already leased," and Ms. Bae did not ask. *Id*. 52:6-10.

- **Mr. Morris never told the Baes that any leases had actually been signed**, nor did he show the Baes any written documentation to that effect, nor did the Baes ask for any such written documentation. *Id*. 52:18-53:8.

- **The Baes were never told when any such leases would begin**. *Id*. 53:9-14.

- That, although it was allegedly very important to the Baes that The Cheesecake Factory and P.F. Changs be tenants in the District, the Baes never subsequently spoke to Landlord about the two restaurants or Mr. Morris' alleged statements. *Id*. 53:15-54:1 (testifying about the importance of the two restaurants to Kobe), 56:16-57:6 (Ms. Bae never personally spoke with Landlord about the two restaurants), 66:4-10 (Ms. Bae never made any demand, personally or through agents, to Landlord regarding the two restaurants), 68:11-22 (Ms. Bae confirms that no conversations were had with Landlord between 2005 and 2013 regarding the two restaurants).

Then, Mr. Bae testified:

---

[10] A single reference in Ms. Bae's deposition is the only time this alleged restaurant has been identified by the Baes throughout the course of this litigation, including pleadings and written discovery.

- That in 2005 Mr. Morris told the Baes that P.F. Chang's and The Cheesecake Factory, as well as a restaurant "like an Outback Steakhouse" and other unspecified "fancy restaurants" were "coming in." Young Bae Tr. 27:12:20-28:10.

- Mr. Morris did not tell the Baes that any leases had been signed, nor did he show the Baes any written documentation to that effect, nor did he say when any such leases would begin. *Id.* 39:19-40:10.

- That Mr. Bae did not subsequently personally speak with Landlord regarding Mr. Morris' statements, but, in 2008, two (2) years after the Lease was signed, Mr. Bae asked his manager to "put in the question through the management office" and his manager reported back that Landlord was "still working on it." *Id.* 42:5-43:1.

Regarding the Second Alleged Misrepresentation, the Amended Counterclaim states that, on January 5, 2007, "Blake Cordish, vice president of Cordish, announced during a press conference that the … District had 'commitments' for 85 percent of the … project." CC, ¶ 30. In support of this allegation, the Baes attach to the Amended Counterclaim an affidavit from their counsel of record in this litigation, which in turn attaches an article accessed online and printed by their counsel on January 29, 2015. *Id.*, and Exhibit 3 thereto. During deposition, however, the Baes confirmed they had never seen any such article. Chan Bae Tr. 88:19-89:2 ("I have not seen this before.")[11]; Young Bae Tr. 66:10-68:21 (testifying that he thinks he was shown an English-language article about the status of the development of the District in 2010 or 2011 by Kobe's manager, but that he could not recall any further specifics regarding the article).

Other than the website article discovered by their counsel, the Baes have no other evidence whatsoever that Blake Cordish or anyone else on behalf of Landlord ever made any statements pertaining to the Second Alleged Misrepresentation. Nor have the Baes identified any

---

[11] Later in the deposition, Ms. Bae claimed that she might have heard about the article during a subsequent visit to Kansas City, but was unable to identify the source or the date. *Id.* 90:4-91:16.

evidence that, assuming *arguendo* the statement had been made, that it was false, or that Landlord knew it was false.

**8. In 2011, The Baes Were On Notice Of Their Purported Claims, But Consciously Decided Not To Raise Their Concerns With Landlord In Order To Obtain Dismissal Of The 2011 Action And Landlord's Conditional Abatement Of Over $2 Million In Past-Due Amounts And Future CAM Charges**

When the Baes entered into the 2011 Amendment in November of that year, over six (6) years after Mr. Morris' alleged representations, five (5) years after they first signed the Lease, and over two (2) years after opening the restaurant, they were on notice that neither The Cheesecake Factory nor P.F. Changs, nor other unspecified tenants, were coming to the District. Similarly, the Baes understood that Landlord had no obligation—contractual or otherwise—to bring any particular tenant to the District. During deposition, Ms. Bae testified:

- That, when the Baes were sued by Landlord in 2011, there were no residential condominiums or P.F. Changs or The Cheesecake Factory in the District. Chan Bae Tr. 116:19-22. As of this time, the Baes believed that Landlord had not done everything it was supposed to do. *Id.* 131:21-132:1.

