IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KANSAS CITY LIVE BLOCK          :
124 RETAIL, LLC,
                                :
     Plaintiff and
     Counter-Defendant,         :
v.                                        Civil Action No. GLR-14-3236
                                :
KOBE KANSAS, LLC, et al.,
                                :
     Defendants and
     Counter-Plaintiffs.        :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant/Counter-Plaintiffs Kobe Kansas, LLC, Young W. Bae, and Chan H. Bae's (the "Baes") Motion for Partial Summary Judgment (ECF No. 67). The Motion is ripe for disposition. No hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons that follow, the Court will deny the Motion.

### I.  BACKGROUND

As discussed in previous Opinions, this action arises principally out of a dispute concerning a commercial lease (the "Lease") between the Baes and Plaintiff/Counter-Defendant Kansas City Live Block 124 Retail, LLC ("KC Live"). The Lease became effective on September 15, 2008 for a ten-year term. (Compl. Ex. 2 ["Lease"] §§ 101, 201(b), ECF No. 1-3). In September 2009, the Baes executed a personal guaranty (the "Guaranty") of their obligations under the Lease. (Second Am. Compl. ¶ 18, ECF No. 34).

Under the Lease, the Baes rented approximately 7,500 square feet of commercial space (the "Premises") in the Kansas City Power and Light District (the "District"). (Lease § 201(a)). The Baes agreed

to operate a "high end" KOBE Japanese Steakhouse restaurant in the Premises. (Id. § 201(c)). The Lease requires the Baes to pay both Minimum Rent and Additional Rent (collectively "Rent") for the Premises. (Id. §§ 201(d), 301). Additional Rent includes taxes, as well as charges for common area maintenance, promotional activities, and trash receptacles. (Id. §§ 8, 10, 11, 17). The Lease also requires the Baes to operate their restaurant during Minimum Store Hours, which the Lease defines as 11 a.m. to 10 p.m. on Sunday through Thursday, and 11 a.m. to 11 p.m on Friday and Saturday. (Id. § 201(q)).

Section 26 of the Lease governs default. Lease § 2602(vii) ("Section 2602(vii)") provides that if the Baes fail to operate their restaurant during Minimum Store Hours for more than three consecutive days, then KC Live shall be entitled to treble damages:

> If [the Baes] fail[] to conduct [their] business operations at the Premises during the Minimum Store hours for more than three (3) consecutive business days, it is agreed and understood that [KC Live] shall have been deprived of an important right under this Lease and, as a result thereof, shall suffer damages in an amount which is not readily ascertainable; therefore, in addition to, and not in lieu of, any other remedies which [KC Live] has under this Lease, at law or in equity, [KC Live] shall have the right to collect as liquidated damages (and not as a penalty) three (3) times the Rent due for each month, or portion thereof, that such discontinuance shall persist.

Lease § 2605 ("Section 2605") provides that if the Baes fail to pay Rent in accordance with the terms of the Lease, then KC Live shall be

entitled to late charges:

> If [the Baes] fail[] to pay any Rent in accordance with the provisions of this Lease when such Rent becomes due and payable as specified in [this Lease], [the Baes] shall pay to [KC Live] a late charge equal to the greater of five percent (5%) of the amount due or Two Hundred Fifty Dollars ($250.00) for each month that such Rent remains unpaid and, in addition, such unpaid Rent shall bear interest at the Lease Interest Rate. Such late charge and interest shall constitute Additional Rent hereunder immediately due and payable.

Additionally, Lease § 402 ("Section 402") obligates the Baes to pay Rent plus additional damages if the Baes do not open their restaurant on the Rent Commencement Date.[1] The additional damages are $1,833 per day until the Baes open their restaurant. (Lease § 402). The Rent Commencement Date was February 6, 2009. (See WDQ-11-2171, Compl. ¶ 7, ECF No. 1). The Baes did not open their restaurant until October 17, 2009 -- eight months after the Rent Commencement Date. (Fowler Aff. ¶ 10, ECF No. 72-1).

