IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KANSAS CITY LIVE BLOCK : 
124 RETAIL, LLC, 
 : 
    Plaintiff and 
    Counter-Defendant, : 
v.                                                                           Civil Action No. GLR-14-3236
 : 
KOBE KANSAS, LLC, et al., 
 : 
    Defendants and 
    Counter-Plaintiffs. : 

## MEMORANDUM OPINION

THIS MATTER is before the Court on Plaintiff/Counter-Defendant's, Kansas City Live Block 124 Retail, LLC ("KC Live"), Motion for Partial Summary Judgment on (1) its Second Amended Complaint and (2) Count I of Defendants/Counter-Plaintiffs', Kobe Kansas, LLC, Young W. Bae, and Chan H. Bae (the "Baes"), Counterclaims. (ECF No. 73). The Motion is ripe for disposition. No hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons that follow, the Court will grant in part and deny in part the Motion.

### I.    BACKGROUND[1]

This case involves a dispute over a commercial lease between the Baes and KC Live and alleged misrepresentations KC Live's representatives made to induce them to lease space in a KC Live-owned mixed-use development. The Lease,[2] executed on September 24, 2009, became

---

[1] The Court provided additional factual background in its October 16, 2015 and June 20, 2017 Memorandum Opinions (ECF Nos. 26, 82). The Court repeats only facts relevant to the pending Motion.

[2] Capitalized terms retain their definitions from previous Opinions.

effective for a ten-year term on September 15, 2008. (Second Am. Compl. Ex. 1 [the "Lease"] §§ 101, 201(b), ECF No. 34-1). In September 2009, the Baes executed a personal guaranty of their obligations under the Lease. (Second Am. Compl. ¶ 18, ECF No. 34).

Before signing the Lease, on December 3, 2008, KC Live sent the Baes a Notice of Possession, which triggered the Fixturing Period—a 150-day period during which the Baes were to install equipment and fixtures necessary to operate their restaurant. (See Lease § 307). Under the Lease, parties subsequently agreed that the Fixturing Period began on December 9, 2008. (Id. Explanatory Statement). The Rent Commencement date was February 6, 2009.[3] (Fowler Aff. 10, ECF No. 72-1; see also Kansas City Live Block 124 Retail, LLC v. Kobe Kansas, LLC, et al., WDQ-11-2171, Compl. ¶ 7, ECF No. 1). The Baes opened their restaurant on October 17, 2009—eight months after the Rent Commencement Date. (Fowler Aff. ¶ 10). After the Baes opened their restaurant, they failed to pay Rent. (See Second Am. Compl. Ex. 2, ECF No. 34-2; see also Kansas City Live, WDQ-11-2171, Compl. ¶ 8, ECF No. 1).

In August 2011, KC Live sued the Baes in this Court, alleging various breaches of the Lease and Guaranty. (Second Am. Compl. ¶ 22). In November 2011, without the Baes answering KC Live's Complaint, the parties executed an Amendment to the Lease to settle the 2011 Suit. (Id. ¶ 23). In the 2011 Amendment, the parties stipulated that as of July 31, 2011, the Baes owed KC Live $2,122,430.88 under the Lease. (Id. ¶ 24). The Stipulated Amount

---

[3] The Lease defines the Rent Commencement Date as the "next calendar day after the last day of the Fixturing Period or the date [the Baes] open[] for business, whichever is earlier." (Lease § 321).

Owed included liquidated damages under Section 402 of the Lease for the late opening of the Baes' restaurant and late charges on the liquidated damages under Section 2605 of the Lease. (Id.). The parties also agreed that if the Baes paid $350,446.93 of the Stipulated Amount Owed and complied strictly with the Lease and the 2011 Amendment through the end of their terms, KC Live would waive the balance of the Stipulated Amount Owed. (Id. ¶¶ 27, 28). The Baes paid the $350,446.93 to settle the 2011 Suit. (Fowler Aff. ¶ 37).