- That, nevertheless, the Baes decided they "had no other choice but settle the lawsuit." *Id.* 117:1-4; *see also* 119:14-20 (had to sign "because of our position being weak" and "in order for us to save our business"); 132:2-6 ("[W]e had to agree to this document for us to continue running our business to come up with the money.").

- That "no matter what we plead, how we pleaded with the landlord, he wasn't going to give in, he wasn't going to listen to us, so we had no other choice." *Id.* 117:11-18.

- That, as a result, the Baes did not specifically bring to Landlord's attention the statements alleged made by Mr. Morris in 2005, even though, when the 2011 Amendment was signed, "it was important to [Ms. Bae] and [Mr. Bae] and [their] businesses that the promises Michael Morris had made be honored." *Id.* 117:19-118:3 (did not inform Landlord), 121:16-20 (Mr. Morris' statements were important to the Baes in 2011).

- Q: Okay. Then my simple question to you is why did you not make [Mr. Morris' alleged statements] part of your agreement to settle the lawsuit in 2011?

  A: No matter what we bring up to the landlord or landlord's agents, we tried to plead with the landlord, to these people about our worries, and the only answers we get is that, oh, I'm glad you are coming to talk to us about this, **but we never received any kind of promises or answers**. *Id.* 121:21-122:9

- Notwithstanding her concerns regarding the absence of certain tenants from the District as of 2011, Ms. Bae read, understood, and signed the 2011 Amendment, under the advice of counsel, with the explanation that "**We were compelled to to avoid the lawsuit**." *Id.* 122:10-123:1.

Similarly, Mr. Bae testified:

- That, at the time of the 2011 Action, Mr. Morris' representations had not come true, and Mr. Bae "knew [that they had not come true] in 2011 when [he] was sued." Young Bae Tr. 77:11-19. At the time Mr. Bae signed the 2011 Amendment, it was important to him that stores such P.F. Changs and The Cheesecake Factory came to the District. *Id.* 88:4-13.

- Nevertheless, the Baes did not complain to the Landlord about Mr. Morris' representations having not come true "because we are such a small-scale business, trying to communicate with this huge level Cordish Company, we felt as though we were caught and we couldn't speak and we couldn't express our position." *Id.* 77:20-78:21.

- That he carefully listened to a translation of the 2011 Amendment, it made him "very upset," but he signed the 2011 Amendment anyway in order to settle the 2011 Action. *Id.* 84:11-86:6; *see also* 97:7-10 (the Baes were represented by counsel in the preparation of the 2011 Amendment); 97:14-98:17 (Mr. Bae did not like the terms of the 2011 Amendment but "went along with it to prevent further loss for me.").

## ARGUMENT

## 1. Defendants Have Breached The Lease And Guaranty And, As A Result, Landlord Is Entitled To Partial Summary Judgment In The Amount Of $3,481,728.25

Under Missouri law, "[a] breach of contract action includes the following essential elements: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered

performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Braughton v. Esurance Ins. Co.*, 466 S.W.3d 1, 8 (Mo. Ct. App. 2015), reh'g denied (Apr. 28, 2015) (quoting *Keveney v. Missouri Military Academy,* 304 S.W.3d 98, 104 (Mo. banc 2010)).[12]

In this instance, all elements of the claim are conceded by Defendants. There is no dispute that (1) the Lease (as amended) and Guaranty is the operative contract between the parties, (2) that KC Live performed under the contract, (3) that Defendants' failures to pay rent and operate according to Minimum Store Hours constitute breaches of the contract (including the 2011 Amendment), and (4) KC Live has suffered damages. As demonstrated by the Affidavit of Jeffrey Wainger and supporting documentation attached thereto, due to Defendants' breaches of the Lease and Guaranty, KC Live is entitled to partial summary judgment in the total amount of $3,481,728.25.