In August 2011, KC Live sued the Baes in this Court, alleging several breaches of the Lease and Guaranty (the "2011 Suit"). (Second Am. Compl. ¶ 22). Three months later, the parties entered into an Amendment to Lease (the "2011 Amendment") as a means of settling the 2011 Suit. (Id. ¶ 23). In the 2011 Amendment, the

---

[1] The Lease defines the Rent Commencement Date as the "next calendar day after the last day of the Fixturing Period or the date [the Baes] open[] for business, whichever is earlier." (Lease § 321). The Lease contemplates that the "Fixturing Period" is the period in which the Baes install the fixtures and equipment necessary to operate their restaurant. (See id. § 307).

parties stipulated that as of July 31, 2011, the Baes owed KC Live $2,122,430.88 under the Lease (the "Stipulated Amount Owed"). (Id. ¶ 24). The Stipulated Amount Owed comprises the following:

| Description | Amount |
|---|---|
| Rent Owed from February 16, 2009 through October 17, 2009 when the Baes were not Open for Business | $ 224,313.57 |
| Interest on Rent Owed from February 16, 2009 through October 17, 2009 | $ 7,885.20 |
| Late Charges under Lease Section 2605 on Rent Owed from February 16, 2009 through October 17, 2009 | $ 57,721.15 |
| Liquidated Damages under Lease Section 402 for the Baes' failure to open restaurant until October 17, 2009 | $ 463,749.00 |
| Late Charges under Lease Section 2605 on Liquidated Damages for Late Opening | $ 605,531.55 |
| Interest on Liquidated Damages for Late Opening[2] | $ 97,078.19 |
| Rent Owed after October 17, 2009 | $ 288,732.96 |
| Interest on Rent Owed after October 17, 2009 | $ 59,457.68 |
| Late Charges under Lease Section 2605 on Rent Owed after October 17, 2009 | $ 317,961.59 |
| Total | $ 2,122,430.89 |

(Id.). The parties also agreed that if the Baes paid $ 350,446.93 of the Stipulated Amount Owed (the "2011 Settlement Amount") and complied strictly with the Lease and the 2011 Amendment through their terms, KC Live would waive the balance of the Stipulated Amount Owed. (Id. ¶¶ 27, 28). The parties further agreed that in return for

---

[2] Section 2605 addresses late charges for failure to pay Rent. KC Live does not appear to identify the portion of the Lease that permits it to impose late charges for failure to pay liquidated damages.

4

strict compliance with the Lease and 2011 Amendment, KC Live would abate the Common Area Maintenance Costs for which the Baes would be responsible for paying for the period of November 1, 2011 through October 31, 2013.[3]  (Id. ¶ 29).

The Baes paid the 2011 Settlement Amount.  (Fowler Aff. ¶ 37). Nonetheless, KC Live initiated the instant action in October 2014, alleging breach of the Lease, Guaranty, and 2011 Amendment.  (Compl., ECF No. 1).  In its Second Amended Complaint, KC Live asserts that between November 1, 2011 and October 31, 2013, the Baes failed to pay Rent on a timely basis.  (Second Am. Compl. ¶ 36).  According to KC Live, after November 2013, the Baes ceased paying rent altogether. (Fowler Aff. ¶ 36).  KC Live also alleges that the Baes "repeatedly and continuously failed to operate [their restaurant] during the Minimum Store Hours required by the Lease."  (Id. ¶ 38).  For example, on Sundays, the Baes closed their restaurant, and on Saturdays, the Baes only opened their restaurant from 4:30 p.m. to 10:30 p.m.  (Id.).  What is more, the Baes purportedly further violated the Minimum Store Hours requirement, as well as other Lease provisions, when they totally abandoned the Premises in or before May 2016 -- long before the expiration of the Lease term.  (Fowler Aff. ¶ 36).

_____

[3] Section 1002 of the Lease discusses Common Area Maintenance

KC Live seeks $3,210,941.51, asserting that this figure represents the total amount due and owing as of February 22, 2016[4] under the Lease, Guaranty, and 2011 Amendment, exclusive of attorneys' fees and liquidated damages for failure to operate during Minimum Store Hours. (Id. ¶ 48). The $3.2 million figure comprises the unpaid balance of the Stipulated Amount Owed: $1,771,983.95. (Id. ¶ 45). The remainder includes unpaid Rent, late charges, and interest charges, as well as the Common Area Maintenance Costs that KC Live abated conditionally in the 2011 Amendment. (Id. ¶¶ 46, 47). KC Live also seeks liquidated damages under Section 2602 (vii) "in a specific amount to be determined at trial," for each month, or potion thereof, in which the Baes did not operate during Minimum Store Hours. (Id. ¶ 49).