In October 2014, KC Live brought the current action against the Baes for breaches of the Lease, Guaranty, and 2011 Amendment. (Compl., ECF No. 1). According to KC Live, after the parties settled the 2011 Suit, the Baes failed to pay Rent on time between November 1, 2011 and October 31, 2013, and after November 2013, stopped paying Rent entirely. (Second Am. Compl. ¶ 36; Fowler Aff. ¶ 36).

On January 9, 2015, KC Live filed an Amended Complaint, (ECF No. 11), to which the Baes filed an Answer and Counterclaim for fraudulent inducement, (ECF No. 17). On February 16, 2016, KC Live filed a Second Amended Complaint, which added allegations that the Baes failed to operate their restaurant during Minimum Store Hours required under the Lease. (Second Am. Compl. ¶¶ 10, 17, 38). On June 29, 2016, the Baes filed an Answer and Amended Counterclaim. (ECF No. 58). That same day, the Baes filed a Supplemental Counterclaim, adding a declaratory judgment count. (ECF No. 60). In their Supplemental Counterclaim, the Baes allege that KC Live wrongfully retook the Premises on May 11, 2016. (Suppl. Countercl. ¶ 154, ECF No. 60).

According to the Baes' Amended Counterclaim, prior to executing the Lease, representatives associated with KC Live made representations that the District, as a whole, was going to be filled with businesses. (Am. Countercl. ¶¶ 19, 21, 29–30, ECF No. 58). In early September 2005, Michael Morris, the Director of Leasing and Development for KC Live's parent company, told the Baes that many nationally-operated businesses were starting to fill available lots in the District. (Id. ¶ 21). Specifically, Mr. Morris stated that P.F. Chang's and The Cheesecake Factory had "already leased" space in the District. (Id. ¶ 22). At some unspecified time before execution of the Lease, Mr. Morris told the Baes that condominiums would be built above the Baes' restaurant. (Id. ¶ 25). Mr. Morris further represented that "given its location, the other major tenants already committed to the District, and the housing that would be built above the [P]remises, the Baes could easily achieve $3,000,000.00 per year" with their restaurant. (Id. ¶ 26). In January 2007, KC Live's parent company issued a press release in which Blake Cordish, Vice President of KC Live's parent company, stated that they had "commitments" for 85% of the space in the District. (Id. ¶ 30; see also Am. Countercl. Ex. 3, ECF No. 17-3).

The Court has already resolved multiple motions in this case. (See ECF No. 26) (denying KC Live's Motion to Dismiss Counterclaim); (ECF No. 57) (granting KC Live's Motion for Leave to File Second Amended Complaint, granting the Baes' Motion for Leave to File Amended Counterclaim, and denying without prejudice KC Live's Motion for Summary Judgment); (ECF No. 82) (denying the Baes' Motion for Partial Summary Judgment). On

4

February 3, 2017, KC Live filed the pending Motion for Partial Summary Judgment. (ECF No. 73). The Baes filed their Opposition on March 10, 2017. (ECF No. 76). KC Live filed its Reply on April 24, 2017. (ECF No. 81).

## II. DISCUSSION

### A. Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d

at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**B.    Analysis**

KC Live argues that the Baes cannot satisfy the elements of their fraudulent inducement claim with sufficient evidence. KC Live also contends that no dispute exists over whether the Baes breached the Lease, Guaranty, and 2011 Amendment; only portions of the damages amount are disputed. KC Live therefore asserts that it is entitled to summary judgment on the Baes' fraudulent inducement claim and partial summary judgment on its breach of contract claim. The Court addresses KC Live's arguments in turn.

### 1.    Fraudulent Inducement Counterclaim

Under Missouri law,[4] a claim for fraudulent inducement requires:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that it be acted on by the hearer in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation

---

[4] The Court previously determined that the substantive law of Missouri applies to this action. (Oct. 16, 2015 Mem. Op. at 9 n.2, ECF No. 26).

6

being true; (8) the hearer's right to rely on the representation; and (9) the hearer's consequent and proximate injury.