## 2. Defendants Cannot Establish The Elements Of Fraudulent Inducement Under Missouri Law By Clear And Convincing Evidence

In an effort to avoid partial summary judgment against them as set forth in Section 1, above, Defendants will argue that they should be entitled to proceed to trial on their claim of fraudulent inducement. However, despite ample opportunity during discovery, the Baes cannot set forth sufficient evidence to meet the elements of such a claim. Moreover, the Baes' own admissions during deposition undermine their claim entirely.

The nine elements for establishing fraud under Missouri law are as follows: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that it be acted on by the hearer in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the

---

[12] This Court has previously concluded that Missouri law applies to this action. *See* June 29, 2016 Memorandum Opinion (ECF No. 56), p. 10, n. 3.

representation being true; (8) the hearer's right to rely on the representation; and (9) the hearer's consequent and proximate injury. *Joel Bianco Kawasaki Plus v. Meramec Valley Bank,* 81 S.W.3d 528, 536 (Mo. 2002). The absence of any element is fatal. *Midwest Printing, Inc. v. AM Intern., Inc.*, 108 F.3d 168, 170 (8th Cir. 1997).

Defendants have failed to adduce sufficient evidence to establish the foregoing elements. Specifically, as explained further below, there is no evidence to support, at least, the following elements: (2) falsity of a statement; (4) speaker's knowledge of its falsity, and (8) hearer's right to rely on the representation.

### a. There Is No Evidence That Mr. Morris' Alleged Statements Were False, Or That He Knew They Were False

As demonstrated by the Baes' sworn deposition testimony, at most, Mr. Morris only made generalized statements regarding potential future tenants in the District. Although Mr. Morris allegedly said that The Cheesecake Factory, P.F. Changs, and other "fancy restaurants" or "national chains" were coming to the District, the Baes admit that Mr. Morris did not say that such tenants had actually signed leases with Landlord as of September 2005, or how many such tenants existed, or when any such leases would begin. Chan Bae Tr. 52:18-53:8; Young Bae Tr. 39:19-40:10. Moreover, the Baes now concede that many of the allegedly promised national restaurants **did**, in fact, come to the District. Mr. Bae testified:

> Q: Were there other national chains in the District?
> A: There was one steakhouse.
>
> Q: Okay. **Any other national chains or franchises?**
> A: **Yes. There were**. But they had come in and left soon.
>
> Q: Do you know how many came in and left soon?
> A: **Quite a few.** I remember only a few though. Do you want me to tell you?

Young Bae Tr. 76:14-77:2. Mr. Bae then proceeded to list four (4) such "national chains or franchises," and remarked that there were "a few other restaurants whose names I cannot remember." *Id*. 77:3-10.

When pressed further, Mr. Bae also admitted that Mr. Morris had no knowledge of the falsity of any of his representations:

> Q: Okay. And sitting here today, do you believe that Michael Morris, when he was showing you the DVD and telling you about the development, that he was lying to you?
> A: **No**.
>
> Q: **Do you think that Michael Morris believed what he was telling you at the time?**
> A: **Yes**.

*Id*. 79:21-80:6.

The foregoing admissions, individually and collectively, are fatal to the Baes' claim. There is simply no evidence in this case that Mr. Morris made any false statements, or that, even if one of Mr. Morris' statements was untrue, he was aware of its falsity at the time it was made.

Similarly, the Baes have absolutely no evidence that the alleged statement, attributed to Blake Cordish in an article in 2007, which the Baes concede was not made to them, was false, or that Mr. Cordish was aware of its falsity. Accordingly, the Baes have failed to meet the most fundamental elements of a claim for fraud in the inducement: falsity and knowledge of that falsity.

### b. Defendants Had No Right To Rely On Any Statements Made By Landlord

Even if the Baes had demonstrated that a false statement was made, and that Landlord was aware of its falsity at the time it was made, the Baes had no right to rely on the statement. First, the alleged misrepresentations refer to expectations and predictions for the future of the District, not misrepresentations of existing facts. Such statements are not actionable under

Missouri law. Second, the Baes expressly disclaimed any reliance on such statements in the Lease. Third, the Baes own lack of diligence precludes them from relying on any such statements. Fourth, with respect to the alleged statement regarding tenant "commitments" for 85% of the District made by Blake Cordish, the Baes concede it was not made directly to them, and in any event any such statement occurred *after* the Lease had been signed.