The Court has already resolved multiple motions in this case. (See ECF No. 26) (denying KC Live's Motion to Dismiss Counterclaim); (ECF No. 57) (granting KC Live's Motion for Leave to File Second Amended Complaint, granting the Baes' Motion for Leave to File Amended Counterclaim, and denying without prejudice KC Live's Motion for Summary Judgment). On October 18, 2016, the Baes filed the present Motion for Partial Summary Judgment. (ECF No. 67). KC Live filed its opposition on December 22, 2016. (ECF No. 72). To date, the Court has no record that the Baes replied.

---

Costs.
    [4] KC Live notes that damages continue to accumulate. (See Fowler Aff. ¶ 38).

## II. DISCUSSION

### A.   Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor.  Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a), (c)(1)(A).

A "material fact" is one that might affect the outcome of a party's case.  Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)).  Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265.  A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a

reasonable jury to return a verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248.

## B. <u>Analysis</u>

The Baes argue that Sections 402, 2602(vii), and 2605 are unenforceable under Missouri law because they are penalty provisions intended to compel performance.[5]   The Court will first analyze Sections 402 and 2602(vii), and then turn to Section 2605.

### 1.  **Sections 402 and 2602(vii)**

In Missouri, "liquidated damages clauses are valid and enforceable; penalty clauses are not." <u>Grand Bissell Towers, Inc. v. Joan Gagnon Enters., Inc.</u>, 657 S.W.2d 378, 379 (Mo.Ct.App. 1983). "A penalty provision specifies a punishment for default," whereas a liquidated damages provision provides "a measure of compensation that, at the time of contracting, the parties agree will represent damages in the event of a breach." <u>City of Richmond Heights v. Waite</u>, 280 S.W.3d 770, 776 (Mo.Ct.App. 2009) (citation omitted).  To be a liquidated damages provision, a damages provision must satisfy two conditions: "(1) the amount fixed as damages is a reasonable forecast for the harm caused by the breach, and (2) the harm that is caused is of a kind that is difficult to accurately estimate." <u>DynaSteel Corp. v. Black & Veatch Corp.</u>, 698 F.Supp.2d 1170, 1179 (W.D.Mo. 2010) (citation omitted).

---

[5] The parties agree that Missouri law applies.

8

For a damages provision to satisfy the first condition, the damages "must not be unreasonably disproportionate to the amount of harm anticipated when the contract was made." Burst v. R.W. Beal & Co., 771 S.W.2d 87, 90 (Mo.Ct.App. 1989) (citing Grand Bissell Towers, Inc. v. Joan Gagnon Enters, Inc., 657 S.W.2d 378, 379 (Mo.Ct.App. 1983)). The amount of damages fixed "is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss." Star Dev. Corp. v. Urgent Care Assocs., Inc., 429 S.W.3d 487, 493 (Mo.Ct.App. 2014) (quoting Paragon Grp., Inc. v. Ampleman, 878 S.W.2d 878, 881 (Mo.Ct.App. 1994)) (internal quotation marks omitted). Also, "[t]he more difficult it is to forecast the amount of damages, the less proof there need be to show that the liquidated amount is a reasonable estimate of actual damages." Id. (citation and internal quotation marks omitted).

Because the Baes challenge only the first condition, the Court will focus its analysis there. The Court observes that the Baes do not cite to any portions of the record to attempt to show that the damages that Sections 402 and 2602(vii) contemplate are unreasonably disproportionate to the amount of harm anticipated when the parties executed the Lease.[6] Instead, the Baes rely exclusively on a sole

---

[6] In their brief, the only portion of the record to which the Baes refer is a snippet from the deposition of KC Live's corporate designee, Robert Fowler. Fowler testifies that KC Live enforces damages provisions on a case-by-case basis. (See Fowler Dep., Sept. 26, 2016, 34:14–35:2, ECF No. 67-3). The Baes use this testimony to

case from the Missouri Court of Appeals: <u>Kansas City Live Block 139</u>
<u>Retail, LLC v. Fran's K.C. Ltd</u>, 504 S.W.3d 725 (Mo.Ct.App. 2016).