See Joel Bianco Kawasaki Plus v. Meramec Valley Bank, 81 S.W.3d 528, 536 (Mo. 2002).

When considering a fraud claim on a motion for summary judgment, "conclusive evidence is . . . not necessary." Colgan v. Wash. Realty Co., 879 S.W.2d 686, 690 (Mo.Ct.App. 1994) (citations omitted). Fraud "may be proven in its entirety by circumstantial evidence." Id. (quoting Bayer v. Am. Mut. Cas. Co., 359 S.W.2d 748, 752 (Mo. 1962)). Still, the burden of proving fraud "rests upon him who asserts it" because fraud is not presumed. Id. (citations and internal quotation marks omitted). While it may be difficult to determine every element, "fraud must still be proven." Scott v. Car City Motor Co., 847 S.W.2d 861, 867 (Mo.Ct.App. 1992) (citations omitted). If a party cannot provide proof of all the elements of fraud, the court may grant summary judgment. Colgan, 879 S.W.2d at 689 (citation omitted).

KC Live contends that the Baes cannot put forth sufficient evidence to satisfy elements two, four, and eight of their fraudulent inducement claim for the following alleged misrepresentations: (1) Mr. Morris represented to the Baes in late 2005 that "most of the available premises in the District were already leased to well-known, nationally-operated franchises," including specifically P.F. Chang's and The Cheesecake Factory; and (2) Mr. Cordish stated "in 2007 that there were commitments of 85% of the lease space in the [D]istrict." (Pl./Counter-Def.'s Mem. in Supp. of Mot. for Partial Summ. J. ["Pl.'s Mem."] at 2–3, ECF No. 73-1). The Court agrees with KC Live as to the fourth element.

7

To sustain, on a summary judgment motion, the fourth element of a fraudulent inducement claim—the speaker's knowledge of a representation's falsity—the question is whether "[r]easonable minds could believe," from facts "in the record, that a speaker either: (1) knew that the statement was untrue at the time of its utterance; or (2) made the statement without knowledge of its truth or falsity. Colgan, 879 S.W.2d at 690; Scott, 847 S.W.2d at 865. While reasonable inferences, drawn from the facts, about the speaker's knowledge are sufficient to create a dispute of material fact, "equal inferences" that "the evidence is as consistent with honesty as with fraud" are insufficient. Scott, 847 S.W.2d at 866, 865.

Colgan illustrates the kind of evidence that can establish a genuine dispute of material fact concerning a speaker's knowledge of falsity. There, buyers of a house whose garage roof collapsed due to a water leak sued the sellers alleging that they knew of the leak before selling the house and intentionally misrepresented that there were no water leakage problems. The buyers submitted affidavits establishing that the sellers affirmatively stated that the home had no water leakage problems. The buyers submitted additional affidavits from a home improvement worker hired by sellers before the sale who stated that the sellers told him they hired him to perform work to "stop the water leakage in the garage" and one of the home's previous owners who stated that he had experienced and tried to repair water leakage problems. Colgan, 879 S.W.2d at 690. The court concluded that this evidence was sufficient to create a genuine dispute of material fact as to whether the sellers had knowledge of the water leak. Id. at 691.

8

Here, the Baes fail to demonstrate a genuine dispute of material fact concerning whether the KC Live representatives knew the statements at issue were false.[5] As to Mr. Morris's statement about well-known national franchises having "already leased" space in the District, the Baes argument focuses specifically on the franchises P.F. Chang's and The Cheesecake Factory. The Baes argue that because P.F. Chang's and The Cheesecake Factory were never tenants in the District, the Court can draw the inference that Mr. Morris knew that these franchises had never signed leases when he made the statement. To support their argument, the Baes point to Mr. Morris's and Mr. Cordish's deposition testimony in which each of them testify that neither P.F. Chang's nor The Cheesecake Factory became tenants in the District. (Morris Dep. 70:6-17, ECF No. 76-12; Cordish Dep. 28:9-14, ECF No. 76-3).