"To constitute fraud, the alleged misrepresentation must relate to a past or existing fact." *Trotter's Corp. v. Ringleader Restaurants, Inc.*, 929 S.W.2d 935, 940 (Mo. Ct. App. 1996) (citing *Titan Const. Co. v. Mark Twain Kansas City* Bank, 887 S.W.2d 454, 459 (Mo. App. 1994)). "Mere statements of opinion, expectations, and predictions for the future are insufficient to authorize a recovery for fraudulent misrepresentation." *Id*. (citing *Arnott v. Kruse*, 730 S.W.2d 597, 600 (Mo. App. 1987)); *see also Sindecuse v. Katsaros, et. al.,* 541 F.3d 801, 803 (8th Cir. 2008) ("One cannot predicate a fraud action upon a statement regarding what independent third parties will do in the future. Because a statement about the future actions of third parties is really a prediction rather than a promise, this rule is just a corollary of another Missouri rule that predictions for the future are not actionable as fraudulent misrepresentations.") (citing *Eureka Pipe, Inc. v. Cretcher–Lynch & Co. ,* 754 S.W.2d 897, 899 (Mo. Ct. App. 1988).

Furthermore, "mere expressions of opinion or 'puffing' … are not actionable representations." *Midwest Printing, Inc. v. AM Intern., Inc.*, 108 F.3d 168, 170-71 (8th Cir. 1997) (citing *Rich v. Eastman Kodak Co.,* 443 F.Supp. 32, 37 (E.D. Mo. 1977), *aff'd,* 583 F.2d 435 (8th Cir. 1978); *McAlpine Co. v. Graham,* 320 S.W.2d 951, 955 (Mo. Ct. App. 1959)). Similarly, statements of opinion cannot be proven true or false, and thus cannot be the basis of a fraud claim. *See Reis v. Peabody Coal Co.,* 997 S.W.2d 49, 65 (Mo. Ct. App. 1999) ("The generally recognized distinction between statements of fact and opinion is that whatever is susceptible of

exact knowledge is a matter of fact, while that not susceptible is generally regarded as an expression of opinion.").

The Baes' allegation that they were told that unspecified well-known national franchises would be coming to the District is not actionable. **The Baes admit that Landlord never told them that any such tenants had signed leases for the District**. Because the Baes were **never** told that any such leases had been signed, then, *ipso facto*, Mr. Morris' alleged statements could only have been a mere expression of future expectation.

Second, regardless of what the Baes were told in September 2005, Section 3401 of the Lease signed in October 2006 specifically precludes Defendants from claiming that they relied on representations regarding prospective tenants. In Section 3401, Defendants agreed that KC Live had "made no representations, warranties, inducements or promises with respect to the Project, the Development or the Premises or this Lease … or the number or kind of tenants in the Project or the Development…." Exhs. 1 and 5, § 3401. Defendants also expressly affirmed and acknowledged in Section 3401 that they had not relied on any representations from KC Live in deciding whether to enter into the Lease, and represented and warranted that they had undertaken their own independent investigation to confirm the accuracy of any prior information provided (or statements made) by KC Live or its agents. *Id*. The Baes, therefore, have no right to rely on any statements that might have been made regarding prospective tenants.

Recognizing that Section 3401 is fatal to their claims, Defendants have argued that Section 3401 of the Lease is ineffective, citing to Missouri cases which stand for the proposition that a defendant may not rely solely on a boilerplate integration clause disclaiming liability for all pre-contract oral representations in order to defeat a claim for fraud in the inducement. (ECF No. 24, p. 15). This argument is misguided. Section 3401 is not generalized boilerplate; rather, it

contains direct and specific disclaimers of particular types of representations. Direct contractual disclaimers of pre-contract representations are enforceable under Missouri law, even where fraudulent inducement is alleged. *See Luli Corp. v. El Chico Ranch, Inc.*, 481 S.W.2d 246, 255. 256 (Mo. 1972) (finding that disclaimer regarding representation of particular acreage in sale of land to be "positive, direct, and to the point," and thus a bar to claim of fraudulent inducement). As the *Luli Corp.* court stated in support of its holding: "Anything which will put a prudent man upon inquiry is notice, and gross negligence in failing to make inquiry when the surrounding facts suggest the existence of others, and that inquiry to be made is tantamount in courts of equity to notice." (quoting *Connecticut Mut. Life Ins. Co. v. Smith*, 117 Mo. 261, 22 S.W. 623, 629 ( Mo. 1893)).