In <u>Fran's</u>, KC Live sued another District tenant for breach of
its lease agreement. 504 S.W.3d at 729. Following a bench trial,
the trial court awarded liquidated damages under a lease provision
that mirrors the language of Section 2602(vii).[7] <u>See id.</u> On appeal,
the tenants challenged the award of liquidated damages, arguing that
Section 2602(vii) is unenforceable as a matter of law. <u>Id.</u> at 731.
To be sure, the Missouri Court of Appeals concluded that Section
2602(vii) was unenforceable. <u>Id.</u> at 733. That conclusion, however,
was based on the testimony that the parties presented during the
trial. <u>See id.</u> Indeed, the court highlighted that the defendant
landlord provided "no testimony" to indicate that the treble damages
that Section 2602(vii) fixes are "in fact proportionate to the
anticipated harm." <u>Id.</u>

Here -- unlike in <u>Fran's</u> -- KC Live provides testimony that is
directly relevant to whether the liquidated damages that Section 402

---

argue that they are entitled to judgment as a matter of law that
Section 2602(vii) is a penalty provision intended to compel
performance. Yet the Baes cite no legal authority for the
proposition that as a matter of law, a damages provision is a penalty
provision whenever a contracting party enforces it on a case-by-case
basis. Thus, though it appears undisputed that KC Live enforces
damages provisions on a case-by-case basis, the Court cannot conclude
that fact is <u>material</u>. <u>See Anderson</u>, 477 U.S. at 248 (explaining that
a material fact is one "that might affect the outcome of the suit
under the governing law"). And for the Baes to be entitled to
summary judgment, they must demonstrate that there is no genuine
dispute of <u>material</u> fact. Fed.R.Civ.P. 56(a).

    [7] The Court, therefore, will also refer to the damages provision

and 2602(vii) fix are a reasonable forecast of the harm KC Live would suffer as a result of the Baes' purported breaches of the Lease.  KC Live presents a detailed affidavit from Robert Fowler, who is "responsible for leasing matters for KC Live."  (Fowler Aff. ¶ 3).

Fowler explains that within the District, the financial success of the tenants' businesses is interrelated -- "[o]ne tenant's decision to open-late, close early or not open at all affects the financial success of all other tenants."  (Id. ¶ 22).  Indeed, when one tenant -- like the Baes -- violates the obligations of its lease with KC Live, "whether that's by opening late, not being open during the day when it's supposed to be . . . , or closing altogether, that has an undeniably detrimental impact on the tenant's gross sales and the gross sales of other tenants in the shopping center."  (Id.).  This detrimental financial impact ultimately affects KC Live because many of the commercial leases in the District contain "percentage rent provisions."  (Id. ¶ 21).  Under these provisions, "[i]f a tenant achieves a certain amount of gross sales in a given year, they will pay a percentage of the gross sales to the landlord."  (Id. ¶ 20).

Fowler further explains that when a tenant elects to abandon a leased property before the end of the lease term and without notice to KC Live -- just as the Baes purportedly did here -- it also has a negative financial impact on KC Live for at least two reasons.

---

in Fran's as "Section 2602(vii)."

First, "[i]t is much more difficult to lease space in a shopping center that is unoccupied or vacant." (Id. ¶ 23). Second, "if [KC Live] is successful in re-leasing the space it is reasonably likely that [KC Live] will receive a lesser amount of rent than it could have obtained if the shopping center were fully occupied." (Id.).

Having reviewed Fowler's testimony, the Court must now determine whether based on this testimony, a reasonable jury could find that the liquidated damages that Section 402 and 2602(vii) fix are a reasonable forecast of the harm KC Live would suffer as a result of the Baes' purported breaches of the Lease. In making this determination, the Court finds another case in this Court to be instructive: Bistro of Kansas City, LLC v. Kansas City Live Block 125 Retail, LLC, No. ELH-10-2726 (D.Md. judgment entered Nov. 26, 2013).

In Bistro, KC Live sued another District tenant, Bistro of Kansas City, MO., LLC ("Bistro"), for breach of the parties' lease agreement. Following a bench trial, this Court issued a Memorandum of Decision in which it set forth its findings of fact and conclusions of law. Bistro of Kansas City, LLC v. Kansas City Live Block 125 Retail, LLC, No. ELH-10-2726, 2013 WL 4431292 (D.Md. Aug. 16, 2013). Bistro argued that two damages provisions -- which were also numbered sections 402 and 2602(vii) and contained language nearly identical to Sections 402 and 2602(vii) -- were unenforceable penalty clauses. Id. at *35. The first provision that Bistro challenged mirrors Section 402, except that it sets damages at $500

per day, as opposed to $1,833 per day.  Id. at *17.[8]  The second

provision mirrors the language of Section 2602(vii), except that it

provides for double, as compared to treble, damages.[9]  Id. at *33.