But where "the evidence is as consistent with honesty as with fraud," the Court may not infer knowledge of falsity. Scott, 847 S.W.2d at 865. The Court may not treat "equal inferences" as sufficient evidence to survive summary judgment. Id. at 866.

the failure of P.F. Chang's and The Cheesecake Factory to ultimately occupy the District does not necessarily mean that Mr. Morris knew that these franchises had not signed leases with

---

[5] The Baes question this Court's previous ruling dismissing Mr. Morris's statement that residential condominiums would be built above the restaurant as predictions for the future. (Defs./Counter-Pls.' Opp'n Counter-Def.'s Mot. Partial Summ. J. ["Defs.' Opp'n"] at 3 n.1, 21, ECF No. 76; see also Oct. 16, 2015 Mem. Op. at 10). Although the Baes amended their Counterclaim subsequent to this Court's ruling, the factual allegations surrounding Mr. Morris's statement in the Baes' Amended Counterclaim remain the same. (Compare Countercl. ¶ 25, with Am. Countercl. ¶ 25). Therefore, for the reasons stated in this Court's October 16, 2015 Memorandum Opinion, the Court concludes that Mr. Morris's statement regarding condominiums is not actionable.

KC Live when he made the statement. Indeed, it is possible that P.F. Chang's and The Cheesecake Factory leased premises at the District only to back out at a later date, or they could have signed memorandums of understanding with no firm commitment to lease. Unlike Colgan, the Baes do not point to any evidence that directly contradicts Mr. Morris's statement. And the Baes fail to put forth any other evidence that Mr. Morris knew his statement was false at the time he made it. Thus, Mr. Morris's statements that KC Live had "already leased" space to national chains, including P.F. Chang's and the Cheesecake Factory, and the subsequent failure to secure those specific businesses, does not entitle the Baes to an inference that Mr. Morris knew his statements was false.

The Baes argument regarding Mr. Morris's general statement that well-known national chains had leases in the District is similarly bereft of evidence from which a reasonable jury could conclude that Mr. Morris knew his statement was false. In fact, KC Live points to Mr. Bae's deposition testimony in which he stated that "[q]uite a few" national chains had come in to the District. (Young Bae Dep. 76:14-77:2, ECF No. 73-8). The Baes do not direct the Court to any evidence that generates a dispute regarding this fact. Because Mr. Baes' statement establishes that national chains indeed leased space in the District, it would not be reasonable to infer that Mr. Morris knew the statement was false. See Scott, 847 S.W.2d at 866. Thus, the Baes fail to create a genuine dispute of material fact over whether Mr. Morris knew his representations were false.

As to Mr. Cordish's statement, the Baes direct the Court to a newspaper article from April 23, 2012, which states that the District "is now 85% occupied, according to Cordish." (Am. Countercl. Ex. 10, ECF No. 58-10). Notably, the Baes do not dispute that the District had an 85% occupancy rate in April 2012. Instead, the Baes contend that because Mr. Cordish's 2007 statement that 85% of the District had "commitments" was not reflected in the District immediately after the Baes' restaurant opened in 2009, they are entitled to the inference that Mr. Cordish knew his 2007 statement was not true.

The Court concludes that an inference that Mr. Cordish knew his 2007 statement was false based on a five-and-a-half-year delay in the District achieving an 85% occupancy rate is not justified. See Ricci, 557 U.S. at 586; Anderson, 477 U.S. at 255 (citing Adickes, 398 U.S. at 158–59) (The court draws "justifiable inferences" in favor of the nonmoving party.). Given the size and complexity of the District, there could be several years' delay between when tenants committed to the District and when they actually occupied it. The facts in this case illustrate this very point. The Baes entered into the initial lease with KC Live in October 2006, but the Baes did not open their restaurant until October 2009—a full three years later. Thus, the Baes have not created a genuine dispute of material fact as to whether Mr. Cordish knew his 2007 statement was false.