Third, the Baes' complete lack of diligence precludes their right to rely on any alleged statements. The Baes concede that they failed to perform <u>any</u> investigation into other prospective tenants as they warranted in Section 3401 of the Lease. Young Bae Tr. 63:12-21; Chan Bae Tr. 87:20-88:4. The Baes also admit that, when presented with the Lease, they did not ask the Landlord to insert language identifying or guaranteeing which other tenants would be present in the District or when. Chan Bae Tr. 58:22-59:4. In this context, the direct disclaimers in Section 3401 put the Baes on notice. Having failed to make any additional inquiry before signing the Lease (to Landlord or otherwise), the Baes forfeited any right to rely on any alleged misrepresentations regarding prospective tenants.

Fourth, there is no evidence that the Baes ever heard or saw the alleged January 2007 statement by Blake Cordish. Moreover, it allegedly was made after the Lease had already been signed, meaning the Baes could not have relied on it when they entered into the Lease

.

**3. Defendants' Counterclaim Is Barred By The Doctrines Of Waiver And Estoppel**

When the Baes signed the 2011 Amendment, they affirmatively waived any claim that KC Live fraudulently induced them into executing the underlying Lease. In the alternative, the Baes' execution of the 2011 Amendment estops them from asserting any fraudulent inducement claim against KC Live now.

Under Missouri law, waiver is "the intentional relinquishment of a known right, and may be implied from conduct." *Howe v. Lever Bros. Co.,* 851 S.W.2d 769, 775 (Mo. App. 1993) (internal citation omitted). Where waiver is implied, "the conduct must clearly and unequivocally show a purpose to relinquish the right." *Brown v. State Farm Mut. Auto. Ins. Co.,* 776 S.W.2d 384, 386–87 (Mo. banc 1989). "To make out a case of implied waiver of a legal right, there must be a clear, unequivocal, and decisive act of the party showing such purpose, or acts amounting to an estoppel on his part." *Quirk v. Columbian Nat'l Life Ins. Co.*, 207 S.W.2d 551, 557 (Mo. Ct. App. 1947). Waiver differs from estoppel in that waiver does not require one to be misled to his or her prejudice or into an altered position. *Vill. of Big Lake v. BNSF R. Co.*, 433 S.W.3d 460 (Mo. Ct. App. 2014).

It is black letter Missouri law that when one party to a contract, with knowledge of a second party's fraudulent conduct, enters into a new contract regarding the same subject matter as the original contract, the first party is conclusively deemed to have waived any right to maintain an action for fraud in the inducement with respect to the original contract. *Peck v. Jadwin*, 704 S.W.2d 708, 711-12 (Mo. Ct. App. 1986) ("The authorities are unanimous in holding that where one has been induced by fraud to enter into a contract, and *after discovery of the fraud*, enters into an agreement concerning the subject matter of the contract, he is conclusively deemed to have waived any claim for damages on account of fraud.") (emphasis in

original) (quotation and citations omitted); *Anselmo v. Manufacturers Life Ins. Co.*, 771 F.2d 417, 420 (8th Cir. 1985) ("It is well settled that a valid fraud claim is relinquished when the victim of the fraud enters into a subsequent agreement with the perpetrator concerning the same subject matter."); *Brown v. South Joplin Lead & Zinc Mining Co.*, 132 S.W. 693, 695 (Mo. 1910) ("If at the time the parties entered into the new agreement the facts as to the fraud and deceit were known, it is to be presumed that both parties acted with that question in view, and the new agreement was the wiping out of all old scores."); *Cantley v. Plattner*, 67 S.W.2d 125, 129 (Mo. Ct. App. 1934) ("[W]here a party entitled to recover for fraud and deceit has knowledge of the fraud and deceit in the original contract and thereafter makes a new agreement, the case law seems to preclude a recovery for the fraud and deceit tincturing the original contract.") (quoting *Brown*, 132 S.W. at 694). A claim for fraud is waived where the party claiming fraud has either "actual or imputed knowledge of the facts constituting the alleged fraud" at the time it enters into a subsequent agreement with the alleged perpetrator. *Peck*, 704 S.W.2d at 711.