During trial, there was testimony that within the District, each

tenant's business is influenced by its neighbors' businesses.  Id. at

*37.  A Bistro representative testified that the lack of retail and a

delay in the opening of theaters impacted Bistro's restaurant

business.  Id.  There was also testimony that after Bistro left the

commercial space it had leased in the District, KC Live relet the

space for less rent than Bistro had agreed to pay.  Id.  This Court

concluded that based on this testimony, Bistro Sections 402 and

2602(vii) were enforceable as a matter of law.  Id.

Here, likewise, Fowler states in his affidavit that the

financial success of the tenants' business is interrelated and that

if and when KC Live relets the commercial space that the Baes

occupied, it is reasonably likely that KC Live will receive a lesser

amount of rent than the Baes were paying.  (Fowler Aff. ¶¶ 22, 23).

Considering the similarity between the testimony in Bistro and the

testimony that Fowler provides in his affidavit, the Court concludes

that KC Live generates a genuine dispute regarding whether the

damages that Sections 402 and 2602(vii) fix are reasonably

_____

    [8] The Court will refer to this provision as "Bistro Section
402."
    [9] The Court will refer to this provision as "Bistro Section
2602(vii)."

proportionate to the amount of harm the parties anticipated when they executed the Lease.

Although Sections 402 and 2602(vii) fix liquidated damages that are greater than those in Bistro, the Court finds it significant that the parties agreed to both provisions. As this Court explained in Bistro, in Missouri, "courts look with candor on provisions deliberately entered into between parties, and do not look with disfavor upon liquidated damage stipulations." 2013 WL 4431292, at *36 (quoting Germany v. Nelson, 677 S.W.2d 386, 388 (Mo.Ct.App. 1984)) (internal quotation marks omitted). The Court underscores, furthermore, that it is undisputed that the Baes "are sophisticated business owners, with multiple decades of experience owning, opening, and operating restaurants," (Fowler Aff. ¶ 5), and they were "represented by legal counsel" and "freely negotiated and agreed to" the Lease and the 2011 Amendment, (id. ¶ 6). See DynaSteel, 698 F.Supp.2d at 1179 (concluding that 25% markup on direct backcharge costs was a reasonable liquidated damages clause because, among other reasons, "[the plaintiff] is a sophisticated business that freely negotiated its contract with [the defendant] and agreed to the 25% markup").

Because KC Live generates a genuine dispute of material fact, the Court will deny the Baes' Motion as to Sections 402 and 2602(vii).

## 2. Section 2605

The Court must also determine whether the Baes are entitled to judgment as a matter of law that Section 2605 is an unenforceable penalty provision, as opposed to an enforceable liquidated damages provision. Again, to be an enforceable liquidated damages provision, a late charge provision must satisfy two conditions: "(1) the amount fixed as damages is a reasonable forecast for the harm caused by the breach, and (2) the harm that is caused is of a kind that is difficult to accurately estimate." Id. at 1179 (citation omitted). The Baes argue that Section 2605 does not satisfy the first condition, contending specifically that Section 2605 fixes damages "that would be excess compensation for any actual harm suffered." (ECF No. 67-1 at 8). As with their challenge to Sections 402 and 2602(vii), the Baes do not cite to any materials in the record, instead relying chiefly on Fran's.

There is no question that in Fran's, the Missouri Court of Appeals concluded that a late charge provision identical to Section 2605 was an unenforceable penalty provision. The Court, however, does not find Fran's persuasive.

The Fran's court highlighted that "KC Live failed to show that it suffered any substantial damages from Fran's default not already compensated by other contractual provisions." Fran's, 504 S.W.3d at 735. In Fran's, however, there was testimony that the lease's administrative fee, calculated as 20% of the common area maintenance

15

costs, was "a back-of-house overhead more specifically related to the amount of accounting time that is necessary to monitor and put together ledgers, deal with organization coding, etc." Id. The Fran's court concluded that based on this testimony, any "administrative fees incurred in relation to the late payments would appear to have been compensated, in whole or in part, by the 20% administrative fee." Id.