Because the Baes fail to put forth proof of element four of their fraudulent inducement claim—knowledge of falsity—the Court concludes that KC Live is entitled to judgment as a

11

matter of law as to the two representations at issue.[6]  Accordingly, the Court will grant KC Live's Motion for Summary Judgment.

2.     **Breach of Contract Claim**

Under Missouri law, a breach of contract claim requires establishing the following elements: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." Keveney v. Missouri Military Acad., 304 S.W.3d 98, 104 (Mo. 2010).

KC Live argues that it is entitled to partial summary judgment on its breach of contract claim because the Baes neither contest that the Lease, Guaranty, or 2011 Amendment are binding and enforceable, nor do the Baes contest that they are in breach.  KC Live seeks $3,481,728.25, asserting that this figure represents the total amount due and owing as of February 3, 2017[7] under the Lease, Guaranty, and 2011 Amendment, exclusive of attorneys' fees, liquidated damages for failure to operate during Minimum Store Hours, and Rent and

---

[6] The Court observes that KC Live does not make any arguments regarding Mr. Morris's alleged misrepresentation that "given its location, the other major tenants already committed to the District, and the housing that would be built above the [P]remises, the Baes could easily achieve $3,000,000.00 per year" with their restaurant. (Am. Countercl. ¶ 26).  Therefore, the Court does not address this statement.

[7] In its Second Amended Complaint, KC Live seeks $3,210,941.51, which it contends represents the total amount due and owing as of February 22, 2016. (Second Am. Compl. ¶ 48).

12

liquidated damages for the period of May 11, 2016[8] through February 4, 2019, the end of the Lease term. (Wainger Aff. ¶ 5, ECF No. 73-3; Wainger Aff. Exs. A & B, ECF Nos. 73-4, 73-5; Suppl. Countercl. ¶ 154). The $3.48 million figure is comprised of the following: (1) $1,771,983.95 of the remaining Stipulated Amount Owed; (2) $289,434.73 in unpaid Rent, late fees, and interest from August 1, 2011 through October 31, 2013; and (3) $1,420,309.57 in unpaid Rent, late fees, and interest from November 1, 2013 through May 11, 2016.[9] (Wainger Aff. ¶ 5; Wainger Aff. Exs. A & B)

The Baes counter that there is a dispute of material fact over the amount of damages, thus precluding the entry of summary judgment KC Live's favor. Specifically, the Baes contend that their restaurant did not open late under the terms of the Lease, and therefore they do not owe $1,456,278.66 of the Stipulated Amount Owed in the 2011 Amendment. The Baes further

---

[8] The Baes dispute the date that KC Live retook possession of the Premises—the Baes assert that it was May 11, 2016, while KC Live contends that it was May 13, 2016. The Baes contend, therefore, that the amount of damages should be reduced accordingly. In its Reply, KC Live offers to "submit a revised statement calculating damages through May 11, 2016 instead of May 13, 2016" upon this Court's entry of judgment. (Pl./Counter-Def.'s Reply at 4 n.2, ECF No. 81). Because of KC Live's offer to submit a revised statement, the Court considers the date KC Live retook possession—May 11, 2016—undisputed.

[9] The Court notes that KC Live intends to seek at trial Rent and liquidated damages for the period of May 13, 2016 through February 2019 (the end of the Lease term), liquidated damages for the Baes' abandonment of the Premises and purported failure to operate their restaurant according to Minimum Store Hours, and attorneys' fees. (Pl.'s Mem. at 2, 2 n.1).

contend that because the late fees provision, Section 2605, is unenforceable as a matter of law, the Court must remove the late fees from KC Live's damages calculations.[10]

Because the Baes only dispute KC Live's damages calculation, the Court's analysis will focus on that element. The Baes challenge the Stipulated Amount Owed and the assessment of late fees. The Court addresses these two parts of KC Live's damages calculation.