Each of these cases clearly preclude the Baes' claim for fraudulent inducement. The Baes' own testimony reveals that, in 2011, they were well aware that Mr. Morris' statements had not come true and were upset with Landlord for that very reason. Nevertheless, for their own strategic reasons (namely, a speedy resolution of the 2011 Action and Landlord's conditional waiver of over $2 million dollars of past and future obligations under the Lease), they declined to pursue their claims, and instead entered into the 2011 Amendment. In doing so, the Baes ratified and re-affirmed the Lease and all obligations thereunder while extracting significant concessions from KC Live. Exh. 7; *see also* Fowler Aff. ¶¶ 15-18. Accordingly, under controlling Missouri authority, the Baes expressly waived their right to maintain any claim against KC Live for fraud in the inducement with respect to the Lease.

KC Live is similarly entitled to summary judgment in its favor on the Baes' Counterclaim under the doctrine of estoppel. The doctrines of waiver and estoppel are similar, but distinct. Estoppel requires (1) an admission, statement, or act inconsistent with the claim afterwards asserted and sued upon, (2) action by the other party on the faith of such admission, statement or act, and (3) injury to such other party, resulting from allowing the first party to contradict or repudiate the admission, statement or act. *Rooks v. Lincoln Cnty. Farmers Fire & Lightning Mut. Ins. Co.*, 830 S.W.2d 507, 511 (Mo. Ct. App. 1992); *Mississippi–Fox Drainage Dist. v. Plenge*, 735 S.W.2d 748, 754 (Mo. App. 1987). The estoppel doctrine "seeks to foreclose one from denying his own expressed or implied admissions which have in good faith and in pursuance of its purpose been accepted and relied upon by another." *Lake Saint Louis Com. v. Ravenwood Prop.*, 746 S.W.2d 642, 646 (Mo. Ct. App. 1988). Equity views suits brought long after transactions have occurred with disfavor. *Grieshaber v. Grieshaber*, 793 S.W.2d 161, 163 (Mo. Ct. App. 1990).

By entering into the 2011 Amendment, the Baes expressly reaffirmed the validity of the Lease and made numerous promises to KC Live regarding their intent to strictly comply with the Lease through the end of the Lease term. *See e.g.* Exh. 7, ¶ 1 (requiring Tenant's compliance with all provisions of 2011 Amendment and Lease through end of Lease term), ¶ 2 (same), ¶ 6 (same), ¶ 7 (same, and providing that upon failure of Tenant to strictly comply with Lease, Landlord would not be bound by concessions in 2011 Amendment, and all sums due under Lease and 2011 would become "immediately due and payable."), and p. 3 (wherein the Baes personally consented to the 2011 Amendment and expressly ratified the existing Lease and Guaranty).

There is no dispute that KC Live took action in reliance upon the Baes' representations and affirmations in the 2011 Amendment. Specifically, KC Live dismissed the 2011 Action,

resumed the parties' commercial landlord/tenant relationship, and conditionally granted over $2 million in rent and CAM concessions. Accordingly, under Missouri law, the Baes are estopped from bringing a claim against KC Live based on allegations or events that were indisputably known by the Baes prior to entering into the 2011 Amendment.

### 4. Count I Of The Counterclaims Is Also Barred By The Economic Loss Doctrine

In Missouri, the economic loss doctrine bars recovery of purely economic losses in tort where claims arise out of a contractual relationship. Missouri's federal courts have recently extended this doctrine to claims of fraud. Thus, even claims of fraud in the inducement can be barred if the subject matter of the alleged misrepresentation is addressed by the parties' contract.