Here, to be sure, the Lease also provides for an administrative fee of 20% of Common Area Maintenance Costs. (See Lease § 1003). But the limited portions of the record that the Court has reviewed are devoid of any testimony regarding what the parties intended the 20% to cover. In the absence of such testimony, the Court cannot conclude, as the Fran's Court did, that the parties intended the 20% administrative fee to cover the expenses associated with tracking and collecting late Rent payments.

The Fran's court also found it significant that the lease authorized KC Live to recover interest on any unpaid rent and the attorneys' fees associated with actions to collect unpaid rent. See Fran's, 504 S.W.3d at 735. The court concluded that "[t]hese contractual remedies would also serve to compensate KC Live for any harms it suffered as a result of rental delinquencies." Id. Here, too, the Lease permits KC Live to collect interest and attorneys' fees. (Lease §§ 311, 2701). But in Fran's, the court's conclusion that interest and attorneys' fees would adequately compensate KC Live

for any harm arising from late rent was based on the Court's acknowledgment of the minimal harm that KC Live actually suffered. See Fran's, 504 S.W.3d at 735. The Court noted that the only testimony as to KC Live's actual harm resulting from Fran's failure to pay rent was that KC Live had to take two administrative actions: (1) "sending eight default letters;" and (2) "generating e-mails attached to a number of the letters from KC Live to [Fran's] inquiring about the status of the late payments." Id. (internal quotation marks omitted).

Here, the harm KC Live has sustained far exceeds the harm KC Live sustained in Fran's. It is undisputed that as a direct consequence of the Baes' "constant and repeated defaults," "[t]here have been numerous -- even constant -- efforts by accounting, legal leasing, and other KC Live personnel, including multiple in-person meetings, over the years." (Fowler Aff. ¶ 24). Because there is evidence of more extensive harm in this case, the Court cannot conclude, as the Fran's Court did, that KC Live fails to show that it suffered damages not already compensated by other Lease provisions.

Instead of Fran's, the Court finds Star Development, supra, another case from the Missouri Court of Appeals, to be persuasive. There, the Court considered whether a late charge provision imposing late charges of 15% of delinquent rent was an enforceable liquidated damages provisions. Star Dev., 429 S.W.3d at 491. The plaintiff tenant argued, like the Baes do here, that the late charge provision

did not satisfy the first condition of an enforceable liquidated damages provision. The plaintiff contended that the late charge provision "was punitive in its operation because it was not a reasonable forecast of the damages [the defendant] would incur upon [the plaintiff's] late remittances." Id. at 492.

The court disagreed with the plaintiff, highlighting that "[w]hen the lease was made, the parties did not know how long [the plaintiff] would be past due on any late rental payments or the extent of the administrative efforts that [the defendant's] employees would be required to expend to collect [the plaintiff's] late payments." Id. at 493. The court reasoned that "[d]epending upon those variables, [the plaintiff's] actual harm could be less than, or significantly more than, the 15% late charge." Id. The Court then concluded that "[g]iven the difficulty of estimating [the defendant's] actual harm due to these unknown variables at the time the lease was made, the 15% late charge to which [the plaintiff] expressly agreed was a reasonable forecast of damages to compensate [the defendant] for its administrative efforts." Id.

Here, not only did the Baes, like the plaintiff in Star Development, expressly agree to the terms of Section 2605, but also Section 2605 imposes late charges of 5% -- 10% less than the late charge provision that the Star Development court found enforceable. And, what is more, just like in Star Development, there is no evidence that the parties knew how long the Baes would be past due on

any late Rent payments or the extent of the administrative efforts KC Live's employees would be forced to undertake to attempt to collect the delinquent Rent payments.  In the absence of such evidence, the Court concludes that the Baes are not entitled to a judgment as a matter of law that Section 2605 is unenforceable.  The Court, therefore, will deny the Baes' Motion as to that provision.[10]

### III. CONCLUSION

For the foregoing reasons, the Court will deny the Baes' Motion for Partial Summary Judgment (ECF No. 67).  A separate Order follows. Entered this 20th day of June, 2017

/s/

_____
George L. Russell, III
United States District Judge

---

[10] Because the Court concludes that the Baes are not entitled to judgment as a matter of law that Sections 402, 2602(vii), and 2605 are unenforceable, to the extent that the Baes argue that the damages for late opening and the late charges for unpaid Rent must be eliminated from the Stipulated Amount Owed, the Court will also deny the Baes' Motion.