### i. Stipulated Amount Owed

As to the Stipulated Amount Owed, the Baes argue KC Live had not completed all of the Landlord's Work under the Lease before KC Live sent the Baes a Notice of Possession on September 3, 2008. In support of their argument, the Baes point to a December 1, 2008 Proposal requesting: (1) an upgrade of the electrical service to 400V; (2) a rooftop HVAC unit; (3) gas and grease waste lines for the Premises; and (4) an "egress study" between the Premises and adjacent spaces. (Defs.' Opp'n Ex. 9, ECF No. 76-9). The Baes also point to a December 10, 2008 email between Nick Benjamin, an agent of KC Live, and Mr. Cordish stating that "the only additional element of work that needs to be done for the Kobe space is the installation of an additional 25-ton HVAC unit." (Defs.' Opp'n Ex. 10, ECF No. 76-10). The Baes argue that these documents establish that KC Live had not substantially completed the required Landlord's

---

[10] The Baes also argue that KC Live's damages calculation does not apply the Baes' security deposit. KC Live notes that under Section 1201, in the event of the Baes' default, KC Live "may, at its option, apply any [of the security deposit] to cure such default," (Lease § 1201), and therefore KC Live can elect to apply the security deposit—or it can elect not to. Because the Baes do not challenge KC Live's assertion, the Court concludes that it is undisputed.

Work under the Lease until sometime after December 10, 2008, and therefore the Fixturing Period, triggered by the Notice of Possession from KC Live, should not have started until after that date. As a result, the Rent Commencement Date would be later. The Baes contend that because the Landlord's Work was incomplete, they could not have knowingly waived their right to challenge the Stipulated Amount Owed.[11]

KC Live counters that the Baes waived their right to challenge the late opening date when they expressly agreed in the Lease that "the date of Notice of Possession for the Premises is September 9, 2008, and the Tenant's Fixturing Period began on September 9, 2008. . . . [T]he delays in the Tenant's opening are completely Tenant's responsibility." (Pl./Counter-Def.'s Mot. Partial Summ. J. ["Pl.'s Mot."] Ex. 5 at 1, ECF No. 73-10). KC Live also points a term in the 2011 Amendment which states that KC Live "has fully complied with its obligations under this Lease and that [the Baes] have no basis to assert any claim of breach by Landlord of its obligations under the Lease or otherwise." (Pl.'s Mot. Ex. 7, ¶ 8, ECF No. 73-12). The 2011 Amendment also states: "The amounts due under the Lease from Tenant as of the date of [the 2011 Amendment] are set forth in [the Stipulated Amount Owed], and the parties including the Guarantors waive any right to challenge any of said sums." (Id. ¶ 2).

---

[11] In their Opposition, the Baes argue in passing that their liability under the Guaranty should be limited to 24 months. (Defs.' Opp'n at 12 n.4). Because KC Live does not challenge the limitation of the Baes' personal liability to 24 months, the Court concludes that this fact is undisputed.

15

Waiver is "the intentional or voluntary relinquishment of a known right." Walker v. Rogers, 182 S.W.3d 761, 766 (Mo.Ct.App. 2006). "[T]he doctrine of waiver is not applicable unless the waiver has been made with full knowledge of the rights claimed to have been waived." Miller v. Rosebud Bank, 116 S.W.2d 267, 272 (Mo.Ct.App. 1938). Here, the Baes entered into the 2011 Amendment—including agreeing to pay the Stipulated Amount Owed—in exchange for KC Live's dismissal of its 2011 Suit. By the express terms of the 2011 Amendment the Baes "waive[d] any right to challenge" the Stipulated Amount Owed. The right at issue here is the Baes ability to challenge the Stipulated Amount Owed, and the Baes put forth no evidence that they did not have full knowledge that they were waiving this right. There is no dispute that the Baes contracted to settle the 2011 Suit through the 2011 Amendment. In exchange for the Baes' partial payment of the Stipulated Amount Owed and strict compliance with the Lease and the 2011 Amendment, KC Live agreed to dismiss the 2011 Suit. In reaching this conclusion, the Court emphasizes its previous conclusion that "the Baes are sophisticated business owners, with multiple decades of experience owning, opening, and operating restaurants, and they were represented by legal counsel and freely negotiated and agreed to the Lease and the 2011 Amendment." (June 20, 2017 Mem. Op. at 14, ECF No. 82). Thus, the Court concludes that the Baes have not produced enough evidence to create a genuine dispute of material fact about whether they waived their right to challenge the Stipulated Amount Owed.