"The economic loss doctrine bars recovery of purely pecuniary losses in tort where the injury results from a breach of a contractual duty." *Dubinsky v. Mermart, LLC*, 595 F.3d 812, 819 (8th Cir. 2010) (applying Missouri law) (internal quotations and citations omitted). "The doctrine exists to protect the integrity of the bargaining process, through which the parties have allocated the costs and risks." *Web Innovations & Tech. Servs., Inc. v. Bridges to Digital Excellence, Inc.*, 69 F. Supp. 3d 928, 932 (E.D. Mo. 2014) (citing *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.,* 223 F.3d 873, 882 (8th Cir. 2000). While Missouri's state courts have not yet explicitly applied the economic loss doctrine to fraud claims, Missouri and Minnesota federal courts have, anticipating that Missouri's appellate courts will eventually extend the doctrine to fraud claims. *See e.g., Web Innovations & Tech. Servs.*, *Inc.*, 69 F. Supp. 3d at 933; *Compass Bank v. Eager Rd. Assocs., LLC*, 922 F. Supp. 2d 818, 827 (E.D. Mo. 2013); *Superior Edge, Inc. v. Monsanto Co.*, 44 F. Supp. 3d 890, 904 (D. Minn. 2014) (applying Missouri law).

The Eighth Circuit has explained the application of the economic loss doctrine to fraud claims as follows: "A fraud claim independent of the contract is actionable, but it must be based

upon a misrepresentation that was outside of or collateral to the contract, such as many claims of fraudulent inducement. That distinction has been drawn by courts applying traditional contract and tort remedy principles." *AKA Distrib. Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1086 (8th Cir. 1998). Relying on the Eighth Circuit's logic, Missouri's federal courts apply the following two-part test: (1) whether the subject matter of the alleged misrepresentations was incorporated into the parties' contract, and (2) whether the plaintiff suffered additional damages outside the contract as a result of the alleged fraud. *Compass Bank*, 922 F. Supp. 2d at 827 (citing *AKA Distrib.,* 137 F.3d at 1087).

The *Compass Bank* case, though not directly on point, is instructive, and confirms that the economic loss doctrine may bar claims of fraud in the inducement. There, the plaintiffs alleged that the defendants made certain pre-contract misrepresentations with respect to their ability to perform various obligations. *Id*. Those obligations then became part of the parties' contract. *Id*. The court held that, because the asserted misrepresentations concerned "subject matter incorporated within the four corners of the contract," plaintiffs had failed to state a claim for fraud in the inducement. *Id*.

Similarly, in this case the Baes allege that Landlord's agent made certain pre-contract misrepresentations regarding tenants that would come to the District. The Lease squarely incorporates and addressed that very same subject matter in Sections 3401 (disclaimer of Tenant's right to rely on statements regarding the "number or kind of tenants in Block 124 or the District") and 3404 (disclaiming any representation as to future tenants or occupants of the District by way of any site plan or exhibit to the Lease).

Because the Baes' alleged misrepresentations concern "subject matter incorporated within the four corners of the contract," under Missouri law the economic loss doctrine precludes

a claim for fraud in the inducement, and summary judgment should be entered in favor of KC Live on Count I of the Amended Counterclaim and Count I of the Supplemental Counterclaim.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Plaintiff and Counter-Defendant, Kansas City Live Block 124 Retail, LLC, respectfully requests that the Court grant partial summary judgment in its favor and against Defendants and Counter-Plaintiffs, Kobe Kansas, LLC, Young W. Bae, and Chan H. Bae as set forth on the accompanying proposed order.

Respectfully submitted,

*/s/ Todd M. Reinecker*
Todd M. Reinecker (Fed Bar No. 27082)
Joshua J. Gayfield (Fed Bar No. 29189)
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, Maryland 21202
410.727.6464 (t)
410.385.3700 (f)
treinecker@milesstockbridge.com
jgayfield@milesstockbridge.com

*Attorneys for Plaintiff /Counter-Defendant,*
*Kansas City Live Block 124 Retail, LLC*