Even assuming that the Baes waiver of their right to contest the Stipulated Amount Owed was not knowing and intelligent, the Court concludes that the items of the Landlord's Work that

16

were not completed were so open and obvious that the Baes should have known about KC Live's alleged failures. Indeed, one of the items was a "metered gas line with shut-off valve within five feet (5') of the [P]remises <u>at a location specified by the Tenant</u>." (Lease Ex. C) (emphasis added). Because the Baes determined the location of the gas line, the Baes could have easily verified whether KC Live had installed it. Yet the Baes accepted possession of the Premises and did not dispute KC Live's completion of the gas line installation. Similarly, the Lease required KC Live to "provide access to all adjacent and remote spaces as required for the completion of [the Baes] build out." (<u>Id.</u>). The Court concludes that whether this task was complete would have been when the Baes took possession of the Premises. Simply moving from space to space to determine whether the Baes indeed had access to these spaces would have made it readily apparent that KC Live had not completed this task. No reasonable juror could conclude otherwise. In short, the Baes cannot now attempt to create a dispute of material fact regarding whether KC Live substantially completed the Landlord's Work. As experienced restauranteurs, when the Baes took possession of the Premises, they knew or should have known that the Landlord's Work had not been completed.

The Court therefore concludes that KC Live is entitled to judgment as a matter of law as to the 2011 Amendment's Stipulated Amount Owed.[12]

---

[12] The Baes also contend that the unpaid balance of the Stipulated Amount Owed must be reduced to eliminate the unenforceable liquidated damages and late fees provided under Sections 402 and 2605 of the Lease. Because the Court concludes that the Baes waived their right to challenge the Stipulated Amount Owed, consequently, they waived their right to challenge the late fees and liquidated damages included in the Stipulated Amount Owed.

### ii. Late Fees

As to the late fees, the Baes argue that they should be eliminated from KC Live's calculation of damages due from August 1, 2011 through October 31, 2013 and from November 1, 2013 through May 11, 2013 because Section 2605, the Lease's late fee provision, is unenforceable as a matter of law. The Court notes that neither party challenges this Court's previous ruling that a genuine dispute of material fact exists regarding whether Section 2605 is enforceable as a matter of law.[13] (June 20, 2017 Mem. Op. at 19). Accordingly, the Court concludes that KC Live is not entitled to judgment as a matter of law on the damages owed from August 1, 2011 through October 31, 2013 and from November 1, 2013 through May 11, 2013.

## III. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part KC Live's Motion for Partial Summary Judgment (ECF No. 73). The Court will grant the Motion as to Count I of the Baes' Counterclaims to the extent that it is premised on Mr. Morris's statements regarding well-known, nationally-operated franchises and Mr. Cordish's statement regarding 85% commitments in the District. The Court will also grant KC Live's Motion on its Second Amended Complaint as to the Stipulated Amount Owed from the 2011 Amendment but will

---

[13] On October 18, 2016, the Baes filed a Motion for Partial Summary Judgment, arguing that Sections 402, 2602(ii), and 2605 of the Lease—late fee and liquidated damages provisions—were unenforceable as a matter of law. (ECF No. 67). In a June 20, 2017 Memorandum Opinion, this Court denied the Baes' Motion because the Court concluded that there was a genuine dispute of material fact as to the enforceability of Sections 402, 2602(ii), and 2605. (June 20, 2017 Mem. Op. at 19).

deny the Motion as to the damages owed from August 1, 2011 through October 31, 2013 and from November 1, 2013 through May 11, 2013.  A separate Order follows.

Entered this 26th day of September, 2017.

/s/
_____
George L. Russell, III
United States District Judge